# Addendum A

## Table of Contents for Addendum A

| Name | Date | Page # |
|---|---|---|
| 35 USC 123 | 01/03/24 | AA001 |
| Public Law 118-151 [Amendment to 35 USC 123(f)] | 12/17/24 | AA003 |
| 35 USC 111 | 01/03/24 | AA004 |
| 35 USC 116 | 01/03/24 | AA007 |
| 44 USC 3512 | 01/03/24 | AA009 |
| 5 USC 552a | 01/06/25 | AA011 |
| ECF Notice of Electronic Filing of Doc 32 | 08/01/25 | AA026 |
| ECF Notice of Electronic Filing of Doc 33 | 08/01/25 | AA028 |
| USPTO Annual Reports [on https://www.uspto.gov] | 06/14/25 | AA030 |
| USPTO 2024 Agency Financial Report [pg. 6] | 11/08/24 | AA031 |
| United States District Court, Eastern District of Texas, Pro Se Forms [on https://txed.uscourts.gov] | 2025 | AA032 |
| Form: General Complaint, United States District Court, Eastern District of Texas | 2025 | AA033 |
| Rule 301. Presumptions in Civil Cases Generally in Federal Rules of Evidence | 12/01/19 | AA038 |
| Statement by Director Squires before the United States Senate Subcommittee on Intellectual Property Committee on the Judiciary | 10/10/25 | AA040 |
| Bibliographic Data - Application - Patent Center – USPTO for '555 | 06/10/25 | AA048 |

| | | |
|---|---|---|
| USPTO Global Dossier for '555 | 06/10/25 | AA049 |
| European Patent Office Global Dossier for '555 | 06/10/25 | AA050 |
| PRA OMB Guidance on GSA's digital.gov | 03/29/25 | AA054 |
| OMB Guidance: Information Collection under the Paperwork Reduction Act | 04/07/10 | AA055 |
| Glossary of Abbreviations | | AA063 |
| Table of Contents for Attachment to Informal Opening Brief | | AA065 |

## Editorial Notes

### AMENDMENTS

2012—Subsec. (b)(2)(B)(iii). Pub. L. 112–211 struck out '', unless it is shown to the satisfaction of the Director that the delay in submitting the notice was unintentional'' after ''regarded as abandoned''.

2011—Subsec. (b)(2)(A)(ii). Pub. L. 112–29, §20(j), struck out ''of this title'' after ''181''.

Subsec. (b)(2)(A)(iii). Pub. L. 112–29, §20(j), struck out ''of this title'' after ''111(b)''.

Subsec. (b)(2)(A)(iv). Pub. L. 112–29, §20(j), struck out ''of this title'' after ''16''.

Subsec. (d). Pub. L. 112–29, §20(j), struck out ''of this title'' after ''17''.

Subsec. (e). Pub. L. 112–29, §8(a), added subsec. (e).

1999—Pub. L. 106–113 amended section catchline and text generally. Prior to amendment, text read as follows: ''Applications for patents shall be kept in confidence by the Patent and Trademark Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commissioner.''

1975—Pub. L. 93–596 substituted ''Patent and Trademark Office'' for ''Patent Office''.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–211 effective on the date that is 1 year after Dec. 18, 2012, applicable to patents issued before, on, or after that effective date and patent applications pending on or filed after that effective date, and not effective with respect to patents in litigation commenced before that effective date, see section 203 of Pub. L. 112–211, set out as an Effective Date note under section 27 of this title.

### EFFECTIVE DATE OF 2011 AMENDMENT

Pub. L. 112–29, §8(b), Sept. 16, 2011, 125 Stat. 316, provided that: ''The amendments made by this section [amending this section] shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act [Sept. 16, 2011] and shall apply to any patent application filed before, on, or after that effective date.''

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective Nov. 29, 2000, and applicable only to applications (including international applications designating the United States) filed on or after that date, and applications published pursuant to subsec. (b) of this section resulting from an international application filed before Nov. 29, 2000 not to be effective as prior art as of the filing date of the international application, but to be effective as prior art in accordance with section 102(e) of this title in effect on Nov. 28, 2000, see section 1000(a)(9) [title IV, §4508] of Pub. L. 106–113, as amended, set out as a note under section 10 of this title.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–596 effective Jan. 2, 1975, see section 4 of Pub. L. 93–596, set out as a note under section 1111 of Title 15, Commerce and Trade.

### STUDY OF APPLICANTS FILING ONLY IN UNITED STATES

Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4502(b)], Nov. 29, 1999, 113 Stat. 1536, 1501A–562, provided that:

''(1) IN GENERAL.—The Comptroller General shall conduct a 3-year study of the applicants who file only in the United States on or after the effective date of this subtitle [see section 1000(a)(9) [title IV, §4508] of Pub. L. 106–113, set out as an Effective Date of 1999 Amendment note under section 10 of this title] and shall provide the results of such study to the Judiciary Committees of the House of Representatives and the Senate.

''(2) CONTENTS.—The study conducted under paragraph (1) shall—

''(A) consider the number of such applicants in relation to the number of applicants who file in the United States and outside of the United States;

''(B) examine how many domestic-only filers request at the time of filing not to be published;

''(C) examine how many such filers rescind that request or later choose to file abroad;

''(D) examine the status of the entity seeking an application and any correlation that may exist between such status and the publication of patent applications; and

''(E) examine the abandonment/issuance ratios and length of application pendency before patent issuance or abandonment for published versus unpublished applications.''

## § 123. Micro entity defined

(a) IN GENERAL.—For purposes of this title, the term ''micro entity'' means an applicant who makes a certification that the applicant—

(1) qualifies as a small entity, as defined in regulations issued by the Director;

(2) has not been named as an inventor on more than 4 previously filed patent applications, other than applications filed in another country, provisional applications under section 111(b), or international applications filed under the treaty defined in section 351(a) for which the basic national fee under section 41(a) was not paid;

(3) did not, in the calendar year preceding the calendar year in which the applicable fee is being paid, have a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census; and

(4) has not assigned, granted, or conveyed, and is not under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

(b) APPLICATIONS RESULTING FROM PRIOR EMPLOYMENT.—An applicant is not considered to be named on a previously filed application for purposes of subsection (a)(2) if the applicant has assigned, or is under an obligation by contract or law to assign, all ownership rights in the application as the result of the applicant's previous employment.

(c) FOREIGN CURRENCY EXCHANGE RATE.—If an applicant's or entity's gross income in the preceding calendar year is not in United States dollars, the average currency exchange rate, as reported by the Internal Revenue Service, during that calendar year shall be used to determine whether the applicant's or entity's gross income

exceeds the threshold specified in paragraphs[1] (3) or (4) of subsection (a).

(d) INSTITUTIONS OF HIGHER EDUCATION.—For purposes of this section, a micro entity shall include an applicant who certifies that—

　　(1) the applicant's employer, from which the applicant obtains the majority of the applicant's income, is an institution of higher education as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)); or

　　(2) the applicant has assigned, granted, conveyed, or is under an obligation by contract or law, to assign, grant, or convey, a license or other ownership interest in the particular applications to such an institution of higher education.

(e) DIRECTOR'S AUTHORITY.—In addition to the limits imposed by this section, the Director may, in the Director's discretion, impose income limits, annual filing limits, or other limits on who may qualify as a micro entity pursuant to this section if the Director determines that such additional limits are reasonably necessary to avoid an undue impact on other patent applicants or owners or are otherwise reasonably necessary and appropriate. At least 3 months before any limits proposed to be imposed pursuant to this subsection take effect, the Director shall inform the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate of any such proposed limits.

(f) PENALTY FOR FALSE CERTIFICATIONS.—In addition to any other penalty available under law, an entity that is found to have falsely made a certification under this section shall be subject to a fine, to be determined by the Director, the amount of which shall be not less than 3 times the amount that the entity failed to pay as a result of the false certification, whether the Director discovers the false certification before or after the date on which a patent has been issued.

(Added and amended Pub. L. 112–29, §§10(g)(1), 20(j), Sept. 16, 2011, 125 Stat. 318, 335; Pub. L. 112–274, §1(m), Jan. 14, 2013, 126 Stat. 2459; Pub. L. 117–328, div. W, §107(b)(2), Dec. 29, 2022, 136 Stat. 5522.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 61(a) of the Internal Revenue Code of 1986, referred to in subsec. (a)(3), (4), is classified to section 61(a) of Title 26, Internal Revenue Code.

#### AMENDMENTS

2022—Subsec. (f). Pub. L. 117–328 added subsec. (f).

2013—Subsec. (a). Pub. L. 112–274 inserted "of this title" after "For purposes" in introductory provisions.

2011—Subsec. (a). Pub. L. 112–29, §20(j), struck out "of this title" after "For purposes" in introductory provisions.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2013 AMENDMENT

Amendment by Pub. L. 112–274 effective Jan. 14, 2013, and applicable to proceedings commenced on or after such date, see section 1(n) of Pub. L. 112–274, set out as a note under section 5 of this title.

#### EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

#### EFFECTIVE DATE

Section effective on Sept. 16, 2011, see section 10(i)(1) of Pub. L. 112–29, set out as a Fee Setting Authority note under section 41 of this title.

## CHAPTER 12—EXAMINATION OF APPLICATION

Sec.
131.　　Examination of application.
132.　　Notice of rejection; reexamination.
133.　　Time for prosecuting application.
134.　　Appeal to the Patent Trial and Appeal Board.
135.　　Derivation proceedings.

### Editorial Notes

#### AMENDMENTS

2011—Pub. L. 112–29, §3(j)(5), Sept. 16, 2011, 125 Stat. 291, amended items 134 and 135 generally, substituting "Appeal to the Patent Trial and Appeal Board" for "Appeal to the Board of Patent Appeals and Interferences" in item 134 and "Derivation proceedings" for "Interferences" in item 135.

1984—Pub. L. 98–622, title II, §204(b)(2), Nov. 8, 1984, 98 Stat. 3388, substituted "Patent Appeals and Interferences" for "Appeals" in item 134.

### Statutory Notes and Related Subsidiaries

TRANSFER OF ACCELERATION CERTIFICATE ISSUED PURSUANT TO THE PATENTS FOR HUMANITY PROGRAM

Pub. L. 116–316, Jan. 5, 2021, 134 Stat. 5065, provided that:

"SECTION 1. SHORT TITLE.

"This Act may be cited as the 'Patents for Humanity Program Improvement Act'.

"SEC. 2. TRANSFERABILITY OF ACCELERATION CERTIFICATES.

"(a) IN GENERAL.—A holder of an acceleration certificate issued pursuant to the Patents for Humanity Program (established in the notice entitled 'Humanitarian Awards Pilot Program', published at 77 Fed. Reg. 6544 (February 8, 2012)), or any successor thereto, of the United States Patent and Trademark Office, may transfer (including by sale) the entitlement to such acceleration certificate to another person.

"(b) REQUIREMENT.—An acceleration certificate transferred under subsection (a) shall be subject to any other applicable limitations under the notice entitled 'Humanitarian Awards Pilot Program', published at 77 Fed. Reg. 6544 (February 8, 2012), or any successor thereto."

## § 131. Examination of application

The Director shall cause an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefor.

(July 19, 1952, ch. 950, 66 Stat. 801; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906.)

#### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., §36 (R.S. 4893).

---

[1] So in original. Probably should be "paragraph".

Public Law 118–151
118th Congress

## An Act

Dec. 17, 2024
[S. 3960]

To amend title 35, United States Code, to provide a good faith exception to the imposition of fines for false assertions and certifications, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. GOOD FAITH EXCEPTION TO THE IMPOSITION OF CERTAIN FINES.**

Patents and trademarks.

Title 35, United States Code, is amended—

(1) in section 41(j), by inserting ", unless the entity shows that the assertion was made in good faith," before "be subject"; and

(2) in section 123(f), by inserting ", unless the entity shows that the certification was made in good faith," before "be subject".

Approved December 17, 2024.

LEGISLATIVE HISTORY—S. 3960:

CONGRESSIONAL RECORD, Vol. 170 (2024):
    June 20, considered and passed Senate.
    Dec. 3, considered and passed House.

○

tion for patent'' in item 111 and ''Benefit of earlier filing date; right of priority'' for ''Benefit of earlier filing date in foreign country; right of priority'' in item 119.

## § 111. Application

(a) IN GENERAL.—

(1) WRITTEN APPLICATION.—An application for patent shall be made, or authorized to be made, by the inventor, except as otherwise provided in this title, in writing to the Director.

(2) CONTENTS.—Such application shall include—

(A) a specification as prescribed by section 112;

(B) a drawing as prescribed by section 113; and

(C) an oath or declaration as prescribed by section 115.

(3) FEE, OATH OR DECLARATION, AND CLAIMS.—The application shall be accompanied by the fee required by law. The fee, oath or declaration, and 1 or more claims may be submitted after the filing date of the application, within such period and under such conditions, including the payment of a surcharge, as may be prescribed by the Director. Upon failure to submit the fee, oath or declaration, and 1 or more claims within such prescribed period, the application shall be regarded as abandoned.

(4) FILING DATE.—The filing date of an application shall be the date on which a specification, with or without claims, is received in the United States Patent and Trademark Office.

(b) PROVISIONAL APPLICATION.—

(1) AUTHORIZATION.—A provisional application for patent shall be made or authorized to be made by the inventor, except as otherwise provided in this title, in writing to the Director. Such application shall include—

(A) a specification as prescribed by section 112(a); and

(B) a drawing as prescribed by section 113.

(2) CLAIM.—A claim, as required by subsections (b) through (e) of section 112, shall not be required in a provisional application.

(3) FEE.—The application shall be accompanied by the fee required by law. The fee may be submitted after the filing date of the application, within such period and under such conditions, including the payment of a surcharge, as may be prescribed by the Director. Upon failure to submit the fee within such prescribed period, the application shall be regarded as abandoned.

(4) FILING DATE.—The filing date of a provisional application shall be the date on which a specification, with or without claims, is received in the United States Patent and Trademark Office.

(5) ABANDONMENT.—Notwithstanding the absence of a claim, upon timely request and as prescribed by the Director, a provisional application may be treated as an application filed under subsection (a). Subject to section 119(e)(3), if no such request is made, the provisional application shall be regarded as abandoned 12 months after the filing date of such application and shall not be subject to revival after such 12-month period.

(6) OTHER BASIS FOR PROVISIONAL APPLICATION.—Subject to all the conditions in this subsection and section 119(e), and as prescribed by the Director, an application for patent filed under subsection (a) may be treated as a provisional application for patent.

(7) NO RIGHT OF PRIORITY OR BENEFIT OF EARLIEST FILING DATE.—A provisional application shall not be entitled to the right of priority of any other application under section 119, 365(a), or 386(a) or to the benefit of an earlier filing date in the United States under section 120, 121, 365(c), or 386(c).

(8) APPLICABLE PROVISIONS.—The provisions of this title relating to applications for patent shall apply to provisional applications for patent, except as otherwise provided, and except that provisional applications for patent shall not be subject to sections 131 and 135.

(c) PRIOR FILED APPLICATION.—Notwithstanding the provisions of subsection (a), the Director may prescribe the conditions, including the payment of a surcharge, under which a reference made upon the filing of an application under subsection (a) to a previously filed application, specifying the previously filed application by application number and the intellectual property authority or country in which the application was filed, shall constitute the specification and any drawings of the subsequent application for purposes of a filing date. A copy of the specification and any drawings of the previously filed application shall be submitted within such period and under such conditions as may be prescribed by the Director. A failure to submit the copy of the specification and any drawings of the previously filed application within the prescribed period shall result in the application being regarded as abandoned. Such application shall be treated as having never been filed, unless—

(1) the application is revived under section 27; and

(2) a copy of the specification and any drawings of the previously filed application are submitted to the Director.

(July 19, 1952, ch. 950, 66 Stat. 798; Pub. L. 97–247, § 5, Aug. 27, 1982, 96 Stat. 319; Pub. L. 103–465, title V, § 532(b)(3), Dec. 8, 1994, 108 Stat. 4986; Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, §§ 4732(a)(10)(A), 4801(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582, 1501A–588; Pub. L. 107–273, div. C, title III, § 13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, §§ 3(e)(2), 4(a)(3), (d), 20(j), Sept. 16, 2011, 125 Stat. 287, 295, 296, 335; Pub. L. 112–211, title I, § 102(3), title II, § 201(a), Dec. 18, 2012, 126 Stat. 1531, 1533.)

HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 33 (R.S. 4888, amended (1) Mar. 3, 1915, ch. 94, § 1, 38 Stat. 958; (2) May 23, 1930, ch. 312, § 2, 46 Stat. 376).

The corresponding section of existing statute is divided into an introductory section relating to the application generally (this section) and a section on the specification (sec. 112).

The parts of the application are specified and the requirement for signature is placed in this general section so as to insure that only one signature will suffice.

## Editorial Notes

### AMENDMENTS

2012—Subsec. (a)(3), (4). Pub. L. 112–211, §201(a)(1), added pars. (3) and (4) and struck out former pars. (3) and (4) which related to fee and oath or declaration and failure to submit.

Subsec. (b)(3), (4). Pub. L. 112–211, §201(a)(2), added pars. (3) and (4) and struck out former pars. (3) and (4) which related to fee and filing date of a provisional application.

Subsec. (b)(7). Pub. L. 112–211, §102(3), substituted "section 119, 365(a), or 386(a)" for "section 119 or 365(a)" and "section 120, 121, 365(c), or 386(c)" for "section 120, 121, or 365(c)".

Subsec. (c). Pub. L. 112–211, §201(a)(3), added subsec. (c).

2011—Subsec. (a)(2)(A). Pub. L. 112–29, §20(j), struck out "of this title" after "112".

Subsec. (a)(2)(B). Pub. L. 112–29, §20(j), struck out "of this title" after "113".

Subsec. (a)(2)(C). Pub. L. 112–29, §20(j), struck out "of this title" after "115".

Pub. L. 112–29, §4(a)(3)(A), substituted "or declaration" for "by the applicant".

Subsec. (a)(3). Pub. L. 112–29, §4(a)(3)(B), (C), inserted "or declaration" after "and oath" in heading and text.

Subsec. (a)(4). Pub. L. 112–29, §4(a)(3)(C), inserted "or declaration" after "and oath" in two places.

Subsec. (b)(1)(A). Pub. L. 112–29, §4(d)(1), substituted "section 112(a)" for "the first paragraph of section 112 of this title".

Subsec. (b)(1)(B). Pub. L. 112–29, §20(j), struck out "of this title" after "113".

Subsec. (b)(2). Pub. L. 112–29, §4(d)(2), substituted "subsections (b) through (e) of section 112," for "the second through fifth paragraphs of section 112,".

Subsec. (b)(5). Pub. L. 112–29, §20(j), struck out "of this title" after "119(e)(3)".

Subsec. (b)(6). Pub. L. 112–29, §20(j), struck out "of this title" after "119(e)".

Subsec. (b)(7). Pub. L. 112–29, §20(j), struck out "of this title" after "365(a)" and after "365(c)".

Subsec. (b)(8). Pub. L. 112–29, §20(j), struck out "of this title" before period at end.

Pub. L. 112–29, §3(e)(2), substituted "sections 131 and 135" for "sections 115, 131, 135, and 157".

2002—Subsecs. (a)(1), (3), (4), (b)(1), (3)(B), (C), (6). Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113, §1000(a)(9) [title IV, §4732(a)(10)(A)]. See 1999 Amendment notes below.

1999—Subsecs. (a)(1), (3), (4), (b)(1), (3)(B), (C). Pub. L. 106–113, §1000(a)(9) [title IV, §4732(a)(10)(A)], as amended by Pub. L. 107–273, substituted "Director" for "Commissioner".

Subsec. (b)(5). Pub. L. 106–113, §1000(a)(9) [title IV, §4801(a)], amended heading and text of par. (5) generally. Prior to amendment, text read as follows: "The provisional application shall be regarded as abandoned 12 months after the filing date of such application and shall not be subject to revival thereafter."

Subsec. (b)(6). Pub. L. 106–113, §1000(a)(9) [title IV, §4732(a)(10)(A)], as amended by Pub. L. 107–273, substituted "Director" for "Commissioner".

1994—Pub. L. 103–465 amended section generally. Prior to amendment, section read as follows: "Application for patent shall be made, or authorized to be made, by the inventor, except as otherwise provided in this title, in writing to the Commissioner. Such application shall include (1) a specification as prescribed by section 112 of this title; (2) a drawing as prescribed by section 113 of this title; and (3) an oath by the applicant as prescribed by section 115 of this title. The application must be accompanied by the fee required by law. The fee and oath may be submitted after the specification and any required drawing are submitted, within such period and under such conditions, including the payment of a surcharge, as may be prescribed by the Commissioner. Upon failure to submit the fee and oath within such prescribed period, the application shall be regarded as abandoned, unless it is shown to the satisfaction of the Commissioner that the delay in submitting the fee and oath was unavoidable. The filing date of an application shall be the date on which the specification and any required drawing are received in the Patent and Trademark Office."

1982—Pub. L. 97–247 inserted ", or authorized to be made," after "shall be made", struck out the colon after "shall include", struck out "signed by the applicant and" after "The application", and inserted provisions that the fee and oath may be submitted after the specification and any required drawing are submitted, within such period and under such conditions, including the payment of a surcharge, as may be prescribed by the Commissioner, that upon failure to submit the fee and oath within such prescribed period, the application shall be regarded as abandoned, unless it is shown to the satisfaction of the Commissioner that the delay in submitting the fee and oath was unavoidable, and that the filing date of an application shall be the date on which the specification and any required drawing are received in the Patent and Trademark Office.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by section 102(3) of Pub. L. 112–211 effective on the later of the date that is 1 year after Dec. 18, 2012, or the date that the Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs enters into force with respect to the United States (May 13, 2015), and applicable only to certain applications filed on and after that effective date and patents issuing thereon, see section 103 of Pub. L. 112–211, set out as a note under section 100 of this title.

Amendment by section 201(a) of Pub. L. 112–211 effective on the date that is 1 year after Dec. 18, 2012, applicable to certain patents and applications for patent, and not effective with respect to patents in litigation commenced before the effective date, see section 203 of Pub. L. 112–211, set out as an Effective Date note under section 27 of this title.

### EFFECTIVE DATE OF 2011 AMENDMENT

Pub. L. 112–29, §3(e)(3), Sept. 16, 2011, 125 Stat. 288, provided that: "The amendments made by this subsection [amending this section and repealing section 157 of this title] shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act [Sept. 16, 2011], and shall apply to any request for a statutory invention registration filed on or after that effective date."

Pub. L. 112–29, §4(e), Sept. 16, 2011, 125 Stat. 297, provided that: "The amendments made by this section [amending this section and sections 112, 115, 118, 121, and 251 of this title] shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act [Sept. 16, 2011] and shall apply to any patent application that is filed on or after that effective date."

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by section 1000(a)(9) [title IV, §4732(a)(10)(A)] of Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, §4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

Amendment by section 1000(a)(9) [title IV, §4801(a)] of Pub. L. 106–113 effective Nov. 29, 1999, and applicable to any provisional application filed on or after June 8, 1995, see section 1000(a)(9) [title IV, §4801(d)] of Pub. L. 106–113, set out as a note under section 119 of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective 6 months after Dec. 8, 1994, and applicable to all patent applications filed in the United States on or after that effective date, with provisions relating to earliest filed patent application, see section 534(b)(1), (3) of Pub. L. 103–465, set out as a note under section 154 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–247 effective six months after Aug. 27, 1982, see section 17(c) of Pub. L. 97–247, set out as an Effective Date note under section 294 of this title.

EMERGENCY RELIEF FROM POSTAL SITUATION AFFECTING PATENT, TRADEMARK, AND OTHER FEDERAL CASES

Pub. L. 92–34, June 30, 1971, 85 Stat. 87, provided that a patent or trademark application would be considered filed in the United States Patent Office on the date that it would have been received by the Patent Office except for the delay caused by emergency situation affecting postal service from Mar. 18, 1970 to Mar. 30, 1970, if a claim was made.

## § 112. Specification

(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

(b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

(c) FORM.—A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

(d) REFERENCE IN DEPENDENT FORMS.—Subject to subsection (e), a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

(e) REFERENCE IN MULTIPLE DEPENDENT FORM.—A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

(f) ELEMENT IN CLAIM FOR A COMBINATION.—An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

(July 19, 1952, ch. 950, 66 Stat. 798; Pub. L. 89–83, § 9, July 24, 1965, 79 Stat. 261; Pub. L. 94–131, § 7, Nov. 14, 1975, 89 Stat. 691; Pub. L. 112–29, § 4(c), Sept. 16, 2011, 125 Stat. 296.)

HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 33 (R.S. 4888, amended (1) Mar. 3, 1915, ch. 94, § 1, 38 Stat. 958; (2) May 23, 1930, ch. 312, § 2, 46 Stat. 376).

The sentence relating to signature of the specification is omitted in view of the general requirement for a signature in section 111.

The last sentence is omitted for inclusion in the chapter relating to plant patents.

The clause relating to machines is omitted as unnecessary and the requirement for disclosing the best mode of carrying out the invention is stated as generally applicable to all types of invention (derived from Title 35, U.S.C., 1946 ed., § 69, first defense).

The clause relating to the claim is made a separate paragraph to emphasize the distinction between the description and the claim or definition, and the language is modified.

A new paragraph relating to functional claims is added.

### Editorial Notes

AMENDMENTS

2011—Pub. L. 112–29 designated first to sixth pars. as subsecs. (a) to (f), respectively, inserted headings, in subsec. (a), substituted "or joint inventor of carrying out the invention" for "of carrying out his invention", in subsec. (b), substituted "inventor or a joint inventor regards as the invention" for "applicant regards as his invention", and, in subsec. (d), substituted "Subject to subsection (e)," for "Subject to the following paragraph,".

1975—Pub. L. 94–131 substituted provision authorizing the writing of claims, if the nature of the case admits, in dependent or multiple dependent form for prior provision for writing claims in dependent form, required claims in dependent form to contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed, substituted text respecting construction of a claim in dependent form so as to incorporate by reference all the limitations of the claim to which it refers for prior text for construction of a dependent claim to include all the limitations of the claim incorporated by reference into the dependent claim, and inserted paragraph respecting certain requirements for claims in multiple dependent form.

1965—Pub. L. 89–83 permitted a claim to be written in independent or dependent form, and if in dependent form, required it to be construed to include all the limitations of the claim incorporated by reference into the dependent claim.

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to any patent application that is filed on or after that effective date, see section 4(e) of Pub. L. 112–29, set out as a note under section 111 of this title.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–131 effective Jan. 24, 1978, and applicable on and after that date to patent applications filed in the United States and to international applications, where applicable, see section 11 of Pub. L. 94–131, set out as an Effective Date note under section 351 of this title.

EFFECTIVE DATE OF 1965 AMENDMENT

Amendment by Pub. L. 89–83 effective three months after July 24, 1965, see section 7(a) of Pub. L. 89–83, set out as a note under section 41 of this title.

ignated by a foreign country which, by treaty or convention, accords like effect to apostilles of designated officials in the United States, and such oath shall be valid if it complies with the laws of the state or country where made. When the application is made as provided in this title by a person other than the inventor, the oath may be so varied in form that it can be made by him. For purposes of this section, a consular officer shall include any United States citizen serving overseas, authorized to perform notarial functions pursuant to section 1750 of the Revised Statutes, as amended (22 U.S.C. 4221).''

1998—Pub. L. 105–277 inserted at end ''For purposes of this section, a consular officer shall include any United States citizen serving overseas, authorized to perform notarial functions pursuant to section 1750 of the Revised Statutes, as amended (22 U.S.C. 4221).''

1982—Pub. L. 97–247 substituted ''is'' for ''shall be'' after ''whose authority'', and inserted '', or acquiesce of an official designated by a foreign country which, by treaty or convention, accords like effect to apostilles of designated officials in the United States''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2013 AMENDMENT

Amendment by Pub. L. 112–274 effective Jan. 14, 2013, and applicable to proceedings commenced on or after such date, see section 1(n) of Pub. L. 112–274, set out as a note under section 5 of this title.

EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–211 effective on the later of the date that is 1 year after Dec. 18, 2012, or the date that the Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs enters into force with respect to the United States (May 13, 2015), and applicable only to certain applications filed on and after that effective date and patents issuing thereon, see section 103 of Pub. L. 112–211, set out as a note under section 100 of this title.

EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to any patent application that is filed on or after that effective date, see section 4(e) of Pub. L. 112–29, set out as a note under section 111 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–247 effective Aug. 27, 1982, see section 17(a) of Pub. L. 97–247, set out as a note under section 41 of this title.

## § 116. Inventors

(a) JOINT INVENTIONS.—When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

(b) OMITTED INVENTOR.—If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor. The Director, on proof of the pertinent facts and after such notice to the omitted inventor as he prescribes, may grant a patent to the inventor making the application, subject to the same rights which the omitted inventor would have

had if he had been joined. The omitted inventor may subsequently join in the application.

(c) CORRECTION OF ERRORS IN APPLICATION.—Whenever through error a person is named in an application for patent as the inventor, or through error an inventor is not named in an application, the Director may permit the application to be amended accordingly, under such terms as he prescribes.

(July 19, 1952, ch. 950, 66 Stat. 799; Pub. L. 97–247, §6(a), Aug. 27, 1982, 96 Stat. 320; Pub. L. 98–622, title I, §104(a), Nov. 8, 1984, 98 Stat. 3384; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, §20(a), Sept. 16, 2011, 125 Stat. 333.)

HISTORICAL AND REVISION NOTES

The first paragraph is implied in the present statutes, and the part of the last paragraph relating to omission of an erroneously joined inventor is in the Patent Office rules. The remainder is new and provides for the correction of a mistake in erroneously joining a person as inventor, and for filing an application when one of several joint inventors cannot be found. This section is ancillary to section 256.

**Editorial Notes**

AMENDMENTS

2011—Pub. L. 112–29 designated first to third pars. as subsecs. (a) to (c), respectively, inserted headings, and, in subsec. (c), struck out ''and such error arose without any deceptive intention on his part,'' before ''the Director''.

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.

1999—Pub. L. 106–113, as amended by Pub. L. 107–273, substituted ''Director'' for ''Commissioner'' in two places.

1984—Pub. L. 98–622 amended first par. generally, striking out ''and each sign the application'' after ''patent jointly'' and inserting sentence beginning ''Inventors may apply''.

1982—Pub. L. 97–247 substituted ''Inventors'' for ''Joint inventors'' as section catchline, and substituted ''through error a person is named in an application for patent as the inventor, or through error an inventor is not named in an application'' for ''a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, §4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–622 applicable to all United States patents granted before, on, or after Nov. 8, 1984, and to all applications for United States patents pending on or filed after that date, except as otherwise pro-

vided, see section 106 of Pub. L. 98–622, set out as a note under section 103 of this title.

Effective Date of 1982 Amendment

Amendment by Pub. L. 97–247 effective six months after Aug. 27, 1982, see section 17(c) of Pub. L. 97–247, set out as an Effective Date note under section 294 of this title.

## § 117. Death or incapacity of inventor

Legal representatives of deceased inventors and of those under legal incapacity may make application for patent upon compliance with the requirements and on the same terms and conditions applicable to the inventor.

(July 19, 1952, ch. 950, 66 Stat. 799.)

Historical and Revision Notes

Based on Title 35, U.S.C., 1946 ed., § 46 (R.S. 4896, amended (1) Feb. 28, 1899, ch. 227, 30 Stat. 915, (2) Mar. 3, 1903, ch. 1019, § 3, 32 Stat. 1225, 1226, (3) May 23, 1908, ch. 188, 35 Stat. 245).

The language has been considerably simplified.

## § 118. Filing by other than inventor

A person to whom the inventor has assigned or is under an obligation to assign the invention may make an application for patent. A person who otherwise shows sufficient proprietary interest in the matter may make an application for patent on behalf of and as agent for the inventor on proof of the pertinent facts and a showing that such action is appropriate to preserve the rights of the parties. If the Director grants a patent on an application filed under this section by a person other than the inventor, the patent shall be granted to the real party in interest and upon such notice to the inventor as the Director considers to be sufficient.

(July 19, 1952, ch. 950, 66 Stat. 799; Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, § 13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, § 4(b)(1), Sept. 16, 2011, 125 Stat. 296.)

Historical and Revision Notes

This section is new and provides for the filing of an application by another on behalf of the inventor in certain special hardship situations.

### Editorial Notes

Amendments

2011—Pub. L. 112–29 amended section generally. Prior to amendment, text read as follows: ''Whenever an inventor refuses to execute an application for patent, or cannot be found or reached after diligent effort, a person to whom the inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary interest in the matter justifying such action, may make application for patent on behalf of and as agent for the inventor on proof of the pertinent facts and a showing that such action is necessary to preserve the rights of the parties or to prevent irreparable damage; and the Director may grant a patent to such inventor upon such notice to him as the Director deems sufficient, and on compliance with such regulations as he prescribes.''

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.

1999—Pub. L. 106–113, as amended by Pub. L. 107–273, substituted ''Director'' for ''Commissioner'' in two places.

Statutory Notes and Related Subsidiaries

Effective Date of 2011 Amendment

Amendment by Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to any patent application that is filed on or after that effective date, see section 4(e) of Pub. L. 112–29, set out as a note under section 111 of this title.

Effective Date of 1999 Amendment

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, § 4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

## § 119. Benefit of earlier filing date; right of priority

(a) An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, or in a WTO member country, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within 12 months from the earliest date on which such foreign application was filed. The Director may prescribe regulations, including the requirement for payment of the fee specified in section 41(a)(7), pursuant to which the 12-month period set forth in this subsection may be extended by an additional 2 months if the delay in filing the application in this country within the 12-month period was unintentional.

(b)(1) No application for patent shall be entitled to this right of priority unless a claim is filed in the Patent and Trademark Office, identifying the foreign application by specifying the application number on that foreign application, the intellectual property authority or country in or for which the application was filed, and the date of filing the application, at such time during the pendency of the application as required by the Director.

(2) The Director may consider the failure of the applicant to file a timely claim for priority as a waiver of any such claim. The Director may establish procedures, including the requirement for payment of the fee specified in section 41(a)(7), to accept an unintentionally delayed claim under this section.

(3) The Director may require a certified copy of the original foreign application, specification, and drawings upon which it is based, a translation if not in the English language, and such other information as the Director considers necessary. Any such certification shall be made by the foreign intellectual property authority in which the foreign application was filed and show the date of the application and of the filing of the specification and other papers.

(c) In like manner and subject to the same conditions and requirements, the right provided in this section may be based upon a subsequent regularly filed application in the same foreign country instead of the first filed foreign applica-

(iii) the cost and benefits to the public of converting the data into a format that could be understood and used by the public;

(iv) whether the public dissemination of the data asset could result in legal liability;

(v) whether the data asset—

(I) is subject to intellectual property rights, including rights under titles 17 and 35;

(II) contains confidential business information, that could be withheld under section 552(b)(4) of title 5; or

(III) is restricted by contract or other binding, written agreement;

(vi) whether the holder of a right to such data asset has been consulted;

(vii) the expectation that all data assets that would otherwise be made available under section 552 of title 5 be disclosed; and

(viii) any other considerations that the Director determines to be relevant.

(F) Criteria for the head of an agency to use in assessing the indication of a determination under subparagraph (A)(iii) and how to prioritize any such subsequent determinations in the strategic information management plan under section 3506, in consideration of the existing resources available to the agency.

(3) REGULAR UPDATES REQUIRED.—With respect to each data asset created or identified by an agency, the head of the agency shall update the comprehensive data inventory of the agency not later than 90 days after the date of such creation or identification.

(b) PUBLIC DATA ASSETS.—The head of each agency shall submit public data assets, or links to public data assets available online, as open Government data assets for inclusion in the Federal data catalogue maintained under subsection (c), in accordance with the guidance established under subsection (a)(2).

(c) FEDERAL DATA CATALOGUE.—

(1) IN GENERAL.—The Administrator of General Services shall maintain a single public interface online as a point of entry dedicated to sharing agency data assets with the public, which shall be known as the "Federal data catalogue". The Administrator and the Director shall ensure that agencies can submit public data assets, or links to public data assets, for publication and public availability on the interface.

(2) REPOSITORY.—The Director shall collaborate with the Office of Government Information Services and the Administrator of General Services to develop and maintain an online repository of tools, best practices, and schema standards to facilitate the adoption of open data practices across the Federal Government, which shall—

(A) include any definitions, regulations, policies, checklists, and case studies related to open data policy;

(B) facilitate collaboration and the adoption of best practices across the Federal

Government relating to the adoption of open data practices; and

(C) be made available on the Federal data catalogue maintained under paragraph (1).

(3) ACCESS TO OTHER DATA ASSETS.—The Director shall ensure the Federal data catalogue maintained under paragraph (1) provides information on how the public can access a data asset included in a comprehensive data inventory under subsection (a) that is not yet available on the Federal data catalogue, including information regarding the application process established under section 3583 of title 44.

(d) DELEGATION.—The Director shall delegate to the Administrator of the Office of Information and Regulatory Affairs and the Administrator of the Office of Electronic Government the authority to jointly issue guidance required under this section.

(Added Pub. L. 104–13, §2, May 22, 1995, 109 Stat. 180; amended Pub. L. 113–235, div. H, title I, §1301(c)(1), Dec. 16, 2014, 128 Stat. 2537; Pub. L. 115–435, title II, §202(d)(1), Jan. 14, 2019, 132 Stat. 5538.)

### Editorial Notes

#### PRIOR PROVISIONS

A prior section 3511, added Pub. L. 96–511, §2(a), Dec. 11, 1980, 94 Stat. 2822; amended Pub. L. 99–500, §101(m) [title VIII, §818], Oct. 18, 1986, 100 Stat. 1783–308, 1783–339, and Pub. L. 99–591, §101(m) [title VIII, §818], Oct. 30, 1986, 100 Stat. 3341–308, 3341–339, related to establishment and operation of a Federal Information Locator System prior to the general amendment of this chapter by Pub. L. 104–13.

Another prior section 3511, Pub. L. 90–620, Oct. 22, 1968, 82 Stat. 1305, provided for penalty for failure to furnish information, prior to the general amendment of this chapter by Pub. L. 96–511.

#### AMENDMENTS

2019—Pub. L. 115–435 amended section generally. Prior to amendment, section related to establishment and operation of Government Information Locator Service.

2014—Subsec. (a)(3). Pub. L. 113–235 substituted "Director of the Government Publishing Office" for "Public Printer".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2019 AMENDMENT

Amendment by Pub. L. 115–435 effective 180 days after Jan. 14, 2019, see section 403 of Pub. L. 115–435, set out as a note under section 306 of Title 5, Government Organization and Employees.

#### EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

## § 3512. Public protection

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—

(1) the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter; or

(2) the agency fails to inform the person who is to respond to the collection of information

that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

(Added Pub. L. 104–13, § 2, May 22, 1995, 109 Stat. 181; amended Pub. L. 106–398, § 1 [[div. A], title X, § 1064(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275.)

**Editorial Notes**

PRIOR PROVISIONS

A prior section 3512, added Pub. L. 96–511, § 2(a), Dec. 11, 1980, 94 Stat. 2822, related to protection of persons failing to maintain or provide information if information collection request did not display current control number prior to the general amendment of this chapter by Pub. L. 104–13.

Another prior section 3512, added Pub. L. 93–153, title IV, § 409(b), Nov. 16, 1973, 87 Stat. 593, related to information for independent regulatory agencies, prior to the general amendment of this chapter by Pub. L. 96–511.

AMENDMENTS

2000—Subsec. (a). Pub. L. 106–398 substituted ''subchapter'' for ''chapter'' in introductory provisions and par. (1).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2000 AMENDMENT

Amendment by Pub. L. 106–398 effective 30 days after Oct. 30, 2000, see section 1 [[div. A], title X, § 1065] of Pub. L. 106–398, Oct. 30, 2000, 114 Stat. 1654, formerly set out as an Effective Date note under former section 3531 of this title.

EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

**§ 3513. Director review of agency activities; reporting; agency response**

(a) In consultation with the Administrator of General Services, the Archivist of the United States, the Director of the National Institute of Standards and Technology, and the Director of the Office of Personnel Management, the Director shall periodically review selected agency information resources management activities to ascertain the efficiency and effectiveness of such activities to improve agency performance and the accomplishment of agency missions.

(b) Each agency having an activity reviewed under subsection (a) shall, within 60 days after receipt of a report on the review, provide a written plan to the Director describing steps (including milestones) to—

(1) be taken to address information resources management problems identified in the report; and

(2) improve agency performance and the accomplishment of agency missions.

(c) COMPARABLE TREATMENT.—Notwithstanding any other provision of law, the Director shall treat or review a rule or order prescribed or proposed by the Director of the Bureau of Consumer Financial Protection on the same terms and conditions as apply to any rule or order prescribed or proposed by the Board of Governors of the Federal Reserve System.

(Added Pub. L. 104–13, § 2, May 22, 1995, 109 Stat. 181; amended Pub. L. 111–203, title X, § 1100D(b), July 21, 2010, 124 Stat. 2111.)

**Editorial Notes**

PRIOR PROVISIONS

A prior section 3513, added Pub. L. 96–511, § 2(a), Dec. 11, 1980, 94 Stat. 2822; amended Pub. L. 98–497, title I, § 107(b)(27), Oct. 19, 1984, 98 Stat. 2291, related to periodic review of agency activities by Director and report of review and agency response to it prior to the general amendment of this chapter by Pub. L. 104–13.

AMENDMENTS

2010—Subsec. (c). Pub. L. 111–203 added subsec. (c).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

**§ 3514. Responsiveness to Congress**

(a)(1) The Director shall—

(A) keep the Congress and congressional committees fully and currently informed of the major activities under this subchapter; and

(B) submit a report on such activities to the President of the Senate and the Speaker of the House of Representatives annually and at such other times as the Director determines necessary.

(2) The Director shall include in any such report a description of the extent to which agencies have—

(A) reduced information collection burdens on the public, including—

(i) a summary of accomplishments and planned initiatives to reduce collection of information burdens;

(ii) a list of all violations of this subchapter and of any rules, guidelines, policies, and procedures issued pursuant to this subchapter;

(iii) a list of any increase in the collection of information burden, including the authority for each such collection; and

(iv) a list of agencies that in the preceding year did not reduce information collection burdens in accordance with section 3505(a)(1), a list of the programs and statutory responsibilities of those agencies that precluded that reduction, and recommendations to assist those agencies to reduce information collection burdens in accordance with that section;

(B) improved the quality and utility of statistical information;

(b) Within 90 days of the issuance of the Open Data Policy, the Administrator for Federal Procurement Policy, Controller of the Office of Federal Financial Management, CIO, and Administrator of OIRA shall work with the Chief Acquisition Officers Council, Chief Financial Officers Council, Chief Information Officers Council, and Federal Records Council to identify and initiate implementation of measures to support the integration of the Open Data Policy requirements into Federal acquisition and grant-making processes. Such efforts may include developing sample requirements language, grant and contract language, and workforce tools for agency acquisition, grant, and information management and technology professionals.

(c) Within 90 days of the date of this order, the Chief Performance Officer (CPO) shall work with the President's Management Council to establish a Cross-Agency Priority (CAP) Goal to track implementation of the Open Data Policy. The CPO shall work with agencies to set incremental performance goals, ensuring they have metrics and milestones in place to monitor advancement toward the CAP Goal. Progress on these goals shall be analyzed and reviewed by agency leadership, pursuant to the GPRA Modernization Act of 2010 (Public Law 111–352).

(d) Within 180 days of the date of this order, agencies shall report progress on the implementation of the CAP Goal to the CPO. Thereafter, agencies shall report progress quarterly, and as appropriate.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Nothing in this order shall compel or authorize the disclosure of privileged information, law enforcement information, national security information, personal information, or information the disclosure of which is prohibited by law.

(e) Independent agencies are requested to adhere to this order.

BARACK OBAMA.

FREEDOM OF INFORMATION ACT

Memorandum of President of the United States, Jan. 21, 2009, 74 F.R. 4683, provided:

Memorandum for the Heads of Executive Departments and Agencies

A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.

The presumption of disclosure also means that agencies should take affirmative steps to make information public. They should not wait for specific requests from the public. All agencies should use modern technology to inform citizens about what is known and done by their Government. Disclosure should be timely.

I direct the Attorney General to issue new guidelines governing the FOIA to the heads of executive departments and agencies, reaffirming the commitment to accountability and transparency, and to publish such guidelines in the Federal Register. In doing so, the Attorney General should review FOIA reports produced by the agencies under Executive Order 13392 of December 14, 2005. I also direct the Director of the Office of Management and Budget to update guidance to the agencies to increase and improve information dissemination to the public, including through the use of new technologies, and to publish such guidance in the Federal Register.

This memorandum does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

# § 552a. Records maintained on individuals

(a) DEFINITIONS.—For purposes of this section—

(1) the term "agency" means agency as defined in section 552(e)[1] of this title;

(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term "maintain" includes maintain, collect, use, or disseminate;

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

(6) the term "statistical record" means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;

(7) the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

(8) the term "matching program"—

_____
[1] See References in Text note below.

(A) means any computerized comparison of—

(i) two or more automated systems of records or a system of records with non-Federal records for the purpose of—

(I) establishing or verifying the eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs, or

(II) recouping payments or delinquent debts under such Federal benefit programs, or

(ii) two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records,

(B) but does not include—

(i) matches performed to produce aggregate statistical data without any personal identifiers;

(ii) matches performed to support any research or statistical project, the specific data of which may not be used to make decisions concerning the rights, benefits, or privileges of specific individuals;

(iii) matches performed, by an agency (or component thereof) which performs as its principal function any activity pertaining to the enforcement of criminal laws, subsequent to the initiation of a specific criminal or civil law enforcement investigation of a named person or persons for the purpose of gathering evidence against such person or persons;

(iv) matches of tax information (I) pursuant to section 6103(d) of the Internal Revenue Code of 1986, (II) for purposes of tax administration as defined in section 6103(b)(4) of such Code, (III) for the purpose of intercepting a tax refund due an individual under authority granted by section 404(e), 464, or 1137 of the Social Security Act; or (IV) for the purpose of intercepting a tax refund due an individual under any other tax refund intercept program authorized by statute which has been determined by the Director of the Office of Management and Budget to contain verification, notice, and hearing requirements that are substantially similar to the procedures in section 1137 of the Social Security Act;

(v) matches—

(I) using records predominantly relating to Federal personnel, that are performed for routine administrative purposes (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)); or

(II) conducted by an agency using only records from systems of records maintained by that agency;

if the purpose of the match is not to take any adverse financial, personnel, disciplinary, or other adverse action against Federal personnel;

(vi) matches performed for foreign counterintelligence purposes or to produce background checks for security clearances of Federal personnel or Federal contractor personnel;

(vii) matches performed incident to a levy described in section 6103(k)(8) of the Internal Revenue Code of 1986;

(viii) matches performed pursuant to section 202(x)(3) or 1611(e)(1) of the Social Security Act (42 U.S.C. 402(x)(3), 1382(e)(1));

(ix) matches performed by the Secretary of Health and Human Services or the Inspector General of the Department of Health and Human Services with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records; or

(x) matches performed pursuant to section 3(d)(4) of the Achieving a Better Life Experience Act of 2014;[1]

(9) the term ''recipient agency'' means any agency, or contractor thereof, receiving records contained in a system of records from a source agency for use in a matching program;

(10) the term ''non-Federal agency'' means any State or local government, or agency thereof, which receives records contained in a system of records from a source agency for use in a matching program;

(11) the term ''source agency'' means any agency which discloses records contained in a system of records to be used in a matching program, or any State or local government, or agency thereof, which discloses records to be used in a matching program;

(12) the term ''Federal benefit program'' means any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals; and

(13) the term ''Federal personnel'' means officers and employees of the Government of the United States, members of the uniformed services (including members of the Reserve Components), individuals entitled to receive immediate or deferred retirement benefits under any retirement program of the Government of the United States (including survivor benefits).

(b) CONDITIONS OF DISCLOSURE.—No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

(4) to the Bureau of the Census for purposes of planning or carrying out a census or survey

or related activity pursuant to the provisions of title 13;

(5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

(11) to the Director of the Congressional Budget Office, or any authorized representative of the Director, in the course of performance of the duties of the Congressional Budget Office;

(12) pursuant to the order of a court of competent jurisdiction; or

(13) to a consumer reporting agency in accordance with section 3711(e) of title 31.

(c) ACCOUNTING OF CERTAIN DISCLOSURES.— Each agency, with respect to each system of records under its control, shall—

(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

(B) the name and address of the person or agency to whom the disclosure is made;

(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

(3) except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request; and

(4) inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made.

(d) ACCESS TO RECORDS.—Each agency that maintains a system of records shall—

(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;

(2) permit the individual to request amendment of a record pertaining to him and—

(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and

(B) promptly, either—

(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section;

(4) in any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed; and

(5) nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding.

(e) AGENCY REQUIREMENTS.—Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

(f) AGENCY RULES.—In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including spe-

cial procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.

(g)(1) CIVIL REMEDIES.—Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the ex-

emptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

(h) RIGHTS OF LEGAL GUARDIANS.—For the purposes of this section, the parent of any minor, or the legal guardian of any individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, may act on behalf of the individual.

(i)(1) CRIMINAL PENALTIES.—Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

(2) Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

(3) Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

(j) GENERAL EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is—

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(k) SPECIFIC EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4)(G), (H), and (I) and (f) of this section if the system of records is—

(1) subject to the provisions of section 552(b)(1) of this title;

(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section: *Provided, however,* That if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual, except to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(3) maintained in connection with providing protective services to the President of the United States or other individuals pursuant to section 3056 of title 18;

(4) required by statute to be maintained and used solely as statistical records;

(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(6) testing or examination material used solely to determine individual qualifications for appointment or promotion in the Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process; or

(7) evaluation material used to determine potential for promotion in the armed services, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(*l*)(1) ARCHIVAL RECORDS.—Each agency record which is accepted by the Archivist of the United States for storage, processing, and servicing in accordance with section 3103 of title 44 shall, for the purposes of this section, be considered to be maintained by the agency which deposited the record and shall be subject to the provisions of this section. The Archivist of the United States shall not disclose the record except to the agency which maintains the record, or under rules established by that agency which are not inconsistent with the provisions of this section.

(2) Each agency record pertaining to an identifiable individual which was transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, prior to the effective date of this section, shall, for the purposes of this section, be considered to be maintained by the National Archives and shall not be subject to the provisions of this section, except that a statement generally describing such records (modeled after the requirements relating to records subject to subsections (e)(4)(A) through (G) of this section) shall be published in the Federal Register.

(3) Each agency record pertaining to an identifiable individual which is transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, on or after the effective date of this section, shall, for the purposes

of this section, be considered to be maintained by the National Archives and shall be exempt from the requirements of this section except subsections (e)(4)(A) through (G) and (e)(9) of this section.

(m)(1) GOVERNMENT CONTRACTORS.—When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system. For purposes of subsection (i) of this section any such contractor and any employee of such contractor, if such contract is agreed to on or after the effective date of this section, shall be considered to be an employee of an agency.

(2) A consumer reporting agency to which a record is disclosed under section 3711(e) of title 31 shall not be considered a contractor for the purposes of this section.

(n) MAILING LISTS.—An individual's name and address may not be sold or rented by an agency unless such action is specifically authorized by law. This provision shall not be construed to require the withholding of names and addresses otherwise permitted to be made public.

(o) MATCHING AGREEMENTS.—(1) No record which is contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency specifying—

(A) the purpose and legal authority for conducting the program;

(B) the justification for the program and the anticipated results, including a specific estimate of any savings;

(C) a description of the records that will be matched, including each data element that will be used, the approximate number of records that will be matched, and the projected starting and completion dates of the matching program;

(D) procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)), to—

(i) applicants for and recipients of financial assistance or payments under Federal benefit programs, and

(ii) applicants for and holders of positions as Federal personnel,

that any information provided by such applicants, recipients, holders, and individuals may be subject to verification through matching programs;

(E) procedures for verifying information produced in such matching program as required by subsection (p);

(F) procedures for the retention and timely destruction of identifiable records created by a recipient agency or non-Federal agency in such matching program;

(G) procedures for ensuring the administrative, technical, and physical security of the records matched and the results of such programs;

(H) prohibitions on duplication and redisclosure of records provided by the source agency within or outside the recipient agency or the non-Federal agency, except where required by law or essential to the conduct of the matching program;

(I) procedures governing the use by a recipient agency or non-Federal agency of records provided in a matching program by a source agency, including procedures governing return of the records to the source agency or destruction of records used in such program;

(J) information on assessments that have been made on the accuracy of the records that will be used in such matching program; and

(K) that the Comptroller General may have access to all records of a recipient agency or a non-Federal agency that the Comptroller General deems necessary in order to monitor or verify compliance with the agreement.

(2)(A) A copy of each agreement entered into pursuant to paragraph (1) shall—

(i) be transmitted to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives; and

(ii) be available upon request to the public.

(B) No such agreement shall be effective until 30 days after the date on which such a copy is transmitted pursuant to subparagraph (A)(i).

(C) Such an agreement shall remain in effect only for such period, not to exceed 18 months, as the Data Integrity Board of the agency determines is appropriate in light of the purposes, and length of time necessary for the conduct, of the matching program.

(D) Within 3 months prior to the expiration of such an agreement pursuant to subparagraph (C), the Data Integrity Board of the agency may, without additional review, renew the matching agreement for a current, ongoing matching program for not more than one additional year if—

(i) such program will be conducted without any change; and

(ii) each party to the agreement certifies to the Board in writing that the program has been conducted in compliance with the agreement.

(p) VERIFICATION AND OPPORTUNITY TO CONTEST FINDINGS.—(1) In order to protect any individual whose records are used in a matching program, no recipient agency, non-Federal agency, or source agency may suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program to such individual, or take other adverse action against such individual, as a result of information produced by such matching program, until—

(A)(i) the agency has independently verified the information; or

(ii) the Data Integrity Board of the agency, or in the case of a non-Federal agency the Data Integrity Board of the source agency, determines in accordance with guidance issued by the Director of the Office of Management and Budget that—

(I) the information is limited to identification and amount of benefits paid by the source agency under a Federal benefit program; and

(II) there is a high degree of confidence that the information provided to the recipient agency is accurate;

(B) the individual receives a notice from the agency containing a statement of its findings and informing the individual of the opportunity to contest such findings; and

(C)(i) the expiration of any time period established for the program by statute or regulation for the individual to respond to that notice; or

(ii) in the case of a program for which no such period is established, the end of the 30-day period beginning on the date on which notice under subparagraph (B) is mailed or otherwise provided to the individual.

(2) Independent verification referred to in paragraph (1) requires investigation and confirmation of specific information relating to an individual that is used as a basis for an adverse action against the individual, including where applicable investigation and confirmation of—

(A) the amount of any asset or income involved;

(B) whether such individual actually has or had access to such asset or income for such individual's own use; and

(C) the period or periods when the individual actually had such asset or income.

(3) Notwithstanding paragraph (1), an agency may take any appropriate action otherwise prohibited by such paragraph if the agency determines that the public health or public safety may be adversely affected or significantly threatened during any notice period required by such paragraph.

(q) SANCTIONS.—(1) Notwithstanding any other provision of law, no source agency may disclose any record which is contained in a system of records to a recipient agency or non-Federal agency for a matching program if such source agency has reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency.

(2) No source agency may renew a matching agreement unless—

(A) the recipient agency or non-Federal agency has certified that it has complied with the provisions of that agreement; and

(B) the source agency has no reason to believe that the certification is inaccurate.

(r) REPORT ON NEW SYSTEMS AND MATCHING PROGRAMS.—Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.

(s) BIENNIAL REPORT.—The President shall biennially submit to the Speaker of the House of Representatives and the President pro tempore of the Senate a report—

(1) describing the actions of the Director of the Office of Management and Budget pursuant to section 6 of the Privacy Act of 1974 during the preceding 2 years;

(2) describing the exercise of individual rights of access and amendment under this section during such years;

(3) identifying changes in or additions to systems of records;

(4) containing such other information concerning administration of this section as may be necessary or useful to the Congress in reviewing the effectiveness of this section in carrying out the purposes of the Privacy Act of 1974.

(t)(1) EFFECT OF OTHER LAWS.—No agency shall rely on any exemption contained in section 552 of this title to withhold from an individual any record which is otherwise accessible to such individual under the provisions of this section.

(2) No agency shall rely on any exemption in this section to withhold from an individual any record which is otherwise accessible to such individual under the provisions of section 552 of this title.

(u) DATA INTEGRITY BOARDS.—(1) Every agency conducting or participating in a matching program shall establish a Data Integrity Board to oversee and coordinate among the various components of such agency the agency's implementation of this section.

(2) Each Data Integrity Board shall consist of senior officials designated by the head of the agency, and shall include any senior official designated by the head of the agency as responsible for implementation of this section, and the inspector general of the agency, if any. The inspector general shall not serve as chairman of the Data Integrity Board.

(3) Each Data Integrity Board—

(A) shall review, approve, and maintain all written agreements for receipt or disclosure of agency records for matching programs to ensure compliance with subsection (o), and all relevant statutes, regulations, and guidelines;

(B) shall review all matching programs in which the agency has participated during the year, either as a source agency or recipient agency, determine compliance with applicable laws, regulations, guidelines, and agency agreements, and assess the costs and benefits of such programs;

(C) shall review all recurring matching programs in which the agency has participated during the year, either as a source agency or recipient agency, for continued justification for such disclosures;

(D) shall compile an annual report, which shall be submitted to the head of the agency and the Office of Management and Budget and made available to the public on request, describing the matching activities of the agency, including—

(i) matching programs in which the agency has participated as a source agency or recipient agency;

(ii) matching agreements proposed under subsection (o) that were disapproved by the Board;

(iii) any changes in membership or structure of the Board in the preceding year;

(iv) the reasons for any waiver of the requirement in paragraph (4) of this section for completion and submission of a cost-benefit analysis prior to the approval of a matching program;

(v) any violations of matching agreements that have been alleged or identified and any corrective action taken; and

(vi) any other information required by the Director of the Office of Management and Budget to be included in such report;

(E) shall serve as a clearinghouse for receiving and providing information on the accuracy, completeness, and reliability of records used in matching programs;

(F) shall provide interpretation and guidance to agency components and personnel on the requirements of this section for matching programs;

(G) shall review agency recordkeeping and disposal policies and practices for matching programs to assure compliance with this section; and

(H) may review and report on any agency matching activities that are not matching programs.

(4)(A) Except as provided in subparagraphs (B) and (C), a Data Integrity Board shall not approve any written agreement for a matching program unless the agency has completed and submitted to such Board a cost-benefit analysis of the proposed program and such analysis demonstrates that the program is likely to be cost effective.[2]

(B) The Board may waive the requirements of subparagraph (A) of this paragraph if it determines in writing, in accordance with guidelines prescribed by the Director of the Office of Management and Budget, that a cost-benefit analysis is not required.

(C) A cost-benefit analysis shall not be required under subparagraph (A) prior to the initial approval of a written agreement for a matching program that is specifically required by statute. Any subsequent written agreement for such a program shall not be approved by the Data Integrity Board unless the agency has submitted a cost-benefit analysis of the program as conducted under the preceding approval of such agreement.

(5)(A) If a matching agreement is disapproved by a Data Integrity Board, any party to such agreement may appeal the disapproval to the Director of the Office of Management and Budget. Timely notice of the filing of such an appeal shall be provided by the Director of the Office of Management and Budget to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives.

(B) The Director of the Office of Management and Budget may approve a matching agreement notwithstanding the disapproval of a Data Integrity Board if the Director determines that—

(i) the matching program will be consistent with all applicable legal, regulatory, and policy requirements;

(ii) there is adequate evidence that the matching agreement will be cost-effective; and

(iii) the matching program is in the public interest.

(C) The decision of the Director to approve a matching agreement shall not take effect until 30 days after it is reported to committees described in subparagraph (A).

(D) If the Data Integrity Board and the Director of the Office of Management and Budget disapprove a matching program proposed by the inspector general of an agency, the inspector general may report the disapproval to the head of the agency and to the Congress.

(6) In the reports required by paragraph (3)(D), agency matching activities that are not matching programs may be reported on an aggregate basis, if and to the extent necessary to protect ongoing law enforcement or counterintelligence investigations.

(v) OFFICE OF MANAGEMENT AND BUDGET RESPONSIBILITIES.—The Director of the Office of Management and Budget shall—

(1) develop and, after notice and opportunity for public comment, prescribe guidelines and regulations for the use of agencies in implementing the provisions of this section; and

(2) provide continuing assistance to and oversight of the implementation of this section by agencies.

(w) APPLICABILITY TO BUREAU OF CONSUMER FINANCIAL PROTECTION.—Except as provided in the Consumer Financial Protection Act of 2010, this section shall apply with respect to the Bureau of Consumer Financial Protection.

(Added Pub. L. 93–579, §3, Dec. 31, 1974, 88 Stat. 1897; amended Pub. L. 94–183, §2(2), Dec. 31, 1975, 89 Stat. 1057; Pub. L. 97–365, §2, Oct. 25, 1982, 96 Stat. 1749; Pub. L. 97–375, title II, §201(a), (b), Dec. 21, 1982, 96 Stat. 1821; Pub. L. 97–452, §2(a)(1), Jan. 12, 1983, 96 Stat. 2478; Pub. L. 98–477, §2(c), Oct. 15, 1984, 98 Stat. 2211; Pub. L. 98–497, title I, §107(g), Oct. 19, 1984, 98 Stat. 2292; Pub. L. 100–503, §§2–6(a), 7, 8, Oct. 18, 1988, 102 Stat. 2507–2514; Pub. L. 101–508, title VII, §7201(b)(1), Nov. 5, 1990, 104 Stat. 1388–334; Pub. L. 103–66, title XIII, §13581(c), Aug. 10, 1993, 107 Stat. 611; Pub. L. 104–193, title I, §110(w), Aug. 22, 1996, 110 Stat. 2175; Pub. L. 104–226, §1(b)(3), Oct. 2, 1996, 110 Stat. 3033; Pub. L. 104–316, title I, §115(g)(2)(B), Oct. 19, 1996, 110 Stat. 3835; Pub. L. 105–34, title X, §1026(b)(2), Aug. 5, 1997, 111 Stat. 925; Pub. L. 105–362, title XIII, §1301(d), Nov. 10, 1998, 112 Stat. 3293; Pub. L. 106–170, title IV, §402(a)(2), Dec. 17, 1999, 113 Stat. 1908; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 111–148, title VI, §6402(b)(2), Mar. 23, 2010, 124 Stat. 756; Pub. L. 111–203, title X, §1082, July 21, 2010, 124 Stat. 2080; Pub. L. 113–295, div. B, title I, §102(d), Dec. 19, 2014, 128 Stat. 4062; Pub. L. 118–104, §2, Oct. 2, 2024, 138 Stat. 1586.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 552(e) of this title, referred to in subsec. (a)(1), was redesignated section 552(f) of this title by section 1802(b) of Pub. L. 99–570.

Section 6103 of the Internal Revenue Code of 1986, referred to in subsec. (a)(8)(B)(iv), (vii), is classified to section 6103 of Title 26, Internal Revenue Code.

Sections 404, 464, and 1137 of the Social Security Act, referred to in subsec. (a)(8)(B)(iv), are classified to sec-

---

[2] So in original. Probably should be "cost-effective."

tions 604, 664, and 1320b–7, respectively, of Title 42, The Public Health and Welfare.

The Achieving a Better Life Experience Act of 2014, referred to in subsec. (a)(8)(B)(x), probably means Pub. L. 113–295, div. B, Dec. 19, 2014, 128 Stat. 4056, known as the Stephen Beck, Jr., Achieving a Better Life Experience Act of 2014 or the Stephen Beck, Jr., ABLE Act of 2014. The Act does not contain a section 3.

For effective date of this section, referred to in subsecs. (k)(2), (5), (7), (l)(2), (3), and (m), see Effective Date note below.

Section 6 of the Privacy Act of 1974, referred to in subsec. (s)(1), is section 6 of Pub. L. 93–579, which was set out below and was repealed by section 6(c) of Pub. L. 100–503.

For classification of the Privacy Act of 1974, referred to in subsec. (s)(4), see Short Title note below.

The Consumer Financial Protection Act of 2010, referred to in subsec. (w), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, which enacted subchapter V (§ 5481 et seq.) of chapter 53 of Title 12, Banks and Banking, and enacted and amended numerous other sections and notes in the Code. For complete classification of this Act to the Code, see Short Title note set out under section 5301 of Title 12 and Tables.

CODIFICATION

Section 552a of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2244 of Title 7, Agriculture.

AMENDMENTS

2024—Subsec. (b)(11) to (13). Pub. L. 118–104 added par. (11) and redesignated former pars. (11) and (12) as (12) and (13), respectively.

2014—Subsec. (a)(8)(B)(x). Pub. L. 113–295 added cl. (x).

2010—Subsec. (a)(8)(B)(ix). Pub. L. 111–148 added cl. (ix).

Subsec. (w). Pub. L. 111–203 added subsec. (w).

2004—Subsec. (b)(10). Pub. L. 108–271 substituted "Government Accountability Office" for "General Accounting Office".

1999—Subsec. (a)(8)(B)(viii). Pub. L. 106–170 added cl. (viii).

1998—Subsec. (u)(6), (7). Pub. L. 105–362 redesignated par. (7) as (6), substituted "paragraph (3)(D)" for "paragraphs (3)(D) and (6)", and struck out former par. (6) which read as follows: "The Director of the Office of Management and Budget shall, annually during the first 3 years after the date of enactment of this subsection and biennially thereafter, consolidate in a report to the Congress the information contained in the reports from the various Data Integrity Boards under paragraph (3)(D). Such report shall include detailed information about costs and benefits of matching programs that are conducted during the period covered by such consolidated report, and shall identify each such waiver granted by a Data Integrity Board of the requirement for completion and submission of a cost-benefit analysis and the reasons for granting the waiver."

1997—Subsec. (a)(8)(B)(vii). Pub. L. 105–34 added cl. (vii).

1996—Subsec. (a)(8)(B)(iv)(III). Pub. L. 104–193 substituted "section 404(e), 464," for "section 464".

Subsec. (a)(8)(B)(v) to (vii). Pub. L. 104–226 inserted "or" at end of cl. (v), struck out "or" at end of cl. (vi), and struck out cl. (vii) which read as follows: "matches performed pursuant to section 6103(l)(12) of the Internal Revenue Code of 1986 and section 1144 of the Social Security Act;".

Subsecs. (b)(12), (m)(2). Pub. L. 104–316 substituted "3711(e)" for "3711(f)".

1993—Subsec. (a)(8)(B)(vii). Pub. L. 103–66 added cl. (vii).

1990—Subsec. (p). Pub. L. 101–508 amended subsec. (p) generally, restating former pars. (1) and (3) as par. (1), adding provisions relating to Data Integrity Boards, and restating former pars. (2) and (4) as (2) and (3), respectively.

1988—Subsec. (a)(8) to (13). Pub. L. 100–503, § 5, added pars. (8) to (13).

Subsec. (e)(12). Pub. L. 100–503, § 3(a), added par. (12).

Subsec. (f). Pub. L. 100–503, § 7, substituted "biennially" for "annually" in last sentence.

Subsecs. (o) to (q). Pub. L. 100–503, § 2(2), added subsecs. (o) to (q). Former subsecs. (o) to (q) redesignated (r) to (t), respectively.

Subsec. (r). Pub. L. 100–503, § 3(b), inserted "and matching programs" in heading and amended text generally. Prior to amendment, text read as follows: "Each agency shall provide adequate advance notice to Congress and the Office of Management and Budget of any proposal to establish or alter any system of records in order to permit an evaluation of the probable or potential effect of such proposal on the privacy and other personal or property rights of individuals or the disclosure of information relating to such individuals, and its effect on the preservation of the constitutional principles of federalism and separation of powers."

Pub. L. 100–503, § 2(1), redesignated former subsec. (o) as (r).

Subsec. (s). Pub. L. 100–503, § 8, substituted "Biennial" for "Annual" in heading, "biennially submit" for "annually submit" in introductory provisions, "preceding 2 years" for "preceding year" in par. (1), and "such years" for "such year" in par. (2).

Pub. L. 100–503, § 2(1), redesignated former subsec. (p) as (s).

Subsec. (t). Pub. L. 100–503, § 2(1), redesignated former subsec. (q) as (t).

Subsec. (u). Pub. L. 100–503, § 4, added subsec. (u).

Subsec. (v). Pub. L. 100–503, § 6(a), added subsec. (v).

1984—Subsec. (b)(6). Pub. L. 98–497, § 107(g)(1), substituted "National Archives and Records Administration" for "National Archives of the United States", and "Archivist of the United States or the designee of the Archivist" for "Administrator of General Services or his designee".

Subsec. (l)(1). Pub. L. 98–497, § 107(g)(2), substituted "Archivist of the United States" for "Administrator of General Services" in two places.

Subsec. (q). Pub. L. 98–477 designated existing provisions as par. (1) and added par. (2).

1983—Subsec. (b)(12). Pub. L. 97–452 substituted "section 3711(f) of title 31" for "section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))".

Subsec. (m)(2). Pub. L. 97–452 substituted "section 3711(f) of title 31" for "section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))".

1982—Subsec. (b)(12). Pub. L. 97–365, § 2(a), added par. (12).

Subsec. (e)(4). Pub. L. 97–375, § 201(a), substituted "upon establishment or revision" for "at least annually" after "Federal Register".

Subsec. (m). Pub. L. 97–365, § 2(b), designated existing provisions as par. (1) and added par. (2).

Subsec. (p). Pub. L. 97–375, § 201(b), substituted provisions requiring annual submission of a report by the President to the Speaker of the House and President pro tempore of the Senate relating to the Director of the Office of Management and Budget, individual rights of access, changes or additions to systems of records, and other necessary or useful information, for provisions which directed the President to submit to the Speaker of the House and the President of the Senate, by June 30 of each calendar year, a consolidated report, separately listing for each Federal agency the number of records contained in any system of records which were exempted from the application of this section under the provisions of subsections (j) and (k) of this section during the preceding calendar year, and the reasons for the exemptions, and such other information as indicate efforts to administer fully this section.

1975—Subsec. (g)(5). Pub. L. 94–183 substituted "to September 27, 1975" for "to the effective date of this section".

## Statutory Notes and Related Subsidiaries

### CHANGE OF NAME

Committee on Governmental Affairs of Senate changed to Committee on Homeland Security and Governmental Affairs of Senate, effective Jan. 4, 2005, by Senate Resolution No. 445, One Hundred Eighth Congress, Oct. 9, 2004.

Committee on Government Operations of House of Representatives treated as referring to Committee on Government Reform and Oversight of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Government Reform and Oversight of House of Representatives changed to Committee on Government Reform of House of Representatives by House Resolution No. 5, One Hundred Sixth Congress, Jan. 6, 1999. Committee on Government Reform of House of Representatives changed to Committee on Oversight and Government Reform of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007. Committee on Oversight and Government Reform of House of Representatives changed to Committee on Oversight and Reform of House of Representatives by House Resolution No. 6, One Hundred Sixteenth Congress, Jan. 9, 2019. Committee on Oversight and Reform of House of Representatives changed to Committee on Oversight and Accountability of House of Representatives by House Resolution No. 5, One Hundred Eighteenth Congress, Jan. 9, 2023.

### EFFECTIVE DATE OF 2014 AMENDMENT

Pub. L. 113–295, div. B, title I, § 102(f)(1), Dec. 19, 2014, 128 Stat. 4062, provided that: ''The amendments made by this section [enacting section 529A of Title 26, Internal Revenue Code, and amending this section, section 5517 of Title 12, Banks and Banking, and sections 26, 877A, 4965, 4973, and 6693 of Title 26] shall apply to taxable years beginning after December 31, 2014.''

### EFFECTIVE DATE OF 2010 AMENDMENT

Pub. L. 111–203, title X, § 1082, July 21, 2010, 124 Stat. 2080, provided that the amendment made by section 1082 is effective on July 21, 2010.

Pub. L. 111–203, title X, § 1100H, July 21, 2010, 124 Stat. 2113, provided that: ''Except as otherwise provided in this subtitle [subtitle H (§§ 1081–1100H) of title X of Pub. L. 111–203, see Tables for classification] and the amendments made by this subtitle, this subtitle and the amendments made by this subtitle, other than sections 1081 [amending section 8G of Pub. L. 95–452, formerly set out in the Appendix to this title, and enacting provisions set out as a note under section 8G of Pub. L. 95–452] and 1082 [amending this section and enacting provisions set out as a note under this section], shall become effective on the designated transfer date.''

[The term ''designated transfer date'' is defined in section 5481(9) of Title 12, Banks and Banking, as the date established under section 5582 of Title 12, which is July 21, 2011.]

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–170 applicable to individuals whose period of confinement in an institution commences on or after the first day of the fourth month beginning after December 1999, see section 402(a)(4) of Pub. L. 106–170, set out as a note under section 402 of Title 42, The Public Health and Welfare.

### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–34 applicable to levies issued after Aug. 5, 1997, see section 1026(c) of Pub. L. 105–34, set out as a note under section 6103 of Title 26, Internal Revenue Code.

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of Title 42, The Public Health and Welfare.

### EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–66 effective Jan. 1, 1994, see section 13581(d) of Pub. L. 103–66, set out as a note under section 1395y of Title 42, The Public Health and Welfare.

### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–503, § 10, Oct. 18, 1988, 102 Stat. 2514, as amended by Pub. L. 101–56, § 2, July 19, 1989, 103 Stat. 149, provided that:

''(a) IN GENERAL.—Except as provided in subsections (b) and (c), the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall take effect 9 months after the date of enactment of this Act [Oct. 18, 1988].

''(b) EXCEPTIONS.—The amendment made by sections 3(b), 6, 7, and 8 of this Act [amending this section and repealing provisions set out as a note below] shall take effect upon enactment.

''(c) EFFECTIVE DATE DELAYED FOR EXISTING PROGRAMS.—In the case of any matching program (as defined in section 552a(a)(8) of title 5, United States Code, as added by section 5 of this Act) in operation before June 1, 1989, the amendments made by this Act (other than the amendments described in subsection (b)) shall take effect January 1, 1990, if—

''(1) such matching program is identified by an agency as being in operation before June 1, 1989; and

''(2) such identification is—

''(A) submitted by the agency to the Committee on Governmental Affairs of the Senate, the Committee on Government Operations of the House of Representatives, and the Office of Management and Budget before August 1, 1989, in a report which contains a schedule showing the dates on which the agency expects to have such matching program in compliance with the amendments made by this Act, and

''(B) published by the Office of Management and Budget in the Federal Register, before September 15, 1989.''

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–497 effective Apr. 1, 1985, see section 301 of Pub. L. 98–497, set out as a note under section 2102 of Title 44, Public Printing and Documents.

### EFFECTIVE DATE

Pub. L. 93–579, § 8, Dec. 31, 1974, 88 Stat. 1910, provided that: ''The provisions of this Act [enacting this section and provisions set out as notes under this section] shall be effective on and after the date of enactment [Dec. 31, 1974], except that the amendments made by sections 3 and 4 [enacting this section and amending analysis preceding section 500 of this title] shall become effective 270 days following the day on which this Act is enacted.''

### SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–508, title VII, § 7201(a), Nov. 5, 1990, 104 Stat. 1388–334, provided that: ''This section [amending this section and enacting provisions set out as notes below] may be cited as the 'Computer Matching and Privacy Protection Amendments of 1990'.''

### SHORT TITLE OF 1989 AMENDMENT

Pub. L. 101–56, § 1, July 19, 1989, 103 Stat. 149, provided that: ''This Act [amending section 10 of Pub. L. 100–503,

set out as a note above] may be cited as the 'Computer Matching and Privacy Protection Act Amendments of 1989'.''

### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–503, §1, Oct. 18, 1988, 102 Stat. 2507, provided that: ''This Act [amending this section, enacting provisions set out as notes above and below, and repealing provisions set out as a note below] may be cited as the 'Computer Matching and Privacy Protection Act of 1988'.''

### SHORT TITLE OF 1974 AMENDMENT

Pub. L. 93–579, §1, Dec. 31, 1974, 88 Stat. 1896, provided: ''That this Act [enacting this section and provisions set out as notes under this section] may be cited as the 'Privacy Act of 1974'.''

### SHORT TITLE

This section is popularly known as the ''Privacy Act'' and the ''Privacy Act of 1974''.

### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of reporting provisions in subsec. (s) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 31 of House Document No. 103–7.

### DELEGATION OF FUNCTIONS

Functions of Director of Office of Management and Budget under this section delegated to Administrator for Office of Information and Regulatory Affairs by section 3 of Pub. L. 96–511, Dec. 11, 1980, 94 Stat. 2825, set out as a note under section 3503 of Title 44, Public Printing and Documents.

### OMB GUIDANCE ON ELECTRONIC CONSENT AND ACCESS FORMS

Pub. L. 116–50, §3, Aug. 22, 2019, 133 Stat. 1073, provided that:

''(a) GUIDANCE.—Not later than 1 year after the date of the enactment of this Act [Aug. 22, 2019], the Director shall issue guidance that does the following:

''(1) Requires each agency to accept electronic identity proofing and authentication processes for the purposes of allowing an individual to provide prior written consent for the disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(2) Creates a template for electronic consent and access forms and requires each agency to post the template on the agency website and to accept the forms from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(3) Requires each agency to accept the electronic consent and access forms described in paragraph (2) from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records to another entity, including a congressional office, in accordance with section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) [of such title].

''(b) AGENCY COMPLIANCE.—Each agency shall comply with the guidance issued pursuant to subsection (a) not later than 1 year after the date on which such guidance is issued.

''(c) DEFINITIONS.—In this section:

''(1) AGENCY; INDIVIDUAL; RECORD.—The terms 'agency', 'individual', and 'record' have the meanings given those terms in section 552a(a) of title 5, United States Code.

''(2) DIRECTOR.—The term 'Director' means the Director of the Office of Management and Budget.''

### EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES

Pub. L. 114–126, Feb. 24, 2016, 130 Stat. 282, provided that:

''SECTION 1. SHORT TITLE.

''This Act may be cited as the 'Judicial Redress Act of 2015'.

''SEC. 2. EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES.

''(a) CIVIL ACTION; CIVIL REMEDIES.—With respect to covered records, a covered person may bring a civil action against an agency and obtain civil remedies, in the same manner, to the same extent, and subject to the same limitations, including exemptions and exceptions, as an individual may bring and obtain with respect to records under—

''(1) section 552a(g)(1)(D) of title 5, United States Code, but only with respect to disclosures intentionally or willfully made in violation of section 552a(b) of such title; and

''(2) subparagraphs (A) and (B) of section 552a(g)(1) of title 5, United States Code, but such an action may only be brought against a designated Federal agency or component.

''(b) EXCLUSIVE REMEDIES.—The remedies set forth in subsection (a) are the exclusive remedies available to a covered person under this section.

''(c) APPLICATION OF THE PRIVACY ACT WITH RESPECT TO A COVERED PERSON.—For purposes of a civil action described in subsection (a), a covered person shall have the same rights, and be subject to the same limitations, including exemptions and exceptions, as an individual has and is subject to under section 552a of title 5, United States Code, when pursuing the civil remedies described in paragraphs (1) and (2) of subsection (a).

''(d) DESIGNATION OF COVERED COUNTRY.—

''(1) IN GENERAL.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Secretary of Homeland Security, designate a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' for purposes of this section if—

''(A)(i) the country or regional economic integration organization, or member country of such organization, has entered into an agreement with the United States that provides for appropriate privacy protections for information shared for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses; or

''(ii) the Attorney General has determined that the country or regional economic integration organization, or member country of such organization, has effectively shared information with the United States for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses and has appropriate privacy protections for such shared information;

''(B) the country or regional economic integration organization, or member country of such organization, permits the transfer of personal data for commercial purposes between the territory of that country or regional economic organization and the territory of the United States, through an agreement with the United States or otherwise; and

''(C) the Attorney General has certified that the policies regarding the transfer of personal data for commercial purposes and related actions of the country or regional economic integration organization, or member country of such organization, do not materially impede the national security interests of the United States.

''(2) REMOVAL OF DESIGNATION.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Sec-

retary of Homeland Security, revoke the designation of a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' if the Attorney General determines that such designated 'covered country'—

"(A) is not complying with the agreement described under paragraph (1)(A)(i);

"(B) no longer meets the requirements for designation under paragraph (1)(A)(ii);

"(C) fails to meet the requirements under paragraph (1)(B);

"(D) no longer meets the requirements for certification under paragraph (1)(C); or

"(E) impedes the transfer of information (for purposes of reporting or preventing unlawful activity) to the United States by a private entity or person.

"(e) DESIGNATION OF DESIGNATED FEDERAL AGENCY OR COMPONENT.—

"(1) IN GENERAL.—The Attorney General shall determine whether an agency or component thereof is a 'designated Federal agency or component' for purposes of this section. The Attorney General shall not designate any agency or component thereof other than the Department of Justice or a component of the Department of Justice without the concurrence of the head of the relevant agency, or of the agency to which the component belongs.

"(2) REQUIREMENTS FOR DESIGNATION.—The Attorney General may determine that an agency or component of an agency is a 'designated Federal agency or component' for purposes of this section, if—

"(A) the Attorney General determines that information exchanged by such agency with a covered country is within the scope of an agreement referred to in subsection (d)(1)(A); or

"(B) with respect to a country or regional economic integration organization, or member country of such organization, that has been designated as a 'covered country' under subsection (d)(1)(B), the Attorney General determines that designating such agency or component thereof is in the law enforcement interests of the United States.

"(f) FEDERAL REGISTER REQUIREMENT; NONREVIEWABLE DETERMINATION.—The Attorney General shall publish each determination made under subsections (d) and (e). Such determination shall not be subject to judicial or administrative review.

"(g) JURISDICTION.—The United States District Court for the District of Columbia shall have exclusive jurisdiction over any claim arising under this section.

"(h) DEFINITIONS.—In this Act:

"(1) AGENCY.—The term 'agency' has the meaning given that term in section 552(f) of title 5, United States Code.

"(2) COVERED COUNTRY.—The term 'covered country' means a country or regional economic integration organization, or member country of such organization, designated in accordance with subsection (d).

"(3) COVERED PERSON.—The term 'covered person' means a natural person (other than an individual) who is a citizen of a covered country.

"(4) COVERED RECORD.—The term 'covered record' has the same meaning for a covered person as a record has for an individual under section 552a of title 5, United States Code, once the covered record is transferred—

"(A) by a public authority of, or private entity within, a country or regional economic organization, or member country of such organization, which at the time the record is transferred is a covered country; and

"(B) to a designated Federal agency or component for purposes of preventing, investigating, detecting, or prosecuting criminal offenses.

"(5) DESIGNATED FEDERAL AGENCY OR COMPONENT.—The term 'designated Federal agency or component' means a Federal agency or component of an agency designated in accordance with subsection (e).

"(6) INDIVIDUAL.—The term 'individual' has the meaning given that term in section 552a(a)(2) of title 5, United States Code.

"(i) PRESERVATION OF PRIVILEGES.—Nothing in this section shall be construed to waive any applicable privilege or require the disclosure of classified information. Upon an agency's request, the district court shall review in camera and ex parte any submission by the agency in connection with this subsection.

"(j) EFFECTIVE DATE.—This Act shall take effect 90 days after the date of the enactment of this Act [Feb. 24, 2016].''

### PUBLICATION OF GUIDANCE UNDER SUBSECTION (p)(1)(A)(ii)

Pub. L. 101–508, title VII, §7201(b)(2), Nov. 5, 1990, 104 Stat. 1388–334, provided that: "Not later than 90 days after the date of the enactment of this Act [Nov. 5, 1990], the Director of the Office of Management and Budget shall publish guidance under subsection (p)(1)(A)(ii) of section 552a of title 5, United States Code, as amended by this Act.''

### LIMITATION ON APPLICATION OF VERIFICATION REQUIREMENT

Pub. L. 101–508, title VII, §7201(c), Nov. 5, 1990, 104 Stat. 1388–335, provided that: "Section 552a(p)(1)(A)(ii)(II) of title 5, United States Code, as amended by section 2 [probably means section 7201(b)(1) of Pub. L. 101–508], shall not apply to a program referred to in paragraph (1), (2), or (4) of section 1137(b) of the Social Security Act (42 U.S.C. 1320b–7), until the earlier of—

"(1) the date on which the Data Integrity Board of the Federal agency which administers that program determines that there is not a high degree of confidence that information provided by that agency under Federal matching programs is accurate; or

"(2) 30 days after the date of publication of guidance under section 2(b) [probably means section 7201(b)(2) of Pub. L. 101–508, set out as a note above].''

### EFFECTIVE DATE DELAYED FOR CERTAIN EDUCATION BENEFITS COMPUTER MATCHING PROGRAMS

Pub. L. 101–366, title II, §206(d), Aug. 15, 1990, 104 Stat. 442, provided that:

"(1) In the case of computer matching programs between the Department of Veterans Affairs and the Department of Defense in the administration of education benefits programs under chapters 30 and 32 of title 38 and chapter 106 of title 10, United States Code, the amendments made to section 552a of title 5, United States Code, by the Computer Matching and Privacy Protection Act of 1988 [Pub. L. 100–503] (other than the amendments made by section 10(b) of that Act) [see Effective Date of 1988 Amendment note above] shall take effect on October 1, 1990.

"(2) For purposes of this subsection, the term 'matching program' has the same meaning provided in section 552a(a)(8) of title 5, United States Code.''

### IMPLEMENTATION GUIDANCE FOR 1988 AMENDMENTS

Pub. L. 100–503, §6(b), Oct. 18, 1988, 102 Stat. 2513, required the Director, pursuant to section 552a(v) of this title, to develop guidelines and regulations for the use of agencies in implementing amendments made by Pub. L. 100–503 not later than 8 months after Oct. 18, 1988.

### CONSTRUCTION OF 1988 AMENDMENTS

Pub. L. 100–503, §9, Oct. 18, 1988, 102 Stat. 2514, provided that: "Nothing in the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall be construed to authorize—

"(1) the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies;

"(2) the direct linking of computerized systems of records maintained by Federal agencies;

"(3) the computer matching of records not otherwise authorized by law; or

"(4) the disclosure of records for computer matching except to a Federal, State, or local agency.''

CONGRESSIONAL FINDINGS AND STATEMENT OF PURPOSE

Pub. L. 93–579, §2, Dec. 31, 1974, 88 Stat. 1896, provided that:

''(a) The Congress finds that—

''(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies;

''(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;

''(3) the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;

''(4) the right to privacy is a personal and fundamental right protected by the Constitution of the United States; and

''(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.

''(b) The purpose of this Act [enacting this section and provisions set out as notes under this section] is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

''(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies;

''(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent;

''(3) permit an individual to gain access to information pertaining to him in Federal agency records, to have a copy made of all or any portion thereof, and to correct or amend such records;

''(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information;

''(5) permit exemptions from the requirements with respect to records provided in this Act only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority; and

''(6) be subject to civil suit for any damages which occur as a result of willful or intentional action which violates any individual's rights under this Act.''

PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §5, Dec. 31, 1974, 88 Stat. 1905, as amended by Pub. L. 95–38, June 1, 1977, 91 Stat. 179, which established the Privacy Protection Study Commission and provided that the Commission study data banks, automated data processing programs and information systems of governmental, regional and private organizations to determine standards and procedures in force for protection of personal information, that the Commission report to the President and Congress the extent to which requirements and principles of section 552a of title 5 should be applied to the information practices of those organizations, and that it make other legislative recommendations to protect the privacy of individuals while meeting the legitimate informational needs of government and society, ceased to exist on September 30, 1977, pursuant to section 5(g) of Pub. L. 93–579.

GUIDELINES AND REGULATIONS FOR MAINTENANCE OF PRIVACY AND PROTECTION OF RECORDS OF INDIVIDUALS

Pub. L. 93–579, §6, Dec. 31, 1974, 88 Stat. 1909, which provided that the Office of Management and Budget shall develop guidelines and regulations for use of agencies in implementing provisions of this section and provide continuing assistance to and oversight of the implementation of the provisions of such section by agencies, was repealed by Pub. L. 100–503, §6(c), Oct. 18, 1988, 102 Stat. 2513.

DISCLOSURE OF SOCIAL SECURITY NUMBER

Pub. L. 93–579, §7, Dec. 31, 1974, 88 Stat. 1909, provided that:

''(a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

''(2) the [The] provisions of paragraph (1) of this subsection shall not apply with respect to—

''(A) any disclosure which is required by Federal statute, or

''(B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

''(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.''

AUTHORIZATION OF APPROPRIATIONS TO PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §9, Dec. 31, 1974, 88 Stat. 1910, as amended by Pub. L. 94–394, Sept. 3, 1976, 90 Stat. 1198, authorized appropriations for the period beginning July 1, 1975, and ending on September 30, 1977.

# Executive Documents

EX. ORD. NO. 9397. NUMBERING SYSTEM FOR FEDERAL ACCOUNTS RELATING TO INDIVIDUAL PERSONS

Ex. Ord. No. 9397, Nov. 22, 1943, 8 F.R. 16095, as amended by Ex. Ord. No. 13478, §2, Nov. 18, 2008, 73 F.R. 70239, provided:

WHEREAS certain Federal agencies from time to time require in the administration of their activities a system of numerical identification of accounts of individual persons; and

WHEREAS some seventy million persons have heretofore been assigned account numbers pursuant to the Social Security Act; and

WHEREAS a large percentage of Federal employees have already been assigned account numbers pursuant to the Social Security Act; and

WHEREAS it is desirable in the interest of economy and orderly administration that the Federal Government move towards the use of a single, unduplicated numerical identification system of accounts and avoid the unnecessary establishment of additional systems:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States, it is hereby ordered as follows:

1. Hereafter any Federal department, establishment, or agency may, whenever the head thereof finds it advisable to establish a new system of permanent account numbers pertaining to individual persons, utilize the Social Security Act account numbers assigned pursuant to title 20, section 422.103 of the Code of Federal Regulations and pursuant to paragraph 2 of this order.

2. The Social Security Administration shall provide for the assignment of an account number to each person who is required by any Federal agency to have such a number but who has not previously been assigned such number by the Administration. The Administration may accomplish this purpose by (a) assigning such numbers to individual persons, (b) assigning blocks of numbers to Federal agencies for reassignment to indi-

vidual persons, or (c) making such other arrangements for the assignment of numbers as it may deem appropriate.

3. The Social Security Administration shall furnish, upon request of any Federal agency utilizing the numerical identification system of accounts provided for in this order, the account number pertaining to any person with whom such agency has an account or the name and other identifying data pertaining to any account number of any such person.

4. The Social Security Administration and each Federal agency shall maintain the confidential character of information relating to individual persons obtained pursuant to the provisions of this order.

5. There shall be transferred to the Social Security Administration, from time to time, such amounts as the Director of the Office of Management and Budget shall determine to be required for reimbursement by any Federal agency for the services rendered by the Administration pursuant to the provisions of this order.

6. This order shall be implemented in accordance with applicable law and subject to the availability of appropriations.

7. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers, employees, or agents, or any other person.

8. This order shall be published in the Federal Register.

CLASSIFIED NATIONAL SECURITY INFORMATION

For provisions relating to a response to a request for information under this section when the fact of its existence or nonexistence is itself classified or when it was originally classified by another agency, see Ex. Ord. No. 13526, §3.6, Dec. 29, 2009, 75 F.R. 718, set out as a note under section 3161 of Title 50, War and National Defense.

§ 552b. Open meetings

(a) For purposes of this section—

(1) the term "agency" means any agency, as defined in section 552(e)[1] of this title, headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency;

(2) the term "meeting" means the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business, but does not include deliberations required or permitted by subsection (d) or (e); and

(3) the term "member" means an individual who belongs to a collegial body heading an agency.

(b) Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency shall be open to public observation.

(c) Except in a case where the agency finds that the public interest requires otherwise, the second sentence of subsection (b) shall not apply to any portion of an agency meeting, and the requirements of subsections (d) and (e) shall not apply to any information pertaining to such meeting otherwise required by this section to be disclosed to the public, where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to—

(1) disclose matters that are (A) specifically authorized under criteria established by an Executive order to be kept secret in the interests of national defense or foreign policy and (B) in fact properly classified pursuant to such Executive order;

(2) relate solely to the internal personnel rules and practices of an agency;

(3) disclose matters specifically exempted from disclosure by statute (other than section 552 of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(4) disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) involve accusing any person of a crime, or formally censuring any person;

(6) disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy;

(7) disclose investigatory records compiled for law enforcement purposes, or information which if written would be contained in such records, but only to the extent that the production of such records or information would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

(8) disclose information contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions;

(9) disclose information the premature disclosure of which would—

(A) in the case of an agency which regulates currencies, securities, commodities, or financial institutions, be likely to (i) lead to significant financial speculation in currencies, securities, or commodities, or (ii) significantly endanger the stability of any financial institution; or

(B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action,

except that subparagraph (B) shall not apply in any instance where the agency has already disclosed to the public the content or nature of its proposed action, or where the agency is required by law to make such disclosure on its

_____
[1] See References in Text note below.

## Responses and Replies

4:25-cv-00423-JCB-JDL Nesarikar et al v. The United States Patent and Trademark Office et al

### U.S. District Court

### Eastern District of TEXAS [LIVE]

**Notice of Electronic Filing**

The following transaction was entered on 8/1/2025 at 1:04 PM CDT and filed on 8/1/2025

| | |
|---|---|
| **Case Name:** | Nesarikar et al v. The United States Patent and Trademark Office et al |
| **Case Number:** | 4:25-cv-00423-JCB-JDL |
| **Filer:** | Abhijit R. Nesarikar |
| | Anika A. Nesarikar |
| | Ashlesha A. Nesarikar |
| **Document Number:** | 32 |

**Docket Text:**
**SUR-REPLY to Reply to Response re [17] MOTION to Dismiss** *and Supporting Memorandum* **filed by Abhijit R. Nesarikar, Anika A. Nesarikar, Ashlesha A. Nesarikar. (Attachments: # (1) Exhibit M)(Nesarikar, Ashlesha)**

**4:25-cv-00423-JCB-JDL Notice has been electronically mailed to:**

Abhijit R. Nesarikar      edt0425@nesarikar.com

Anika A. Nesarikar      anedt0425@icloud.com

Ashlesha A. Nesarikar      asedt0425@icloud.com

James Garland Gillingham      james.gillingham@usdoj.gov, CaseView.ECF@usdoj.gov, cossette.callahan@usdoj.gov, Guadalupe.garcia@usdoj.gov, jill.wood@usdoj.gov, kathy.nash@usdoj.gov, pavlina.peters@usdoj.gov

Philip Charles Sternhell      philip.c.sternhell@usdoj.gov

**4:25-cv-00423-JCB-JDL** <span style="color:red">**Notice will not be electronically mailed to**</span>:

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=8/1/2025] [FileNumber=15377634-0
] [9a1442ee627153a8b015903f7066bc254af9d3356575c374ad42046513fd817aa3a
019f2acbecf21c8b3cecbb86554244647809e68a2e29eb1e906cfcebb977e]]
**Document description:**Exhibit M
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=8/1/2025] [FileNumber=15377634-1

### AA026

] [6a81db1b0a80cb9dda31810646e30b02960589ffdeb1c9c8221c77dc00f47c37d73
fa81823c12e38fd801b6013487422ba852fad27a617de651c3fffc676cf74]]

**AA027**

**Subject:** Activity in Case 4:25-cv-00423-JCB-JDL Nesarikar et al v. The United States Patent and Trademark Office et al Report and Recommendations
**From:** txedCM@txed.uscourts.gov
**Date:** 8/1/2025, 1:22 PM
**To:** txedcmcc@txed.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of TEXAS [LIVE]

## Notice of Electronic Filing

The following transaction was entered on 8/1/2025 at 1:22 PM CDT and filed on 8/1/2025

**Case Name:** Nesarikar et al v. The United States Patent and Trademark Office et al
**Case Number:** 4:25-cv-00423-JCB-JDL
**Filer:**
**Document Number:** 33

**Docket Text:**
**REPORT AND RECOMMENDATION The court RECOMMENDS that Defendants' motion to dismiss Plaintiffs' complaint (Doc. No. [17]) should be GRANTED. Plaintiffs' claims should be DISMISSED without prejudice for lack of standing and Plaintiffs' motion for a preliminary injunction (Doc. No. [2]) should be DENIED Objections due within 14 days of receipt. Signed by Magistrate Judge John D. Love on 8/1/2025. (CLC)**

**4:25-cv-00423-JCB-JDL Notice has been electronically mailed to:**

James Garland Gillingham     james.gillingham@usdoj.gov, CaseView.ECF@usdoj.gov, Guadalupe.garcia@usdoj.gov, cossette.callahan@usdoj.gov, jill.wood@usdoj.gov, kathy.nash@usdoj.gov, pavlina.peters@usdoj.gov

Philip Charles Sternhell     philip.c.sternhell@usdoj.gov

Ashlesha A. Nesarikar     asedt0425@icloud.com

Anika A. Nesarikar    anedt0425@icloud.com

Abhijit R. Nesarikar    edt0425@nesarikar.com

**4:25-cv-00423-JCB-JDL** <span style="color:red">**Notice will not be electronically mailed to**</span>:

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=8/1/2025] [FileNumber=15377692-0
] [42e8345ad2b86e4bfaf723174bad471dc72537d61d789a40f44e89124ffc686204b
0d51fb24b747703e7220ada576ae0cef78ec7efbd0921eced0c60ddb95a2f]]


An official website of the United States government  Here's how you know ⌄

**USPTO** UNITED STATES
PATENT AND TRADEMARK OFFICE ®

About Us  Jobs  Contact Us  MyUSPTO

Search uspto.gov 🔍

Patents  Trademarks  IP Policy  Learning and Resources  🔗 Find It Fast ▾

Home > About Us > Performance and Planning > USPTO annual reports

# USPTO annual reports

Beginning in Fiscal Year (FY) 2022 (October 1, 2021 - September 30, 2022), we adopted the Agency Financial Report (AFR) and Annual Performance Plan and Annual Performance Report (APPR) in lieu of a Performance and Accountability Report (PAR). PARs for earlier fiscal years remain available for review and comparison.

## Agency Financial Report (AFR)

The United States Patent and Trademark Office's (USPTO) Agency Financial Report (AFR) highlights the agency's programs, accomplishments, and challenges, while also providing information on financial management and performance.

## Annual Performance Plan and Annual Performance Report (APPR)

The USPTO's Annual Performance Plan and Annual Performance Report (APPR) highlights our achievements and results of the agency's programmatic performance. This report shows our stakeholders, including the public, our efforts to promote transparency and accountability as we strive to maintain America's intellectual property (IP) system as the gold standard around the world.

Every four years we develop a strategic plan to define the USPTO's mission, vision and goals. A Strategic Plan presents the long-term objectives an agency hopes to accomplish at the beginning of each new term of an Administration by describing general and long-term goals the agency aims to achieve, what actions the agency will take to realize those goals, and how the agency will deal with challenges and risks that may hinder achieving results.

## Workload Tables (required by 35 U.S.C. § 13)

The USPTO workload tables provides stakeholders with multi-year listings on various statistics, including volume of patent and trademark applications (filings), how long it takes for the applications to work their way through the process (pendency), filings by states and countries, petition data, cases in litigation, end of year personnel, and other information.



**FY 2024**
**Agency Financial Report (AFR)**

FEATURED REPORT

View the report

**FY 2024**
**Workload Tables**

FEATURED TABLES

View the tables

**FY 2023**
**Annual Performance Plan and Annual Performance Report (APPR)**

FEATURED REPORT

View the report

For questions or comments regarding these agency reports or workload tables, please email annualreports@uspto.gov

Expand all | Collapse all

> Prior year Agency Financial Report (AFR)
> Prior year Workload Tables
> Prior year Annual Performance Plan and Annual Performance Report (APPR)
> Prior year Performance and Accountability Reports (PARs)
> Prior year Summary of Performance and Financial Information
> Prior year Citizen Centric Reports

⮘ Share this page  🖨 Print this page

Additional information about this page



About the USPTO  •  Search for patents  •  Search for trademarks

US Department of Commerce
Accessibility
Privacy Policy
Terms of Use
Financial and Performance Data

Vulnerability Disclosure Policy
Freedom of Information Act
Inspector General
NoFEAR Act
USA.gov

**Receive updates from the USPTO**

Enter your email to subscribe or update your preferences

your@email.com  Subscribe

**USPTO** UNITED STATES
PATENT AND TRADEMARK OFFICE ®

Follow us 🔵 📷 in 𝕏 ▶

**AA030**

# INTRODUCTION

## Who We Are

The USPTO is the federal agency responsible for granting U.S. patents and registering trademarks. In doing so, the USPTO fulfills the mandate of article I, section 8, clause 8 of the U.S. Constitution, which grants the legislative branch the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The USPTO registers trademarks based on the Commerce Clause of the U.S. Constitution (article I, section 8, clause 3). American industry has flourished under this system of protection, with inventors designing new products and discovering new uses for old ones. These two types of achievement have created employment opportunities for millions of Americans, and the strength and vitality of the U.S. economy depend directly on effective mechanisms that protect new ideas and investments in innovation and creativity. The continued demand for patents and trademarks underscores the ingenuity of America's inventors and entrepreneurs and positions the USPTO at the cutting edge of the nation's technological progress and success.

The USPTO advises the President of the United States, the Secretary of Commerce, and U.S. government agencies on IP[1] policy, protection, and enforcement. In addition, the USPTO promotes stronger and more effective IP protections around the world, including by providing training, education, and capacity-building programs designed to foster respect for IP and encourage U.S. trading partners to develop strong IP enforcement regimes.

There are four basic types of IP rights in the United States: patents, trademarks, copyrights, and trade secrets. The graphic below provides a brief description of each type. The USPTO is responsible for patents and trademarks. Its IP policy work, however, encompasses all IP, including copyrights and trade secrets.

| PATENTS | TRADEMARKS | COPYRIGHTS | TRADE SECRETS |
|---|---|---|---|
| **GRANT** rights to exclude others from making, using, or selling a Utility, Design, or Plant invention. | **GRANT** exclusive use to any word, phrase, symbol, or design used to distinguish a brand from its competitors. | **GRANT** protection for original works—books, music, research, and other forms of creative expression. | **GRANT** rights for information that has either actual or potential economic value by virtue of not being generally known. |
| **TERM** Design: 14-15 years* Utility: 20 years** Plant: 20 years** | **TERM** 10 years Can be renewed | **TERM** 70 years after author's death | **TERM** Continuous |

*From date of issue depending on filing date    **From the earliest claimed date for benefit

[1]  IP, as used here, refers to patents, trademarks, copyrights, or trade secrets.



UNITED STATES DISTRICT COURT
# Eastern District of Texas
*Honorable Amos L. Mazzant, III, Chief Judge*
*David A. O'Toole, Clerk of Court*

Search this site

Court Information | United States Court Sites | Judges | Rules & Orders | Filing | Resources | FAQs | Attorneys | Jurors

Pro Se | Forms

CJA Forms
Non-CJA/Pro Bono Plan Appointment Forms
Civil Forms
Criminal Forms
Prisoner Forms
Pro Se Forms
Appeal Forms
Transcript Forms
National Forms
Court Forms
Patent Forms

## Pro Se Forms

Home » Forms

| Document | Form # |
|---|---|
| Civil Cover Sheet - JS44 | JS044 |
| Complaint | |
| Mediator's Report | |
| Motion for Appointment of Counsel | |
| Motion to Proceed In Forma Pauperis - Non-Prisoner | |
| Non-Prisoner Pro Se Consent to Receive Electronic Notice | |
| Pro Se Litigant EEOC Complaint | |
| Pro Se Litigant Social Security Complaint | |
| Summons in a Civil Action | AO440 |
| Waiver of the Service of Summons | AO399 |

All information provided in this document is for informational purposes only and does not constitute a contract with any person or entity unless otherwise specified. Information on this web site is subject to change without prior notice. Although every reasonable effort is made to ensure the accuracy of the information presented the content of this site is in no way guaranteed. Links to external web sites are provided as a courtesy. The Court does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information; nor does it control or guarantee the on-going availability, maintenance, or security of these Internet sites. Further, the inclusion of links is not intended to reflect their importance or to endorse any views expressed, or products or services offered, on these outside sites, or the organizations sponsoring the sites.

AA032

General Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

_____

_____  Case Number : _____

_____

List the full name of each plaintiff in this action.

VS.

_____

_____

_____

List the full name of each defendant in this action.
Do not use "et al".

Attach additional pages if necessary.

I.  ATTEMPT TO SECURE COUNSEL:

  Please answer the following concerning your attempt to secure counsel.

  A.  In the preparation of this suit, I have attempted to secure the aid of an attorney as follows: (circle one)

    1.  Employ Counsel
    2.  Court - Appointed Counsel
    3.  Lawyer Referral Service of the State Bar of Texas,
      P. O. Box 12487, Austin, Texas 78711.

  B.  List the name(s) and address(es) of the attorney(s):

_____

_____

_____

**AA033**

C.     Results of the conference with counsel:

_____

_____

_____

II.    List previous lawsuits:

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action or any other incidents?      _____Yes      _____ No

B.    If your answer to "A" is "yes",  describe the lawsuit in the space below. If there is more than one lawsuit, attach a separate piece of paper describing each.

    1.    Approximate file date of lawsuit: _____

    2.    Parties to previous lawsuit(s):

    Plaintiff _____

    Defendant_____

    Attach a separate piece of paper for additional plaintiffs or defendants.

    3.    Identify the court the lawsuit was filed. If federal, name the district.  If state, name the county.

    _____

    4.    Docket number in other court. _____

    5.    Name of judge to whom the case was assigned. _____

    6.    Disposition: Was the case dismissed, appealed or still pending?

    _____

    7.    Approximate date of disposition. _____

III.    Parties to this suit:

    A.    List the full name and address of each plaintiff:

        Pla #1 _____

_____

_____

        Pla #2 _____

_____

_____

    B.    List the full name of each defendant, their official position, place of employment and full mailing address.

        Dft #1:_____

_____

_____

        Dft #2:_____

_____

_____

        Dft #3 _____

_____

_____

Attach a separate sheet for additional parties.

**AA035**

IV:     Statement of Claim:

State as briefly as possible the fact of your case.  Describe how each defendant is involved.  Include the names of other persons involved with dates and places.  Do not give any legal arguments or cite cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Use as much space as you need, attaching additional pages if necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

V.    Relief: State Briefly exactly what you want the court to do for you.  Make no legal arguments and do not cite cases or statutes.  Attach additional pages if necessary.

_____

_____

_____

_____

_____

_____

_____

Signed this _____ day of _____, 20 _____.
                                                                    (Month)                                    (Year)

_____

_____

_____

I declare (certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed on: _____
                               Date

_____

_____

_____
Signature of each plaintiff

**AA037**



# FEDERAL RULES

## OF

# EVIDENCE

DECEMBER 1, 2019



Printed for the use

of

## THE COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

**AA038**

(As amended Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE II. JUDICIAL NOTICE

### Rule 201. Judicial Notice of Adjudicative Facts

(a) SCOPE. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

(b) KINDS OF FACTS THAT MAY BE JUDICIALLY NOTICED. The court may judicially notice a fact that is not subject to reasonable dispute because it:

    (1) is generally known within the trial court's territorial jurisdiction; or

    (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) TAKING NOTICE. The court:

    (1) may take judicial notice on its own; or

    (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(d) TIMING. The court may take judicial notice at any stage of the proceeding.

(e) OPPORTUNITY TO BE HEARD. On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

(f) INSTRUCTING THE JURY. In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE III. PRESUMPTIONS IN CIVIL CASES

### Rule 301. Presumptions in Civil Cases Generally

In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

### Rule 302. Applying State Law to Presumptions in Civil Cases

In a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE IV. RELEVANCE AND ITS LIMITS

### Rule 401. Test for Relevant Evidence

Evidence is relevant if:

    (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

The Wayback Machine - https://web.archive.org/web/20251104214906/https://www.uspto.gov/a...



An official website of the United States government

__Here's how you know__ ⌄

UNITED STATES
PATENT AND TRADEMARK OFFICE ®

__Home__  >  __About Us__  >  __News & Updates__

>  Statement by Director Squires before the United States Senate Subcommittee on
Intellectual Property Committee on the Judiciary

# Statement by Director Squires before the United States Senate Subcommittee on Intellectual Property Committee on the Judiciary

**October 10, 2025**

Statement for the Record of

John A. Squires

Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and
Trademark Office

before the Subcommittee on Intellectual Property Committee on the Judiciary United States Senate

"The Patent Eligibility Restoration Act – Restoring Clarity, Certainty, and Predictability to the U.S.
Patent System"

October 9, 2025

## I. Introduction - A Personal Perspective

I am fortunate — indeed, blessed — to even be able to provide this written Statement for the Record. As
Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and

**AA040**

Trademark Office, I thank the Honorable Chair and members of the Subcommittee for the opportunity.

Commuting to work in lower Manhattan under the brilliant blue skies on the morning of September 11, 2001, three times I escaped death. The first time, I walked through the North Tower of 1 World Trade at 8:30 a.m., having good naturedly chided my fellow commuter, neighbor and friend Tommy Cahill to "go make something happen" as he ascended the elevators to the 103rd floor trading desk of Cantor Fitzgerald. I then jumped the NY Waterway ferry downtown and entered my Goldman Sachs office at 1 New York Plaza just as, unbeknownst to me, the first plane struck at 8:46 a.m.

Amidst reports of a "small plane" incident, at 9:03 a.m., I felt a disorienting sensation which I later learned was the percussion wave from the second plane lining up on the South Tower just a few hundred feet over-head, accelerating to 500 mph. I looked just in time to see an eye level wall of flames explode as Flight 175 plowed into its target. I collected myself and ran down 37 flights of stairs and then back uptown to try to find Tommy and also locate my brother-in-law Ed Zier (Eddie's colleagues at Baseline at 1 World Trade perished but he miraculously switched his ticket‑‑from Flight 93‑‑to a later plane having taken the morning off for his daughters' first day of school.[1] At 9:59 a.m., the South Tower collapsed just as I was arriving on the scene and I avoided death a second time.

The third time came as I ran from the debris cloud from the collapse, and avoided being trampled and crushed to death by taking refuge in the South Ferry subway station, which for those who remember was glass-enclosed and above ground.

For the souls who did not escape, it was, as the Mayor put it, "more than we can bear." "Every one a world," as I remember *Wall Street Journal* columnist Daniel Henninger putting it. The terrorists who hijacked commercial aircraft and used them as weapons against the Twin Towers, the Pentagon, and — had they not been stopped by extraordinary heroes — the Capitol itself, were financed and trained by sponsors of terrorism.[2] Their weapons were not only box cutters and airplanes; they were networks of money and ideology, aimed squarely at exploiting our advanced technologies and directed to the heart of American freedom and prosperity.

Before that day, colleagues and I had begun developing the concept of the Risk Data Consortium (RDC). We filed patents modeled after claims held eligible by Judge Rich, the author of the 1952 Patent Act himself, claiming a "hub and spoke" consortium to detect and deter illicit financial activities and suspicious transactions. After that day, on September 12, we knew our mission had changed: America's private sector was now at war against terrorism — and our best weapon and inexhaustible resource was innovation. We filed 40 more patents, expedited by the USPTO as inventions to combat terrorism, built a business and got to work, shoulder to shoulder with the Federal Bureau of Investigation, the intelligence community, and the Department of the Treasury. Together we engaged in what can only be described as a *soft-power war*, with our instruments of that war — encouraged by the government — being patents. Heroically and courageously, our now-Secretary of Commerce Howard Lutnick rebuilt his business with patents, the lasting products of the beautiful minds of his employees, friends and family murdered that day. And we went to war — one that is still being waged this very day. Patents became our shield and sword — tools to create, protect, attract capital and deploy technologies to monitor, track, and counter the financing of terrorism in real time.

I am convinced that I survived to be able to tell this story. To connect the dots between the private sector, national security and our unique-to-the-world, constitutionally enshrined patent system. It is

**AA041**

with this context, passion and lived history that I provide this Statement for the Record to the Committee. Patent eligibility is not an abstract debate. It is a matter of national security, of resilience, and of ensuring that America's system of innovation remains robust enough to confront the challenges of the twenty-first century. It is as expansive as the American dream itself and to respectfully borrow from the Marines, "no better friend, no worse enemy."

## II.  The USPTO After 9/11 – Innovation as a National Security Imperative

In the days and months following the attacks of 9/11, the USPTO rose to meet the moment. Pursuant to provisions of the USA PATRIOT Act,[3] the USPTO expedited review of inventions critical to counter-terrorism. Applications were accelerated.[4] Innovators were encouraged to bring forth new ideas — technologies capable of detecting financial crimes, strengthening communications security, and preventing further attacks. The private sector, empowered by the framework of patent protection, could and did move quickly from concept to deployment.

These were not academic exercises. RDC's patents, designed to counter terrorist financing electronically, became operational tools. For those efforts, our team was honored with Director's Awards from the Federal Bureau of Investigation.[5] These awards signified what we already knew: patents are not just economic instruments. They are instruments of national defense. To suggest otherwise — to say that such inventions should be ineligible for protection under our patent laws — is not only doctrinally wrong. It is cowardice. And cowardice gets no quarter in the Home of the Brave.

## III.  Defending Expansive Eligibility – Historical and Legal Context

At the heart of our patent system lies Section 101 of Title 35, United States Code, which sets forth the statutory categories of patentable inventions: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." These thirty-six words, deceptively simple yet profoundly expansive, unlock the door to patentability.

Throughout my professional journey, particularly during my time in the financial services industry, I have witnessed firsthand how patent eligibility can either unleash or stifle innovation. Early in the 2000s, debates raged over so-called "business method" patents. Critics dismissed them as unworthy of protection, grafting onto Section 101 an unwarranted "technological arts" requirement that found no basis in the statute's plain language or binding precedent. As I argued in a 2006 article co-authored with Thomas S. Biemer, this limitation was ill-conceived and effectively nullified Supreme Court and Federal Circuit decisions that affirmed the patentability of novel processes in fields like finance. Decisions like *Ex parte Lundgren*, in which the Board of Patent Appeals and Interferences rejected the notion that pure business processes are ineligible and affirmed that advances in applied economics can promote the progress of science and the useful arts.

Seven years after 9/11, however, patent eligibility came under attack in the courts and we mounted a full-throated defense. We submitted an amicus brief to the Federal Circuit in the *Bilski* case,[6] urging the court to reject narrow categorical exclusions. That brief was influential enough that the court invited us to argue alongside the parties. Our position was simple but profound: patent law must remain expansive if it is to remain true to its statutory text, to its history, and to its constitutional

**AA042**

purpose.

The Supreme Court's later decisions in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*[7] and *Alice Corp. v. CLS Bank International*[8] have been widely misinterpreted. Properly read, they do not narrow eligibility beyond the established judicial exceptions — laws of nature, natural phenomena, and abstract ideas. Yet in practice, these decisions have been wielded as bludgeons to exclude entire classes of invention, from financial technologies to artificial intelligence to diagnostics. That is not what the Court intended, and it is certainly not what Congress ever authorized.

Consider Samuel Morse's famous Claim 5 of the telegraph patent,[9] upheld as valid and patent-eligible by the Supreme Court 171 years ago. That claim covered the use of electromagnetism to transmit information at a distance. Critics at the time argued that such a claim was overbroad, too abstract, too untethered to machinery. Yet the Court upheld it, recognizing that applied scientific ideas — when claimed in a practical form — are precisely what our patent system was designed to encourage. Morse's Claim 5 is still law today. To deny its eligibility would be to deny the very foundation of modern telecommunications. Fast forward to the 20th century, and we see similar principles at play in cases like *Diamond v. Diehr*, where a process for curing rubber using a mathematical equation was held eligible because it produced a useful, concrete result. These precedents underscore that eligibility should turn on whether an invention integrates abstract ideas into something more — something inventive, practical, and transformative.

Patentable subject matter was once summarized as *"anything under the sun made by man."*[10] Save for perpetual motion machines and the judicial exceptions, the principle was broad, clear, and inclusive. That principle should remain the guiding star today.

Expansiveness is not recklessness. It is fidelity to the text of the statute, to the constitutional design, and to the very spirit of American ingenuity. The drafters of our patent laws understood that human imagination could not be cabined by narrow categories. They chose deliberately broad terms — process, machine, manufacture, composition of matter — so that the law could accommodate technological revolutions unforeseen in their time. Just as their words encompassed the telegraph, the telephone, and the airplane, so too must they encompass the blockchain, the quantum processor, and the diagnostic algorithm. The expansiveness of Section 101 is not a flaw; it is a feature. It is what allows our system to evolve with science and to channel creativity into the marketplace where it creates jobs, spurs investment, and strengthens the nation.

## IV.  The USPTO Today – A Continuum of Leadership

When I assumed office as Director of the USPTO, I sought immediately to reaffirm our commitment to expansive eligibility. On my first full day in office, I issued the first patents of my tenure: one in distributed ledger technology, the other in medical diagnostics. Both are fields where questions of eligibility have become acute.

At the signing ceremony, I displayed a copy of Samuel Morse's telegraph patent and reminded my colleagues and the public: applied technologies are not curiosities; they are the backbone of American growth. From the telegraph to blockchain, from penicillin to precision diagnostics, from semiconductors to quantum computing, each transformative technology began as an idea that was protected and fostered by the patent system.

**AA043**

As I said then, "The onrush of technology knows no bounds. From crypto and AI to quantum computing and diagnostics, these are applied, patent-eligible technologies driving the frontiers of knowledge." I want inventors and entrepreneurs to know: the USPTO is open for business — not only for the technologies of today, but especially for those of tomorrow.

The USPTO is not just an administrative agency; we are the Department of Commerce's Central Bank of Innovation. Every piece of IP we put into circulation is a potential job, a new business, a competitive advantage, or an investible asset. And yet another win for both society and the Constitutional foresight of our Founders.

## V. Doctrinal Clarity – The DeepMind Decision

Just last month, I had the occasion to address these issues directly in *Ex parte Desjardins*, a case involving a machine learning model trained on multiple tasks to mitigate "catastrophic forgetting" — a technical challenge where learning new tasks erodes performance on prior ones. [11] A Board panel had initially rejected the claims as ineligible under § 101, reasoning at too high a level of generality that the invention was merely an "algorithm." On rehearing, the Panel vacated that rejection.

The decision reaffirmed the principles articulated by the Federal Circuit in *Enfish, LLC v. Microsoft Corp.* [12] and *McRO, Inc. v. Bandai Namco Games America Inc.*[13]: software and artificial intelligence can improve the functioning of computer systems in concrete, technical ways. The claims at issue were directed to training a machine learning model in a way that preserved prior knowledge while learning new tasks — a solution to the technical problem of "catastrophic forgetting." This was not an abstract idea; it was a practical improvement in how computers function.

The decision emphasized a critical point: the proper statutory tools for limiting the scope of patents are §§ 102 (novelty), 103 (obviousness), and 112 (written description and enablement). Section 101 should not be misused as a blunt instrument to exclude entire technological fields. To do so risks disqualifying exactly the kinds of advances America needs most — advances in artificial intelligence, biotechnology, and data science. Artificial intelligence in particular illustrates the stakes: without reliable patent protection, AI start-ups cannot secure the venture capital needed to compete against state-backed giants in China and elsewhere. Eligibility is the difference between an ecosystem of American innovators and a future where leadership in AI is ceded abroad.

## VI. National Security, Economic Growth, and Global Leadership

Patent eligibility is not just about legal doctrine or economic incentives. It is a matter of national security, economic growth, and global leadership.

History teaches that innovation is central to America's security. One striking example comes from World War II, where Alfred Loomis and his team at the secret MIT Radiation Laboratory pioneered the development of radar technology. Radar, protected and advanced through patent rights and intensive private sector collaboration, became the decisive innovation that helped the Allies win the Battle of the Atlantic and eventually the war itself.[14] The Cold War era saw similar dynamics: satellite communications, semiconductors, and encryption technologies were all secured by patent rights that encouraged private sector participation in national defense. After 9/11, expedited patents under the PATRIOT Act gave rise to real-time financial monitoring and counter-terrorism systems that

**AA044**

complemented the efforts of law enforcement.

Today, we face a new generation of challenges — cybersecurity threats from state actors, the race for artificial intelligence supremacy, the global transition to clean energy, and the emergence of biotechnology capable of rewriting the boundaries of medicine. Each of these fields is at once a commercial opportunity and a national security imperative. Without robust patent protection, private sector innovators will be reluctant to make the sustained investments necessary to compete at the global level.

Economically, expansive patent eligibility ensures that inventors can secure funding, build companies, and generate jobs. The innovation economy is not confined to Silicon Valley; it stretches across every state, from manufacturing hubs to research hospitals, from university laboratories to startup incubators. Every patent issued represents not only a piece of intellectual property but also a potential job, a competitive advantage, a business formed, and an industry strengthened.

Geopolitically, leadership in innovation translates directly into leadership on the world stage. Nations that dominate in emerging technologies wield not just economic power, but diplomatic and military leverage. Artificial intelligence, quantum computing, clean energy, advanced materials — these are the arenas in which the next century's balance of power will be determined.

Narrow eligibility means jobs lost, industries offshored, and adversaries empowered. Expansive eligibility means jobs created, industries built, and America secured. If the United States narrows its view of what is patent-eligible, it will invite competitors to seize the initiative.

Conversely, the upshot of an expansive eligibility regime is clear: the United States secures its inventors' ability to attract investment, builds industries at home rather than ceding them abroad, sustains good-paying jobs in communities across the country, and maintains its edge in the global race for technology. This is not merely economic policy; it is strategic policy. It is how we ensure that the twenty-first century remains, as the twentieth was, an American century.

From a global perspective, our eligibility standards must keep pace with competitors. Countries like China and across Europe have adopted more permissive approaches in areas like AI and business methods, granting patents that fuel their technological ascendancy. If America's system is perceived as overly restrictive, we risk ceding ground in critical sectors. As Director, my priority is to ensure that our unitary patent system serves all walks of inventors, issuing timely, high-quality rights that foster continued innovation, opportunity, and growth.

## VII.  Conclusion – A Call to Fidelity and Courage

The USPTO was there for us in the days after 9/11. It expedited patents that helped keep our country safe. It empowered the private sector to fight back with ideas and innovation. I am here today for the USPTO — for its mission, for its people, and for the inventors and entrepreneurs it serves.

The law needs to be applied thoughtfully, evenly and expansively as it always has since the Patent Act of 1793. And I will emphasize expansively, as Congress originally intended and as the courts have long understood, but more importantly as our national interest demands now more than ever.

Exclusion is not caution; it is abdication. Inclusion is not excess; it is fidelity. Fidelity to the

**AA045**

Constitution's call to "promote the progress of science and the useful arts." Fidelity to the innovators who trust in the system. Fidelity to the nation whose lifeblood is innovation and sets the global bar for security, prosperity and progress.

Twenty four years ago, I told Tommy to "go make something happen." He can't –so we must. Right here, Right now. God bless the souls taken from us on that bright September morning. God bless the inventors who carry forward the torch of progress and lead us forward. And God bless the United States of America.

## Endnotes:

[1] Ed Zier, Undaunted: Leadership Amid Growth and Adversity (2021).

[2] National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (2004).

[3] USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001).

[4] Brief of *Amicus Curiae* Regulatory DataCorp, Inc., *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc).

[5] Federal Bureau of Investigation, Director's Award Program.

[6] *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc).

[7] *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012).

[8] *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

[9] *O'Reilly v. Morse*, 56 U.S. (15 How.) 62 (1854).

[10] *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) (noting that Congress intended patentable subject matter to "include anything under the sun that is made by man").

[11] USPTO, *Ex parte Desjardins et al.* (Appeals Review Panel, Sept. 26, 2025).

[12] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).

[13] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016).

[14] Robert Buderi, *The Invention That Changed the World: How a Small Group of Radar Pioneers Won the Second World War and Launched a Technological Revolution* (1996) (detailing Alfred Loomis and the MIT Radiation Laboratory's decisive role in the invention and deployment of radar).

 Share this page   Print this page

Additional information  about this page

## Receive updates from the USPTO

Enter your email to subscribe or update your preferences

your@email.com                    Subscribe

**AA046**



**AA047**

An official website of the United States government
Here's how you know ⌄

# 16/591,555 | 2a-riskeval:

# Risk Evaluation and Threat Mitigation Using Artificial Intelligence   PUBLIC VIEW

| Application # | Confirmation # | Attorney Docket # | Patent # |
|---|---|---|---|
| 16/591,555 | 1418 | 2a-riskeval | - |

**Filing or 371 (c) date**
10/02/2019

**Status**
Application Involved in
Court Proceedings
06/10/2025

≡  **Show/hide menu**

## Application data

**Application type**
Utility

**Examiner**
MICHAEL H HOANG

**Group art unit**
2122

**Class/subclass**
706/012.000

**AIA (first inventor to file)**
Yes

**Entity status**
Small

**Earliest publication #**
US 2024-0420264 A1

**Earliest publication date**
12/19/2024

**Assignee for publication**
-

**Confirmation #**
1418

**Intl. registration # (Hague)**
-

**Intl. registration publication date**
-

**Correspondence address**

146553 - Abhijit R. Nesarikar,
Ashlesha A. Nesarikar,
Anika A. Nesarikar
8025 Ambiance Way
Plano, TX
UNITED STATES

**Inventors**

Abhijit R. Nesarikar
Plano, TEXAS (US)

Ashlesha A. Nesarikar
Plano, TEXAS (US)

Anika A. Nesarikar
Plano, TEXAS (US)

**Applicants**

**AA048**

# Global Dossier

Application Number   US 16591555 ▾

Patent Family | All Documents | Classification & Citation

★ Collections   0      ⟲ History   1

## US 16591555   191 (191) documents ℹ

▼ Documents: View All ▾

| Description ⬍ ℹ | Date ⬍ | Code ℹ | Group ℹ | Options |
|---|---|---|---|---|
| Plaintiff's Complaint Administrative Procedure Act (APA) action | 04/24/2025 | DC.CV.COM | 4 | ••• |
| Electronic Filing System Acknowledgment Receipt | 05/08/2025 | N417 | 2 | ••• |
| Petition for review by the Office of Petitions | 05/08/2025 | PET.OP | 4 | ••• |
| Petition Decision | 04/10/2025 | PETDEC | 2 | ••• |
| Petition for review by the Office of Petitions | 02/21/2025 | PET.OP | 4 | ••• |
| Electronic Filing System Acknowledgment Receipt | 02/21/2025 | N417 | 2 | ••• |
| Filing Receipt | 02/05/2025 | APP.FILE.REC | unknown | ••• |
| Request for Corrected Filing Receipt | 02/02/2025 | CFILE | 4 | ••• |
| Electronic Filing System Acknowledgment Receipt | 02/02/2025 | N417 | 2 | ••• |
| Petition Decision | 12/23/2024 | PETDEC | 2 | ••• |
| Notice of Publication | 12/19/2024 | NTC.PUB | unknown | ••• |
| Notification of loss of entitlement to micro entity status via PC | 12/05/2024 | MES.LOSS.PC | unknown | ••• |
| Fee Worksheet (SB06) | 10/30/2024 | WFEE | 5 | ••• |
| Electronic Filing System Acknowledgment Receipt | 10/29/2024 | N417 | 2 | ••• |
| Petition for review by the Office of Petitions | 10/29/2024 | PET.OP | 4 | ••• |
| Appeal Brief Filed | 10/10/2024 | AP.B | 4 | ••• |
| Electronic Filing System Acknowledgment Receipt | 10/10/2024 | N417 | 2 | ••• |
| Fee Worksheet (SB06) | 09/20/2024 | WFEE | 5 | ••• |
| Miscellaneous Communication to Applicant - No Action | 09/09/2024 | M327 | 2 | ••• |

### Plaintiff's Complaint Administrative Procedure Act (APA) action



Case 4:25-cv-00423-JCB-JDL   Document 1   Filed 04/24/25   Page 1 of 16 PageID #: 1

FILED
APR 24 2025
CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ASHLESHA A. NESARIKAR,
ANIKA A. NESARIKAR, and
ABHIJIT R. NESARIKAR,

    *Plaintiffs,*

    -v-

THE UNITED STATES PATENT AND
TRADEMARK OFFICE and
COKE MORGAN STEWART, in her
official capacity as the Acting Director of
the United States Patent and Trademark
Office,

    *Defendants.*

Case No. 4:25cv423 JCB/JDL

**COMPLAINT FOR A CIVIL CASE**

PARTIES

1.   Plaintiffs, Ashlesha A. Nesarikar, Anika A. Nesarikar, and Abhijit R. Nesarikar (hereinafter Inventors), reside at 8025 Ambiance Way, Plano, TX 75024.

2.   The United States Patent and Trademark Office (USPTO) is a federal agency headquartered at 600 Dulany St. Alexandria, VA 22314.

3.   Coke Morgan Stewart is sued in her official capacity as the Acting Director of the USPTO. Acting Director Stewart's principal place of business is in Alexandria, VA.

JURISDICTION AND VENUE



About the USPTO (https://www.uspto.gov/about-us)   •   Search for patents (https://www.uspto.gov/patents/search)   •   Search for trademarks (https://www.uspto.gov/trademarks/search)

US Department of Commerce (https://www.commerce.gov)

Accessibility (https://www.uspto.gov/using-uspto/accessibility-uspto-website)

Privacy Policy (https://www.uspto.gov/privacy-policy)

Terms of Use (https://www.uspto.gov/terms-use-uspto-websites)

Financial and Performance Data (https://www.uspto.gov/about-us/financial-and-performance)

Vulnerability Disclosure Policy (https://www.uspto.gov/about-us/security/vulnerability-disclosure-policy)

Freedom of Information Act (https://www.uspto.gov/learning-and-resources/ip-policy/electronic-freedom-information-act-e-foia)

Inspector General (https://www.oig.doc.gov/Pages/U.S.-Patent-and-Trademark-Office.aspx)

NoFEAR Act (https://www.uspto.gov/about-us/nofear-act)

USA.gov (https://www.usa.gov)

Receive updates from the USPTO

Enter your email to subscribe or update your preferences

your@email.com   [ Subscribe ]



**EPO Global Dossier: US201916591555**    Dossier alert:    RSS

Email

**Dossier provided courtesy of USPTO**

| Date | Description | Pages |
|------|-------------|-------|
| 08.05.2025 | Petition for review by the Office of Petitions | 2 |
| 08.05.2025 | Electronic Filing System Acknowledgment Receipt | 2 |
| 24.04.2025 | Plaintiff's Complaint Administrative Procedure Act (APA) action | 16 |
| 10.04.2025 | Petition Decision | 4 |
| 21.02.2025 | Electronic Filing System Acknowledgment Receipt | 2 |
| 21.02.2025 | Petition for review by the Office of Petitions | 21 |
| 05.02.2025 | Filing Receipt | 4 |
| 02.02.2025 | Request for Corrected Filing Receipt | 1 |
| 02.02.2025 | Electronic Filing System Acknowledgment Receipt | 2 |
| 23.12.2024 | Petition Decision | 4 |
| 19.12.2024 | Notice of Publication | 1 |
| 05.12.2024 | Notification of loss of entitlement to micro entity status via PC | 1 |
| 30.10.2024 | Fee Worksheet (SB06) | 1 |
| 29.10.2024 | Petition for review by the Office of Petitions | 4 |
| 29.10.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 10.10.2024 | Appeal Brief Filed | 323 |
| 10.10.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 20.09.2024 | Fee Worksheet (SB06) | 1 |
| 09.09.2024 | Miscellaneous Communication to Applicant - No Action Count | 1 |
| 03.09.2024 | Request for Corrected Filing Receipt | 1 |
| 03.09.2024 | Rescind Nonpublication Request for Pre Grant Publication | 2 |
| 03.09.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 03.09.2024 | Rescind Nonpublication Request for Pre Grant Publication | 2 |
| 03.09.2024 | Rescind Nonpublication Request for Pre Grant Publication | 2 |
| 21.08.2024 | Miscellaneous Communication to Applicant - No Action Count | 2 |
| 21.08.2024 | Advisory Action (PTOL-303) | 3 |
| 16.08.2024 | List of References cited by applicant and considered by examiner | 4 |
| 16.08.2024 | Advisory Action (PTOL-303) | 4 |
| 16.08.2024 | List of References cited by applicant and considered by examiner | 4 |
| 16.08.2024 | Amendment After Final or under 37CFR 1.312, initiated by the examiner. | 1 |
| 14.08.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 14.08.2024 | Notice of Appeal Filed | 2 |
| 14.08.2024 | Notice of Appeal Filed | 2 |
| 14.08.2024 | Transmittal Letter | 1 |
| 14.08.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 14.08.2024 | Petition for review by the Technology Center Special Program Examiner(SPRE) | 2 |
| 14.08.2024 | Electronic Fee Payment | 2 |
| 14.08.2024 | Applicant summary of interview with examiner | 5 |
| 14.08.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 14.08.2024 | Notice of Appeal Filed | 2 |
| 23.07.2024 | Petition Decision | 4 |
| 30.06.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 30.06.2024 | Petition for review by the Technology Center Special Program Examiner(SPRE) | 33 |
| 30.06.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 30.06.2024 | Applicant Arguments/Remarks Made in an Amendment | 79 |
| 30.06.2024 | Fee Worksheet (SB06) | 1 |
| 30.06.2024 | Response After Final Action | 1 |
| 29.06.2024 | Electronic Fee Payment | 2 |

**AA050**

| Date | Description | Pages |
|------|-------------|-------|
| 29.06.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 29.06.2024 | Information Disclosure Statement (IDS) Form (SB08) | 4 |
| 16.06.2024 | Electronic Filing System Acknowledgment Receipt | 3 |
| 16.06.2024 | Electronic Fee Payment | 2 |
| 16.06.2024 | Information Disclosure Statement (IDS) Form (SB08) | 4 |
| 30.04.2024 | Final Rejection | 97 |
| 30.04.2024 | Search information including classification, databases and other search related notes | 2 |
| 30.04.2024 | List of References cited by applicant and considered by examiner | 5 |
| 30.04.2024 | Examiner's search strategy and results | 2 |
| 30.04.2024 | List of References cited by applicant and considered by examiner | 8 |
| 30.04.2024 | Index of Claims | 5 |
| 30.04.2024 | Examiner's search strategy and results | 4 |
| 30.04.2024 | List of References cited by applicant and considered by examiner | 5 |
| 30.04.2024 | List of References cited by applicant and considered by examiner | 8 |
| 30.04.2024 | List of References cited by applicant and considered by examiner | 8 |
| 30.04.2024 | List of references cited by examiner | 2 |
| 16.04.2024 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 16.04.2024 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 16.04.2024 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 16.04.2024 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 16.04.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 16.01.2024 | Specification | 4 |
| 16.01.2024 | Amendment/Request for Reconsideration-After Non-Final Rejection | 2 |
| 16.01.2024 | Specification | 4 |
| 16.01.2024 | Fee Worksheet (SB06) | 1 |
| 16.01.2024 | Amendment/Request for Reconsideration-After Non-Final Rejection | 2 |
| 16.01.2024 | Applicant Arguments/Remarks Made in an Amendment | 19 |
| 16.01.2024 | Electronic Fee Payment | 2 |
| 16.01.2024 | Amendment/Request for Reconsideration-After Non-Final Rejection | 6 |
| 16.01.2024 | Claims | 60 |
| 16.01.2024 | Electronic Filing System Acknowledgment Receipt | 2 |
| 15.01.2024 | Electronic Fee Payment | 2 |
| 15.01.2024 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 15.01.2024 | Electronic Filing System Acknowledgment Receipt | 17 |
| 15.01.2024 | Information Disclosure Statement (IDS) Form (SB08) | 8 |
| 15.01.2024 | Transmittal Letter | 1 |
| 15.01.2024 | Foreign Reference | 69 |
| 15.01.2024 | Other reference-Patent/Application/Search Documents | 21 |
| 15.01.2024 | Electronic Filing System Acknowledgment Receipt | 11 |
| 15.01.2024 | Information Disclosure Statement (IDS) Form (SB08) | 8 |
| 15.01.2024 | Information Disclosure Statement (IDS) Form (SB08) | 8 |
| 15.01.2024 | Transmittal Letter | 1 |
| 08.11.2023 | Office Action Appendix | 13 |
| 08.11.2023 | Examiner Interview Summary Record (PTOL - 413) | 2 |
| 25.10.2023 | Electronic Request for Interview with Examiner | 1 |
| 20.10.2023 | Index of Claims | 3 |
| 20.10.2023 | List of references cited by examiner | 1 |
| 20.10.2023 | List of References cited by applicant and considered by examiner | 5 |
| 20.10.2023 | Non-Final Rejection | 74 |
| 20.10.2023 | Search information including classification, databases and other search related notes | 1 |
| 20.10.2023 | List of References cited by applicant and considered by examiner | 5 |
| 20.10.2023 | Examiner's search strategy and results | 2 |
| 20.10.2023 | List of References cited by applicant and considered by examiner | 5 |

**AA051**

| Date | Description | Pages |
|------|-------------|-------|
| 20.10.2023 | Examiner's search strategy and results | 3 |
| 20.10.2023 | List of References cited by applicant and considered by examiner | 5 |
| 20.10.2023 | Bibliographic Data Sheet | 1 |
| 07.06.2023 | Claims | 16 |
| 07.06.2023 | Electronic Filing System Acknowledgment Receipt | 3 |
| 07.06.2023 | Fee Worksheet (SB06) | 1 |
| 07.06.2023 | Applicant Arguments/Remarks Made in an Amendment | 2 |
| 07.06.2023 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 07.06.2023 | Response to Election / Restriction Filed | 1 |
| 07.06.2023 | Electronic Filing System Acknowledgment Receipt | 2 |
| 07.06.2023 | Electronic Fee Payment | 2 |
| 20.05.2023 | Applicant summary of interview with examiner | 2 |
| 20.05.2023 | Electronic Filing System Acknowledgment Receipt | 2 |
| 16.05.2023 | Examiner Interview Summary Record (PTOL - 413) | 2 |
| 16.05.2023 | Office Action Appendix | 2 |
| 03.05.2023 | Electronic Request for Interview with Examiner | 1 |
| 11.04.2023 | Index of Claims | 2 |
| 11.04.2023 | Requirement for Restriction/Election | 8 |
| 03.04.2023 | Electronic Filing System Acknowledgment Receipt | 2 |
| 03.04.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 03.04.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 03.04.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 03.04.2023 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 30.03.2023 | Electronic Filing System Acknowledgment Receipt | 3 |
| 30.03.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 30.03.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 30.03.2023 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 30.03.2023 | Patent Term Adjustment Statement under 37 CFR 1.704(d) filed with an IDS | 2 |
| 28.03.2023 | Information Disclosure Statement (IDS) Form (SB08) | 5 |
| 28.03.2023 | Electronic Filing System Acknowledgment Receipt | 4 |
| 28.02.2023 | Claims | 10 |
| 28.02.2023 | Electronic Fee Payment | 2 |
| 28.02.2023 | Preliminary Amendment | 1 |
| 28.02.2023 | Electronic Filing System Acknowledgment Receipt | 2 |
| 28.02.2023 | Applicant Arguments/Remarks Made in an Amendment | 4 |
| 11.01.2023 | Communication - Re: Power of Attorney (PTOL-308) | 1 |
| 10.01.2023 | Information Disclosure Statement (IDS) Form (SB08) | 4 |
| 10.01.2023 | Electronic Filing System Acknowledgment Receipt | 2 |
| 04.01.2023 | Applicant Arguments/Remarks Made in an Amendment | 1 |
| 04.01.2023 | Power of Attorney | 2 |
| 04.01.2023 | Claims | 12 |
| 04.01.2023 | Power of Attorney | 2 |
| 04.01.2023 | Information Disclosure Statement (IDS) Form (SB08) | 8 |
| 04.01.2023 | Electronic Filing System Acknowledgment Receipt | 7 |
| 04.01.2023 | Electronic Fee Payment | 2 |
| 04.01.2023 | Preliminary Amendment | 1 |
| 04.01.2023 | Power of Attorney | 2 |
| 04.01.2023 | Fee Worksheet (SB06) | 1 |
| 30.11.2022 | Information Disclosure Statement (IDS) Form (SB08) | 6 |
| 30.11.2022 | Electronic Filing System Acknowledgment Receipt | 6 |
| 29.07.2022 | Electronic Filing System Acknowledgment Receipt | 7 |
| 29.07.2022 | Information Disclosure Statement (IDS) Form (SB08) | 6 |
| 10.06.2022 | Information Disclosure Statement (IDS) Form (SB08) | 4 |

**AA052**

| Date | Description | Pages |
|------|-------------|-------|
| 10.06.2022 | Electronic Filing System Acknowledgment Receipt | 2 |
| 26.11.2019 | Communication – Re: Power of Attorney (PTOL-308) | 1 |
| 22.11.2019 | Power of Attorney | 2 |
| 22.11.2019 | Miscellaneous Incoming Letter | 1 |
| 22.11.2019 | Power of Attorney | 2 |
| 22.11.2019 | Power of Attorney | 2 |
| 22.11.2019 | Electronic Filing System Acknowledgment Receipt | 2 |
| 12.11.2019 | Acceptance of Request under Rule 48 to correct inventorship or name | 1 |
| 12.11.2019 | Filing Receipt | 3 |
| 07.11.2019 | Fee Worksheet (SB06) | 2 |
| 07.11.2019 | Request for Corrected Filing Receipt | 1 |
| 07.11.2019 | Application Data Sheet to update/correct info | 7 |
| 07.11.2019 | Electronic Filing System Acknowledgment Receipt | 2 |
| 29.10.2019 | Fee Worksheet (SB06) | 1 |
| 29.10.2019 | Response – Re: Informal Power of Attorney (PTOL-308) | 1 |
| 29.10.2019 | Filing Receipt | 4 |
| 02.10.2019 | Transmittal of New Application | 2 |
| 02.10.2019 | Transmittal of New Application | 6 |
| 02.10.2019 | Nonpublication request from applicant | 2 |
| 02.10.2019 | Specification | 86 |
| 02.10.2019 | Certification of Micro Entity (Gross Income Basis) | 2 |
| 02.10.2019 | Drawings-only black and white line drawings | 14 |
| 02.10.2019 | Certification of Micro Entity (Gross Income Basis) | 2 |
| 02.10.2019 | Transmittal of New Application | 2 |
| 02.10.2019 | Nonpublication request from applicant | 2 |
| 02.10.2019 | Power of Attorney | 2 |
| 02.10.2019 | Abstract | 1 |
| 02.10.2019 | Specification | 95 |
| 02.10.2019 | Electronic Filing System Acknowledgment Receipt | 5 |
| 02.10.2019 | Power of Attorney | 2 |
| 02.10.2019 | Transmittal of New Application | 2 |
| 02.10.2019 | Power of Attorney | 2 |
| 02.10.2019 | Fee Worksheet (SB06) | 2 |
| 02.10.2019 | Certification of Micro Entity (Gross Income Basis) | 2 |
| 02.10.2019 | Claims | 8 |
| 02.10.2019 | Transmittal of New Application | 4 |
| 02.10.2019 | Nonpublication request from applicant | 2 |

The EPO does not accept any responsibility for the accuracy of data and information originating from authorities other than the EPO; in particular, it does not guarantee that such data and information are complete, up to date or fit for specific purposes.

**AA053**



# Additional resources

## OMB Guidance Memoranda

[Complete Collection of OIRA memos](#) - including sources on

- [Supporting Usability Testing Through Paperwork Reduction Act Flexibilities](#) (PDF, 341 KB, 6 pages)
- [M-22-10: Improving Access to Public Benefits Programs](#) (PDF, 605 KB, 18 pages)
- [Flexibilities](#) (PDF, 2.6 MB, 7 pages)
- [Web Technologies](#) (PDF, 2.9 MB, 5 pages)
- [PRA Primer](#) (PDF, 97 KB, 8 pages)

## PRA Systems

[RegInfo PRA Search](#) - find approved ICRs and supporting statements

[ROCIS](#) - where to submit 🔒 PRA requests (login required)

## PRA Legal Text

Law: [44 USC Chapter 35](#)

Legislation: [Paperwork Reduction Act of 1995](#); [Evidence Act of 2018](#)

Regulation: [5 CFR 1320](#)

## Reports

[Information Collection Budget](#) (PDF, 1,007 KB, 52 pages) — Report on 🔒 Burden Reduction Initiatives and Total Paperwork Burdens (Fiscal Year 2024)

## Tools & Templates

[Supporting Statement Part A Questions](#)

[Return to top](#)

**Contact:** [Get PRA Help](#) | [Email us site feedback](#)

 **GSA** pra.digital.gov
**An official website of the** [U.S. General Services Administration](#) **and the** [Office of Management and Budget](#)

[About GSA](#)          [FOIA requests](#)          [Office of the Inspector General](#)          [Performance reports](#)

[Accessibility statement](#)   [No FEAR Act data](#)                                    [Privacy policy](#)

Looking for U.S. government information and services? [Visit USA.gov ↗](#)

**AA054**



ADMINISTRATOR
OFFICE OF
INFORMATION AND
REGULATORY
AFFAIRS

April 7, 2010

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES,
AND INDEPENDENT REGULATORY AGENCIES

FROM:              Cass R. Sunstein
                   Administrator

SUBJECT:           Information Collection under the Paperwork Reduction Act

On January 21, 2009, the President issued a memorandum calling for the establishment of "a system of transparency, public participation, and collaboration."[1] The memorandum required an Open Government Directive to be issued by the Director of the Office of Management and Budget (OMB), instructing "executive departments and agencies to take specific actions implementing the principles set forth in this memorandum."

Implementing the President's memorandum, OMB's Open Government Directive requires a series of measures to promote the commitments to transparency, participation, and collaboration.[2] Section 4 of the Directive specifically instructs the Administrator of the Office of Information and Regulatory Affairs (OIRA) to "review existing OMB policies, such as Paperwork Reduction Act guidance and privacy guidance, to identify impediments to open government and to the use of new technologies and, where necessary, issue clarifying guidance and/or propose revisions to such policies, to promote greater openness in government."

This Memorandum responds to that requirement by offering clarifying guidance with respect to the Paperwork Reduction Act of 1995 (PRA)[3] in order to specify its central requirements and to increase transparency and openness.

The PRA was designed, among other things, to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society."[4] Federal agencies play a critical role in collecting and managing information in order to promote openness, reduce burdens on the public, increase program efficiency and

---

[1] Available at http://www.gpoaccess.gov/presdocs/2009/DCPD200900010.pdf.
[2] Available at http://www.whitehouse.gov/omb/assets/memoranda_2010/m10-06.pdf.
[3] 44 U.S.C. chapter 35; *see* 5 CFR Part 1320.
[4] 44 U.S.C. § 3501.

effectiveness, and improve the integrity, quality, and utility of information to all users within and outside the government.[5]

Before requiring or requesting information from the public, the PRA requires Federal agencies[6] (1) to seek public comment on proposed collections and (2) to submit proposed collections for review and approval by the Office of Management and Budget (OMB). OMB's Office of Information and Regulatory Affairs (OIRA) reviews agency information collection requests for approval or disapproval. When OMB approves an information collection, it assigns an OMB control number[7] that the agency must display on the information collection.[8] OMB has issued regulations and guidance to promote agency compliance with the PRA.[9]

<u>What counts as "information" under the PRA?</u>

OMB regulations define "information" as "any statement or estimate of fact or opinion, regardless of form or format, whether in numerical, graphic, or narrative form, and whether oral or maintained on paper, electronic or other media."[10] This category includes:

(1) requests for information to be sent to the government, such as forms (e.g., the IRS 1040), written reports (e.g., grantee performance reports), and surveys (e.g., the Census);

(2) recordkeeping requirements (e.g., OSHA requirements that employers maintain records of workplace accidents); and

(3) third-party or public disclosures (e.g., nutrition labeling requirements for food).[11]

The PRA applies to collections of information using identical questions posed to, or reporting or recordkeeping requirements imposed on, "ten or more persons."[12] For the purpose of counting the number of respondents, agencies should consider the number of respondents within any 12 month period. If a collection of information is addressed to all or a substantial

---

[5] 44 U.S.C. § 3506(b).
[6] With some exceptions, the PRA applies to "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 44 U.S.C. § 3502(1).
[7] The OMB Control Number is two four-digit codes separated by a hyphen. The first four digits identify the sponsoring agency and bureau, and the second four digits identify the particular collection. The public can find OMB's inventory of currently approved collections, with OMB control numbers, online at http://www.reginfo.gov.
[8] The PRA prohibits agencies from penalizing or denying a benefit to (1) those who fail to respond to Federal collections of information that do not display valid OMB control numbers and (2) those who have not been informed that a response is not required unless the collection of information displays a valid control number. Litigants may raise these public protections at any time during an administrative process or judicial action. *See* 44 U.S.C. § 3512(b); *Center for Auto Safety v. NHTSA*, 244 F.3d 144 (D.C. Cir. 2001); *Saco River Cellular Inc. v. FCC*, 133 F.3d 25 (D.C. Cir. 1998).
[9] Please see OIRA's website: http://www.whitehouse.gov/omb/inforeg_default/.
[10] 5 C.F.R. 1320.3(h).
[11] *See* 5 C.F.R. 1320.3(c).
[12] 44 U.S.C. § 3502(3)(A)(i). Under the PRA, "person" means "an individual, partnership, association, corporation, business trust, or legal representative, an organized group of individuals, a State, territorial, tribal, or local government or branch thereof, or a political subdivision of a State, territory, tribal, or local government or a branch of a political subdivision." 44 U.S.C. § 3502(10).

majority of an industry or sector in a 12 month period, that collection is presumed to be addressed to ten or more persons.[13]

The requirements of the PRA apply to voluntary collections as well as to mandatory collections and collections required to obtain a Federal benefit (e.g., a job, a grant, a contract).[14] In implementing program activities, agencies should be aware of the applicability of the PRA and address PRA compliance in sufficient time to solicit and respond to public comment.[15]

What does not count as information under the PRA?

OMB regulations specify a number of items that are generally not "information" under the PRA.[16] Important examples are

- affidavits, receipts, changes of address, or consents;

- tests of the aptitude, abilities, or knowledge of persons; and

- facts or opinions that are (1) submitted in response to general solicitations of public comments,[17] (2) addressed to a single person, (3) obtained or solicited at or in connection with public hearings or meetings, (4) obtained through direct observation by the agency (e.g., through visual inspection to determine how long it takes for people to complete a specific transaction), or (5) obtained from participants in clinical trials (which typically do not involve answers to "identical questions").

It is worth emphasizing that facts or opinions obtained in connection with public meetings do not count as "information." This "public meeting" exception allows agencies to engage with the public on the Internet so long as the engagement is the functional equivalent of a public meeting (i.e., not a survey). In addition, it is important to underline that general solicitations, such as *Federal Register* notices, do not trigger the PRA. It follows that agencies may offer the public opportunities to provide general comments on discussion topics through the Internet. More generally, agencies may use social media and web-based technologies in a variety of specific ways without triggering the PRA.[18]

What information collections do not require OMB approval?

By statute, the PRA does not apply to some types of information collections. OMB approval is not required for information collections during a Federal criminal investigation or prosecution, during a civil action to which the United States is a party, or during the conduct of intelligence activities.[19] Agency collections from "agencies, instrumentalities, or employees of

---

[13] 5 C.F.R. 1320.3(c)(4)(ii).

[14] *See* 44 U.S.C. § 3502(3); 5 C.F.R. 1320.3(c).

[15] Given that the required public comment periods total 90 days, agencies should plan for at least 90 days plus time to respond to comments and questions that arise during OMB review.

[16] 5. C.F.R. 1320.3(h). Please see the Appendix for the regulatory text.

[17] Documents such as Advance Notices of Proposed Rulemaking, Requests for Comments, Requests for Information, and Notices of Proposed Rulemaking are generally not information collections.

[18] For additional information, see OIRA Memorandum on Social Media, Web-Based Interactive Technologies, and the Paperwork Reduction Act, available at http://www.whitehouse.gov/omb/inforeg_default/.

[19] 44 U.S.C. § 3518(c). Please see the Appendix for the statutory exemptions.

the United States" in their official capacities are generally not subject to the PRA, unless those collections are for "general statistical purposes."[20] It is worth emphasizing that agencies may ask for facts and opinions of Federal employees without triggering the PRA.

<u>What are the public notice and comment requirements for information collection requests?</u>

To obtain the public's input on an agency's proposal to collect information, the PRA generally requires the agency to publish a 60-day notice in the *Federal Register* soliciting public comment on the agency's proposed collection. The notice must include a specific request that the public evaluate whether the proposed collection of information is necessary; evaluate the accuracy of the agency's estimate of the burden that the collection would impose on respondents; comment on how to enhance the quality, utility, and clarity of the information to be collected; and comment on how to minimize the burden of the collection of information.[21]

After conclusion of the 60-day comment period and the agency's internal consideration of the public's comments, the agency submits the collection to OMB and publishes a second *Federal Register* notice to announce the start of OMB review.[22] This second notice informs the public about how to submit comments to OMB and informs the public that OMB may act on the agency's request only after the 30-day comment period has closed.



<u>When and how may the public notice and comment requirements be reduced?</u>

Under certain circumstances, an agency head or designee may request that it be permitted to seek expedited, or "emergency," OMB review of an information collection request. When expedited review is granted, the agency must take all practicable steps to consult with members of the public, but OMB may modify or, if necessary, waive the public comment requirements.[23] And when review is expedited, OMB acts promptly through a suitably streamlined process, consistent with the purposes of the PRA.

OMB may grant expedited review if: "(i) Public harm is reasonably likely to result if normal clearance procedures are followed; (ii) An unanticipated event has occurred; or (iii) The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed."[24]

---

[20] 44 U.S.C. § 3502(3)(A).
[21] 44 U.S.C. § 3506(c)(2)(A). If a new information collection is associated with a proposed rule, OMB regulations require that only one notice be published. Agencies include this PRA notice in the preamble to the proposed rule and comments are directed to OMB. *See* 44 U.S.C. § 3506(c)(2)(B); 5 C.F.R. 1320.11.
[22] 44 U.S.C. § 3507(a)(1)(D).
[23] 5 CFR 1320.13(c) and (d).
[24] 44 U.S.C. § 3507(j); 5 C.F.R. 1320.13(a)(2).

As these situations arise, agencies should consult with OIRA to select an approach that permits them to comply with the PRA while meeting their other obligations.[25]

An agency may also request a "generic clearance" in situations in which (a) there is a need for multiple, similar low-burden collections that do not raise substantive or policy issues and (b) the specifics of each collection cannot be determined until shortly before the data are to be collected. Generic clearances have proved useful for customer satisfaction surveys, focus group testing, and website usability surveys. To obtain a generic clearance, agencies provide the public with opportunity for comment as required by the PRA and provide all information that would allow for meaningful comment, including a description of the need for the collection, the general nature of the collection, an estimate of the overall burden, and a description of the methodologies that will be used to collect the data. Once approval is granted for the overall collection, individual collections that fall within the generic clearance are reviewed on an expedited basis and are not generally required to undergo further public comment. Agencies are encouraged to consult with their OMB desk officers before developing a generic clearance to determine if it is appropriate.

<u>What does OMB evaluate during its review of proposed collections?</u>

A central goal of OMB review is to help agencies strike a balance between collecting information necessary to fulfill their statutory missions and guarding against unnecessary or duplicative information that imposes unjustified costs on the American public. In this regard, OIRA evaluates whether the collection of information by the agency:

- is necessary for the proper performance of the functions of the agency, including whether the information has practical utility;[26]

- minimizes the Federal information collection burden, with particular emphasis on those individuals and entities most adversely affected; and

- maximizes the practical utility of and public benefit from information collected by or for the Federal Government.[27]

OIRA also reviews the extent to which the information collection is consistent with applicable laws, regulations, and policies related to privacy, confidentiality, security, information quality, and statistical standards. In addition, OMB coordinates efforts across Federal agencies in shared areas of interest and expertise.

Under the PRA, OMB may approve a collection for up to three years at one time.[28] To extend the expiration date of a collection, an agency must provide the public with an opportunity to comment on the continuation of the collection, with the two notices described above, and

---

[25] This includes setting a schedule for when the agency will provide the public with opportunities for full notice and comment under the PRA.
[26] 44 U.S.C. § 3508.
[27] 44 U.S.C. § 3504.
[28] 44 U.S.C. § 3507(g). Some approvals are for shorter periods of time. In the case of "emergency" requests, OMB approvals are limited to six months. 44 U.S.C. § 3507(j)(2).

resubmit the information collection request.[29]  The public may have access to an inventory of currently approved agency collections at http://www.reginfo.gov/public/do/PRAMain.[30]

<u>What resources are available to provide assistance?</u>

OIRA provides guidance on its website[31] and makes its staff available to assist agencies in determining whether their activities are information collections under the PRA.  When questions arise about the applicability of the PRA, an agency's internal resources, coordinated by the agency's Chief Information Officer, are the best sources for guidance and assistance.  By working together, for example, OMB and the agencies have been able to minimize the number of PRA violations and to bring agencies into compliance when PRA violations occur.  Finally, the PRA requires OMB to report to Congress annually on the Federal Government's major activities under the Act.  This report, the Information Collection Budget (ICB), is available on OIRA's website.

---

[29] Agencies may also discontinue collections at any time by submitting a short request to OMB.
[30] To ensure that the public record is accurate, agencies must submit, and OMB must review, documentation of all proposed revisions to an active collection before those revisions may be implemented.  If the agency is considering significant or substantive revisions to the collection, it must provide the public with an opportunity to comment on the proposed revisions, as it would with a new collection.  For insignificant or non-substantive changes, the agency is not required to seek public comment.
[31] http://www.whitehouse.gov/omb/inforeg_default/

# Appendix

<u>Statutory Exemptions</u>[32]

(1) Except as provided in paragraph (2), this subchapter shall not apply to the collection of information--
> (A) during the conduct of a Federal criminal investigation or prosecution, or during the disposition of a particular criminal matter;
> (B) during the conduct of--
> (i) a civil action to which the United States or any official or agency thereof is a party; or
> (ii) an administrative action or investigation involving an agency against specific individuals or entities;
> (C) by compulsory process pursuant to the Antitrust Civil Process Act and section 13 of the Federal Trade Commission Improvements Act of 1980; or
> (D) during the conduct of intelligence activities as defined in section 3.4(e) of Executive Order No. 12333, issued December 4, 1981, or successor orders, or during the conduct of cryptologic activities that are communications security activities.

(2) This subchapter applies to the collection of information during the conduct of general investigations (other than information collected in an antitrust investigation to the extent provided in subparagraph (C) of paragraph (1)) undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry.

<u>OMB Regulations</u>

OMB regulations specify categories of items that are generally not "information" under the PRA.[33] These categories include:

(1) Affidavits, oaths, affirmations, certifications, receipts, changes of address, consents, or acknowledgments; provided that they entail no burden other than that necessary to identify the respondent, the date, the respondent's address, and the nature of the instrument (by contrast, a certification would likely involve the collection of "information" if an agency conducted or sponsored it as a substitute for a collection of information to collect evidence of, or to monitor, compliance with regulatory standards, because such a certification would generally entail burden in addition to that necessary to identify the respondent, the date, the respondent's address, and the nature of the instrument);

(2) Samples of products or of any other physical objects;

(3) Facts or opinions obtained through direct observation by an employee or agent of the sponsoring agency or through nonstandardized oral communication in connection with such direct observations;

(4) Facts or opinions submitted in response to general solicitations of comments from the public, published in the *Federal Register* or other publications, regardless of the form or format thereof, provided that no person is required to supply specific information pertaining to the commenter, other than that necessary for self-identification, as a condition of the agency's full consideration of the comment;

---

[32] 44 U.S.C. § 3518(c).
[33] 5. C.F.R. 1320.3(h).

(5) Facts or opinions obtained initially or in follow-on requests, from individuals (including individuals in control groups) under treatment or clinical examination in connection with research on or prophylaxis to prevent a clinical disorder, direct treatment of that disorder, or the interpretation of biological analyses of body fluids, tissues, or other specimens, or the identification or classification of such specimens;

(6) A request for facts or opinions addressed to a single person;

(7) Examinations designed to test the aptitude, abilities, or knowledge of the persons tested and the collection of information for identification or classification in connection with such examinations;

(8) Facts or opinions obtained or solicited at or in connection with public hearings or meetings;

(9) Facts or opinions obtained or solicited through nonstandardized follow-up questions designed to clarify responses to approved collections of information; and

(10) Like items so designated by OMB.

# Glossary of Abbreviations

'288: U.S. patent application 18/069,288

'382: U.S. patent application 18/069,382

'555: U.S. patent application 16/591,555

'844: U.S. patent application 17/906,844 issued as U.S. Patent 11,741,562 on 08/29/2023.

AI: Artificial intelligence

APA: Administrative Procedure Act

CAFC: U.S. Court of Appeals for The Federal Circuit

DC: district court document from the CM/ECF system

FC: CAFC document in the CM/ECF system

FRCP: Federal Rules of Civil Procedure

Inventors: Ashlesha A. Nesarikar, Anika A. Nesarikar, and Abhijit R. Nesarikar

IP: intellectual property

MES: micro entity status, as defined by 35 USC 123

N/A: Not applicable

Order: Final judgment and accompanying order by District Judge J. Campbell Barker of the district court on 10/01/2025.

PRA: Paperwork Reduction Act

Report: Report and recommendation of U.S. magistrate judge by Magistrate Judge

     John D. Love of the district court on 08/01/2025

The district court: U.S. District Court Eastern District of Texas

USPTO: U.S. Patent and Trademark Office

## Abbreviations of Authorities

*Bell*: *Bell v. Hood, 327 U.S. 678 (1946)*

*Chou*: *Chou v. Univ. of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001)

*Erickson*: Erickson *v. Pardus*, 551 U.S. 89 (2007)

*Kisor*: *Kisor v. Wilkie*, 588 U.S. ___ (2019)

*Lujan*: *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)

*Montez*: *Montez v. Department of the Navy,* 392 F.3d 147 (5th Cir. 2004)

*Omni*: *Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1152 (Fed. Cir. 2021)

*Perttu*: Perttu *v. Richards*, 605 U.S. 460 (2025)

*Roche*: *Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular*

*Systems, Inc.*, 563 U.S. 776 (2011)

*Shukh*: *Shukh v. Seagate Technology, LLC*, Appeal No. 2014-1406 (Fed. Cir.

October 2, 2015)

*Williamson*: *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir.1981)

# Table of Contents for Attachment to Informal Opening Brief

I Introduction.............................................................................. 1

II Inventors are the owners of the unassigned patent applications...........5

III Order conflates "has assigned" with "is under an obligation to

assign", contradicting 35 USC 123(b).............................................7

IV Order relies on anachronistic fallacy in determining lack of standing.12

V Order's dismissal stands on violation of 35 USC 123(e)....................14

VI Order disregards USPTO's contradictory stances on other

applications....................................................................15

VII Inventors request de novo review by CAFC....................................18

VII.a Order's review was incomplete and erroneous.........................18

VII.b Order imposed improper requirements at the pleading stage....19

VII.c Even if Inventors were not owners, Inventors are still harmed as

patent applicants and objects of USPTO's adverse actions........22

VII.d Order errs in finding no reputational harm to Inventors............23

VII.e Order erred in disregarding PRA evidence and arguments........25

VII.f Order violated due process in construing Inventors' Complaint.27

VIII Order disregarded USPTO's overt attempt to subvert judicial
review............................................................................28

IX Order violated FRCP 8(f)............................................................28