No. 2026-1167

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

## ASHLESHA A. NESARIKAR, ANIKA A. NESARIKAR, ABHIJIT R. NESARIKAR,

*Plaintiffs-Appellants*

v.

## THE UNITED STATES PATENT AND TRADEMARK OFFICE, JOHN A. SQUIRES, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Defendants-Appellees*

---

On Appeal from the United States District Court for the Eastern District of Texas in Case No. 4:25-cv-00423-JCB-JDL, District Judge J. Campbell Barker

---

## Combined Petition for Panel Rehearing and Rehearing En Banc under Federal Circuit Rule 40(a)(2)

Of:
Ashlesha A. Nesarikar, *pro se;*
Anika A. Nesarikar, *pro se;*
and Abhijit R. Nesarikar, *pro se;*
hereinafter "Plaintiffs"

## Certificate of Interest

Under Federal Circuit Rule 47.4(b), Plaintiffs, as unrepresented individuals, are exempt from filing a certificate of interest.

**Table of Contents**

Certificate of Interest...................................................................................i

Table of Authorities.....................................................................................iii

Statement Under Federal Circuit Rule 40(c)...........................................v

**I.** The Opinion rests on fundamental factual errors and material omissions............1

**II.** USPTO's enforcement action creates concrete, ongoing injury independent of ownership.........................................................................................7

**II.a** USPTO's admission of injury is dispositive....................................7

**II.b** The agency record shows Plaintiffs are "objects" of USPTO's enforcement action.............................................................................9

**II.c** The definition in 35 U.S.C. § 123 and the record show the injury includes deprivation of a statutory right..................................................9

**II.d** The Panel shields agency overreach from judicial review..........10

**III.** The Panel creates a procedural "catch-22", immunizing unlawful agency actions from judicial review under the PRA and violating due process........11

**III.a** The Panel erroneously conditions judicial review on compliance with the challenged collection of information, requiring individuals to forfeit their statutory rights to secure the standing to assert them, subverting the separation of powers.............................................................11

**III.b** The Panel misapprehends the Congressional intent of the PRA and renders the PRA's public protection provision nugatory by shielding unlawful collections from oversight.................................................12

**IV.** The Panel erred by eliminating the legal distinction between an obligation to assign in the future and a consummated assignment.....................................15

**IV.a** The Opinion violates the Congressional intent throughout 35 U.S.C. § 123, contravening the separation of powers.........................................16

**IV.b** The Panel's affirmance denies due process by disregarding intertwinement of the jurisdictional challenge with merits of the case, conflicting with established precedent.............................................................18

**V.** Conclusion.............................................................................................19

Certificate of Compliance with Type-Volume Limitations.....................21

# Table of Authorities

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC,*
    625 F.3d 1359 (Fed. Cir. 2010)..................................................................4

*Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc.,*
    563 U.S. 776 (2011)...............................................................................16

*Hyatt v. Office of Management and Budget,*
    998 F.3d 423, 426 (9th Cir. 2021)......................................................13, 14

*Kisor v. Wilkie,*
    588 U.S. ___ (2019).................................................................................18

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024).................................................................................18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................7, 9

*Montez v. Department of the Navy,*
    392 F.3d 147 (5th Cir. 2004)....................................................................19

*Omni MedSci, Inc. v. Apple Inc.,*
    7 F.4th 1148, 1152 (Fed. Cir. 2021).........................................................17

*Perttu v. Richards,*
    605 U.S. 460 (2025).................................................................................19

*Saco River Cellular Inc. v. FCC,*
    133 F.3d 25 (D.C. Cir. 1998)....................................................................15

*Sutton v. Providence St. Joseph Medical Center,*
    192 F.3d 826, 844 (9th Cir. 1999)............................................................14

*Williamson v. Tucker,*
    645 F.2d 404, 415 (5th Cir.1981).......................................................15, 19

**Constitutional Provisions**

Article I,
    Section 8, Clause 8..................................................................................16

U.S. Constitution, Amendment V

due process.............................................................. 11, 15, 16, 18

**Statutes**

35 U.S.C. § 123                                  9, 10, 15, 16, 17, 18

35 U.S.C. § 123(b)                                            17, 18

35 U.S.C. § 123(e)                                                17

35 U.S.C. § 123(f)                                           1, 8, 13

44 U.S.C. § 3502                                               2, 14

44 U.S.C. § 3512                                              12, 15

5 U.S.C. § 552a                                                    6

**Rules**

Federal Rules of Civil Procedure: Rule
    12(b)(1)............................................................6, 15, 18, 19
    12(b)(6)............................................................15

Federal Rules of Evidence: Rule
    301....................................................................16

**USPTO Publications and Regulations**

37 C.F.R. § 1.29(b)                                                18

**Government Authorities, Reports, and Statements**

H. Rept. 104-99 - PAPERWORK REDUCTION ACT OF 1995, H.Rept.104-99,
104th Cong. (1995).                                               12

U.S. General Services Administration and Office Of Management And Budget
(OMB). OMB Guidance Memoranda. Archived on March 29, 2025
(https://web.archive.org/web/20250329185927/https://pra.digital.gov/additional-
resources/).                                                      15

**Other Authorities**

Magesh, Varun, et al. Hallucination-Free? Assessing the Reliability of Leading
AI Legal Research Tools.
    Journal of Empirical Legal Studies 22.2 (2025): 216-242
    (https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12413).......................13

**Statement Under Federal Circuit Rule 40(c)**

Based on our professional judgment, we believe the panel decision[1] is contrary to the following decision(s) of the Supreme Court of the United States or the precedent(s) of this court:

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), hereinafter "*Lujan*";

*Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc.*, 563 U.S. 776 (2011), hereinafter "*Roche*";

*Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1152 (Fed. Cir. 2021), hereinafter "*Omni*";

*Perttu v. Richards*, 605 U.S. 460 (2025), hereinafter "*Perttu*";

*Kisor v. Wilkie*, 588 U.S. ___ (2019), hereinafter "*Kisor*";

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), hereinafter "*Loper Bright*";

*Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359 (Fed. Cir. 2010), hereinafter "*Abraxis*".

\* \* \*

Based on our professional judgment, we believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance:

_____

[1]May 12, 2026 *per curiam* opinion of the Panel, Circuit Judges Taranto, Hughes, and Cunningham (FC 36) ("Opinion"), reproduced in the attached addendum; see A01-A13. "FC" refers to CAFC filings in the CM/ECF system.

1. Whether a person performing a statutory certification under 35 U.S.C. § 123[2], who is subject to administrative and statutory penalties for that certification, has standing to challenge the agency's implementation of the very statute—35 U.S.C. § 123—that governs and defines that certification and the penalties.

2. Whether the Panel's affirmance of the dismissal for lack of standing under the Paperwork Reduction Act[3] (PRA) erred by:

   2.1 violating due process by conditioning the right to judicial review (of an agency action forcing compliance with a "collection of information") on the plaintiff complying with the "collection of information" before the court, thereby creating a "catch-22" that forces plaintiffs to waive their rights under the PRA before exercising their rights under the PRA; or

   2.2 overriding Congress's intent that 44 U.S.C. § 3512 grant a person the right to judicial review of an agency action when the agency action enforces a "collection of information" that requires the person to report their personal information in a manner that violates 44 U.S.C. § 3512(a) and under threat of penalty;

   thereby rendering the agency action unreviewable.

---

[2] See A15-A17.
[3] See A18-A22.

3. Whether the Panel's application of "obligation" to assign, not as prospective, but as functionally equivalent to a consummated "assignment" for the purposes of Article III standing erred by:

3.1 violating 35 U.S.C. § 123, which distinguishes a prospective obligation to assign from a consummated assignment and prohibits imposing additional limits on certification without Congressional oversight;

3.2 improperly resolving a Federal Rule of Civil Procedure 12(b)(1)[4] jurisdictional challenge by making a determination on merits of the underlying dispute; or

3.3 infringing upon inventors' constitutional rights by extinguishing an inventor's legal interest in her invention—a protected property interest—without evidence of a consummated ownership transfer.

_____
Ashlesha A. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
asedt0425@icloud.com

_____
Anika A. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
anedt0425@icloud.com

_____
Abhijit R. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
edt0425@nesarikar.com

Date: June 26, 2026                    Plaintiffs, Inventors, and Appellants

---

[4] See A40-A41.

**I.     The Opinion rests on fundamental factual errors and material omissions.**

The system of logic from which the judiciary derives its credibility requires evidence. The Panel's conclusion that Plaintiffs lack Article III standing is predicated on mischaracterizing the record and systematically omitting material evidence.

**The Panel disregarded USPTO's admission that Plaintiffs are subject to specific penalties, erroneously concluding that Plaintiffs "were subject to no independent "penalty"".** A12. The Notice of Payment Deficiency (hereinafter "Demand") was issued under the guise of implementing a newly-enacted statute, 35 U.S.C. § 123(f): "Penalty for False Certifications" (A16-A17). In attempting to justify the Demand, USPTO specifically identified Plaintiffs as "subject to the penalty provisions of 35 U.S.C. 41(j)) and 123(f)". FC 32-1, pg. 16. By ignoring this admission, the Panel failed to recognize the concrete, imminent and actual harm imposed by USPTO that constitutes injury in fact.

**The Panel omits the evidence that USPTO sent the Demand identically to many distinct small businesses and inventors.** This omission ignores evidence from USPTO's own public records that USPTO sent the Demand identically to more than 10 individuals, a material fact that triggers the "collection

1

of information" definition under 44 U.S.C. § 3502. Appx0235-0280 evidences merely a sample of the identical copies of the Demand sent to more than 10 persons between 04/19/24 – 01/17/25. Combined with the undisputed fact and record evidence that USPTO did not obtain OMB approval for the collection, the scope of the violation is systemic, with only USPTO knowing its full extent.

**The Panel selectively utilizes portions of the record while ignoring others to adopt USPTO's arguments.** The Panel alleges "[t]he exhibits to the Nesarikars' complaint are considered part of the complaint" in order to build its decision upon a statement by Plaintiffs that does not appear in the Complaint and is found exclusively in the agency record. A09. However, **the Panel fails to apply the same standard to other parts of the same agency record**, in which Plaintiffs challenged USPTO's agency actions, including the Demand, in each of applications "18069263, 18069288, 18069382, 18069474, 18069596, 18069721, 18069819, and 18069883". See, e.g., Appx0039, Appx0048, Appx0058, Appx0061-0062, Appx0072-0078, Appx0084-0088. Moreover, the Panel relies on the statement by Plaintiffs by quoting from the agency record at Appx0048 in a manner heavily edited to exclude mentions of any other applications. A04-A05. The Panel's own articulated standard of including exhibits in the Complaint, and

Plaintiffs' own requested relief in the Complaint would require the Panel to address all facts and evidence that Plaintiffs provided for all applications. However, **the Panel adopts a one-sided standard to avoid addressing evidence**, stating: "The complaint refers clearly only to the '288 application[5], so it was not error for the district court to refuse to consider whether the Nesarikars have standing to bring claims not raised related to applications not mentioned until after the Office moved to dismiss". A11. The Panel is factually incorrect on multiple counts. First, the Complaint explicitly discusses '844[6], its assignment previously recorded with USPTO, and USPTO's false statements regarding '844 which contradicted its own public records. However, the Panel refuses to consider the evidence regarding '844, including *the recorded assignment in '844 attached to the Complaint*. Appx0089-0090. Second, the Complaint explicitly discusses USPTO's fabricated evidence regarding "10165455" with evidence of the fabrication attached to the Complaint. Appx0091. **The fabrication and USPTO's eventual admission to the fabrication remains unaddressed.** Third, USPTO's harmful conduct in several other applications was not only "mentioned" but explained and evidenced in detail as part of requests for relief *before USPTO moved to dismiss and simultaneously*

_____

[5] U.S. patent application 18/069,288
[6] U.S. patent application 17/906,844 issued as U.S. Patent 11,741,562

*with the filing of the Complaint.* See, e.g., Appx0008-0137.

**The Panel omits evidence in the agency record** to mischaracterize Plaintiffs' statements as "only conclusory statements about the nature of the supposed assignment obligation—unsupported by any evidence…". A10. Section IV of the Reply Brief set forth specific facts and evidence that were available to the agency, district court, and now the Panel which demonstrated that "[t]he assignment in '844 and the obligation to assign in '288 result from the same employment" and that the dismissal "constitutes an allegation that the '844 assignment is...superfluous or invalid". FC 32-1, pg. 22-23. The Panel's conclusion that "the nature of the…obligation [is] unsupported by any evidence" omits, e.g., a recorded assignment in '844 that evidences the "nature" of the preexisting obligation and evidences Plaintiffs' continued ownership of '288 under CAFC's own precedent in *Abraxis* ("under our "promise to assign" cases, a subsequent written agreement is necessary to consummate the assignment" and "the purported assignment is a nullity if the assignor had nothing to assign"). The Panel's conclusion disregards the timeline of evidenced facts set forth in the table in the Opening Brief. FC 7-1, pg. 15. While the district court explicitly considered one of the documents—the recorded '844 assignment—its analysis was marred by its

4

"anachronistic fallacy". FC 32-1, pg. 22-23. The Panel's exclusion of such evidence, which originates in the agency record of '288 and is attached to the Complaint, continues the one-sided evidentiary standard and condones the anachronistic fallacy. The Panel creates a circular evidentiary standard: it refuses to consider evidence, then leverages that lack of consideration to conclude there is insufficient evidence.

**The Panel misrepresents the agency record.** It repeats USPTO's allegations that Plaintiffs did not provide "necessary evidence" but omits that Plaintiffs provided all evidence USPTO expressed as mandatory and that USPTO admitted it did not know any specific evidence it needed from Plaintiffs. Appx0012; A04-A05. The Panel also falsely alleges Plaintiffs "did not provide… assignments themselves" to the USPTO and that USPTO searched for and presented assignment records of its own accord. A05. However, the agency record shows USPTO falsely alleged "[USPTO's] assignment records [do] not reveal any evidence that the inventors have assigned…['844] to another entity/party". Appx0031. The record shows Plaintiffs repeatedly refuted USPTO's falsification, and *provided the official reel/frame number where the assignment was already recorded and publicly available in USPTO's own records for over a year.*

Appx0072, Appx0075, Appx0077, Appx0089. As another example, the Panel

repeats USPTO's allegation that Plaintiffs did not pay "extension of time" fees for

petitions. A05-A06. The Panel omits that USPTO's own policies prohibit extension

of time for petitions, that USPTO instructed Plaintiffs to file petitions, and that

Plaintiffs timely filed every petition. Moreover, the Panel omits that in cases where

"extension of time" fees were paid, USPTO still ignored the petitions, abandoned

the applications, and kept the accompanying payments—including the extension

payment. FC 32-1, pg. 17; FC 34, pg. 5; Appx0098-0101, Appx0340.

**The Panel misrepresents that Plaintiffs did not argue reputational**

**harm, treating it as "forfeited"**, alleging it "was not clearly articulated until after

the magistrate judge's report…despite the fact that [Plaintiffs] filed a sur-reply

during the Rule 12(b)(1) briefing". A11. Plaintiffs argued reputational harm *before*

*the magistrate judge's report*, as evidenced by Appx0097-0098, Appx0102-103,

Appx0228, *and the sur-reply (Appx0408-0409)*.

**The Panel disregarded that the district court instructed Plaintiffs:**

**"Do not give any legal arguments or cite cases or statutes".** FC 7-2, pg. 38-39.

The Panel, however, erroneously "agree[s] with the district court['s]" refusal to

consider standing under the Privacy Act, 5 U.S.C. § 552a (A23-A37), because the

6

statute "cannot be found anywhere on the face of plaintiffs' complaint". A12; Appx0005.

The Opinion relies upon pervasive mischaracterizations and omissions; the evidence supports only reversal.

## II. USPTO's enforcement action creates concrete, ongoing injury independent of ownership.

The Panel errs by treating Plaintiffs' standing as contingent upon their ownership of '288 and by concluding that Plaintiffs "were subject to no independent "penalty"". A12. These erroneous conclusions omit that USPTO targeted Plaintiffs *personally as the certifiers of micro-entity status*, and issued a determination on Plaintiffs' rights that extends beyond '288. By requiring Plaintiffs to prove patent ownership as a prerequisite to standing, the Panel ignored a critical, undisputed fact in the record: USPTO already admitted that Plaintiffs are injured in fact, identifying Plaintiffs, as individuals certifying micro entity status, as the direct targets of its statutory enforcement power.

## II.a USPTO's admission of injury is dispositive.

Under *Lujan*, standing requires "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized…and (b) actual or imminent". By explicitly identifying Plaintiffs as "subject to the penalty provisions

of 35 U.S.C. 41(j)) and 123(f)", USPTO conceded that Plaintiffs suffered actual or imminent, concrete and particularized injury. FC 32-1, pg. 15-17. Here, that injury is at least the statutory "Penalty for False Certifications" under 35 U.S.C. § 123(f), and, *regardless of the application's ownership, it applies to the certifiers of micro entity status*—Plaintiffs. USPTO consistently argued that the adverse agency actions described in the Complaint (including the Demand) "fulfills its duties under…35 U.S.C. § 123(f)". Appx0288. See also Appx0296-0299, Appx0170, Appx0189. USPTO alleges that § 123(f) provides "existing authority to collect additional information and levy fines" in attempting to justify the adverse agency actions. FC 27, pg. 19. Those agency actions are unlawful and expose Plaintiffs to perpetual threat of "Penalty for False Certifications". USPTO consistently indicated Plaintiffs are subject to the penalties during the agency actions and district court proceedings, and admitted to invoking against Plaintiffs § 123(f), which defines the conditions under which *a person certifying micro entity status* is "subject to a fine, to be determined by the Director, the amount of which shall be not less than 3 times the amount that the entity failed to pay" and "any other penalty available under law". The fact that such provisions are wrongfully applied only exacerbates the harm. FC 32-1, pg. 15-17.

8

**II.b    The agency record shows Plaintiffs are "objects" of USPTO's enforcement action.**

USPTO addressed its enforcement actions to Plaintiffs by name, identifying Plaintiffs as individuals subject to its administrative demands and statutory penalties. Appx0025, Appx0428. USPTO engaged in a pattern of adverse actions against Plaintiffs as certifiers of micro entity status, including coercive demands for excess fees to avoid indiscriminate inquiry spanning "sensitive, proprietary, or nonpublic information" and demanding Plaintiffs falsely admit to erroneous certification. Appx0042. USPTO's actions target Plaintiffs as the certifiers of micro entity status, making them "object[s] of the action…at issue", leaving "little question that the action…caused [them] injury" as described in *Lujan*.

**II.c    The definition in 35 U.S.C. § 123 and the record show the injury includes deprivation of a statutory right.**

The Demand is not a narrow determination on a single filing, but a sweeping declaration affecting Plaintiffs' status across their entire patent portfolio. FC 32-1, pg. 30-31. Based solely on the Demand letter, USPTO explicitly asserted "[t]his application and any other application any of these inventors are on submitted after this application does not qualify for micro entity status". Appx0087, Appx0325-0326. USPTO recommitted to this unlawful deprivation of

rights in the district court. The Demand preemptively deprived Plaintiffs of micro entity fee reductions guaranteed by Congress under 35 U.S.C. § 123 for current and future applications, regardless of compliance with § 123. FC 32-1, pg. 30-31. This deprivation is concrete and personal: it applies to every application Plaintiffs file and does not depend on ownership. The loss of the statutory benefit is an injury in fact caused by USPTO's unlawful, *ad hoc*, and unregulated enforcement action imposed under the guise of implementing § 123. FC 32-1, pg. 4-10.

**II.d    The Panel shields agency overreach from judicial review.**

By making ownership a prerequisite to standing, the Opinion creates a vacuum where agency power exists without judicial oversight: an agency can target any individual with penalty and then evade judicial scrutiny simply by alleging that the individual's underlying property interest is in dispute.

If this decision stands, any action targeting an inventor's certification can be rendered unreviewable by a mere allegation disputing ownership. This allows an executive agency to immunize its administrative actions from the very scrutiny that the PRA and 35 U.S.C. § 123 were designed to ensure, creating a zone of unreviewable agency power that is incompatible with the separation of powers.

**III.** **The Panel creates a procedural "catch-22", immunizing unlawful agency actions from judicial review under the PRA and violating due process.**

**III.a** **The Panel erroneously conditions judicial review on compliance with the challenged collection of information, requiring individuals to forfeit their statutory rights to secure the standing to assert them, subverting the separation of powers.**

Due process requires that when a statute provides a specific mechanism for judicial review of agency penalties, that mechanism must be accessible. The PRA defines "collection of information", establishes requirements for lawful collection, and enables "subsequent judicial review of an agency action involving a penalty" for collections of information. A43. USPTO enforced an unlawful collection of information mandating disclosure of "evidence of the assignment obligation". A06. The Panel violates due process by predicating Plaintiffs' standing on disclosure of "evidence of the assignment obligation", the information the agency unlawfully attempts to collect. A09-A10.

The Panel's error is not merely a statutory misreading; it enables agencies to insulate unlawful acts from judicial scrutiny. If an agency can penalize individuals for noncompliance with an unlawful collection of information, and the court refuses to hear the challenge *because of the noncompliance*, the agency effectively achieves immunity from the PRA—the very law Congress passed to

11

govern agency information collections and protect individuals from mandated compliance with unlawful collections of information. Forcing compliance to establish standing creates a circularity that defeats the purpose of judicial review, unconstitutionally subverting the separation of powers.

### III.b The Panel misapprehends the Congressional intent of the PRA and renders the PRA's public protection provision nugatory by shielding unlawful collections from oversight.

Congress enacted 44 U.S.C. § 3512 to establish a right of judicial review for individuals targeted by agency actions enforcing unlawful collections of information. This intent is codified in the language of the statute and evidenced in H. Rept. 104-99, the 1995 Conference Report for the PRA, which records agreements on the PRA legislation as negotiated between the House and Senate to enable its passage into law (A42-A43). The Conference Report characterizes § 3512 as "enabling a person to assert this protection at any time during an agency administrative process or any subsequent judicial review of an agency action involving a penalty" and further states (A43):

> The conference agreement clarifies and strengthens the Act's "public protection" provision by explicitly providing that the protection provided by the section may be asserted or raised by a person in the form of a complete defense, bar or other manner, at any time during a agency administrative process or any subsequent judicial review…

This case is the scenario Congress envisioned: "subsequent judicial review of an

agency action involving a penalty". The Panel's holding effectively strips the PRA of the "public protection" Congress mandated.

**Plaintiffs met every requirement for standing.** The Panel erroneously concluded that Plaintiffs "were subject to no independent "penalty"". A12. As certifiers of micro entity status, Plaintiffs were subject to penalties when the agency issued the Demand accusing them of "erroneous…certification". Appx0026. These penalties are not speculative; the agency itself admitted Plaintiffs are subject to the penalty provisions of 35 U.S.C. § 123(f). FC 32-1, pg. 15-16. As USPTO repeatedly invoked a power to penalize, Plaintiffs suffer a concrete, particularized injury that meets the threshold for standing.

**The Panel's "doubt" regarding the applicability of the PRA relies on USPTO's discredited mischaracterization of *Hyatt v. OMB*.** The Panel alleges "good reasons to doubt…the Act applies at all" to the Demand. A12. This doubt is not rooted in the law, but in a hallucination: USPTO's mischaracterization of *Hyatt v. Office of Management and Budget*, 998 F.3d 423, 426 (9th Cir. 2021). FC 32-1, pg. 37; Appx0410. See Varun, et al. ("if a model makes a false statement or falsely asserts that a source supports a statement, that constitutes a hallucination"). After Plaintiffs evidenced the hallucination, USPTO did not contest that its argument to

13

exempt the Demand from the PRA stood on falsely citing *Hyatt.* USPTO

acquiesced by choosing not to bring that argument or *Hyatt* before the Panel. The

Panel *sua sponte* resurrects the hallucination in its "doubt". The Opinion thereby

conflicts with *Hyatt,* which finds that the PRA governs "identical requests sent to

many people". The evidence in the record is unequivocal: the Demand was not a

unique, individualized inquiry, but part of a mass, identical demand sent to many

people. FC 32-1, pg. 36; Appx0235-0280. By adopting the hallucination, the Panel

summarily grants agencies power to bypass the PRA simply by falsely labeling a

mass-distributed demand "individualized". The record (Appx0235-0280) evidences

USPTO's own public records showing USPTO issued the demand identically to

over 10 people in under a year, meeting the statutory definition of a "collection of

information" subject to the PRA. 44 U.S.C. § 3502.

**The Panel's "doubt" misapprehends *Sutton* and contravenes**

**precedent and OMB guidance.** A12. The Panel repeats the district court's error

by citing court decisions factually inapposite to this case. The Panel erroneously

relies on *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 844 (9th

Cir. 1999); *the Sutton court did not rule on standing under the PRA*, but affirmed a

dismissal for *failure to state a claim* and noted "Plaintiff did not bring this action

against the federal government…rather, he sued a private employer". This conflation of FRCP 12(b)(1) and 12(b)(6) denies Plaintiffs due process. See *Williamson* ("a claim cannot be dismissed for lack of subject matter jurisdiction because of the absence of a federal cause of action"). Unlike any decision cited in this case to deny standing, this case evidences that an agency implemented an *ad hoc*, unregulated, mass-distributed, identical collection of information without displaying an OMB control number, and the agency admitted Plaintiffs are subject to penalties as a result. Moreover, the Panel's "doubt" contravenes: OMB Guidance Memoranda ("Litigants may raise [PRA] public protections at any time during an administrative process or judicial action") (FC 7-2, pg. 58); *Saco River Cellular Inc. v. FCC*, 133 F.3d 25 (D.C. Cir. 1998); and the text of 44 U.S.C. § 3512 itself. Failing to interpret § 3512 as a mechanism for judicial review renders the statute's "public protection" provision nugatory.

## IV. The Panel erred by eliminating the legal distinction between an obligation to assign in the future and a consummated assignment.

The Panel refers to Plaintiffs' statements in the agency record asserting rights under 35 U.S.C. § 123 based on its "is under an obligation…to assign" language. The Panel's rationale for considering the agency record part of the Complaint is inequitably applied and denies Plaintiffs due process. Regardless, the

Panel errs in concluding "[t]hose representations are insufficient to "clearly" support [Plaintiffs'] ownership of the '288 application so as to prevent a dismissal". A09. Under Federal Rule of Evidence 301, short of *evidence that ownership was already transferred* to overcome an inventor's presumption of ownership, the undisputed fact that Plaintiffs are the inventors is sufficient "support" to demonstrate ownership and standing (A38-A39). The Panel errs in concluding "[t]he "general rule" [articulated in *Roche*] that named inventors…own their inventions does not operate in this case". A11. Contrary to the Panel's conclusion, Plaintiffs' application of the "is under an obligation…to assign" language in § 123 did not demonstrate "that an agreement "contrary" to that general rule existed". A10-A11. The Panel's conclusion erroneously and unconstitutionally conflates an obligation to assign in the future with a consummated assignment. This result deprives inventors ownership of their inventions without evidence of a consummated ownership transfer, violating their due process, property rights, and rights under Article I, Section 8, Clause 8 (A14).

## IV.a   The Opinion violates the Congressional intent throughout 35 U.S.C. § 123, contravening the separation of powers.

Precedent and statute distinguish a patent application that *has been assigned already* from a patent application that is *under an obligation to be*

*assigned in the future*. Congress intentionally distinguished the two by framing "has assigned" and "is under an obligation…to assign" as *alternates* in the text of 35 U.S.C. § 123, the statute governing micro entity status. 35 U.S.C. § 123(b) states in part: "An applicant is not considered to be named on a previously filed application…if the applicant has assigned, or is under an obligation…to assign, all ownership rights…". This distinction is consistent with CAFC's previous rulings, including *Omni*.

The Panel further errs as conflating "has assigned" with "is under an obligation…to assign" violates Congress's mandate in 35 U.S.C. § 123(e) that "before any limits proposed to be imposed [on who may qualify as a micro entity] take effect, the Director shall inform the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate of any such proposed limits". The conflation establishes a narrower definition of micro entity than mandated in the statute's text, effectively endorsing USPTO's unilateral, *ad hoc* imposition of additional limits on who qualifies for micro entity status without informing Congress as required by § 123(e).

There has been no reasoned judicial interpretation—by the Panel or otherwise—of § 123 and no precedent on the legal consequences of making a

certification in reliance on § 123(b). Without that interpretation, the Opinion reflects an unduly-deferential adoption of the agency's statutory and regulatory interpretation. Under *Kisor*, USPTO is not entitled to such deference, particularly as the relevant regulation USPTO relies on, 37 C.F.R. § 1.29(b), parrots § 123(b). Moreover, the Panel erred in failing to set out its own interpretation of § 123 under *Loper Bright*.

**IV.b   The Panel's affirmance denies due process by disregarding intertwinement of the jurisdictional challenge with merits of the case, conflicting with established precedent.**

USPTO's conflation of "has assigned" with "is under an obligation…to assign" underpinned USPTO's enforcement actions challenged in the Complaint. The dismissal under FRCP 12(b)(1) prematurely ceded to USPTO's *post hoc*, unregulated, and erroneous interpretation of 35 U.S.C. § 123, including the conflation. USPTO, under the guise of challenging jurisdiction, challenged the existence of federal causes of action. The Panel decided on the jurisdictional challenge with undue deference to USPTO without interpreting 35 U.S.C. § 123(b), unduly summarily deciding merits of the case. In affirming the 12(b)(1) dismissal, the Panel summarily validated USPTO's interpretation and its alleged enforcement of § 123.

In *Perttu*, the Supreme Court prohibited such dismissals in "the type of case where the question of jurisdiction is dependent on decision of the merits". In affirming the 12(b)(1) dismissal, the Panel violated the Supreme Court's mandate in *Perttu* and the Fifth Circuit's rulings in *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981) and *Montez v. Department of the Navy,* 392 F.3d 147 (5th Cir. 2004), which prohibit 12(b)(1) dismissal when merits of the case intertwine with the jurisdictional challenge. The Panel further erred in disregarding that USPTO itself acknowledged the intertwinement. Appx0213, Appx0389-0390, FC 32-1, pg. 27-28.

## V. Conclusion

For at least the foregoing reasons, Plaintiffs request that CAFC grant *en banc* rehearing, reverse the Opinion, and grant the relief requested in the Opening and Reply briefs.

Respectfully submitted,

_____     _____     _____

Ashlesha A. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
asedt0425@icloud.com

Anika A. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
anedt0425@icloud.com

Abhijit R. Nesarikar
8025 Ambiance Way
Plano, Texas 75024
469-371-4983
edt0425@nesarikar.com

Date: June 26, 2026                  Plaintiffs, Inventors, and Appellants

# Certificate of Compliance with Type-Volume Limitations

Case Number: 26-1167

Short Case Caption: Nesarikar v. PTO

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 3814 words. Items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2) may be excluded from the word count.

| | | |
|---|---|---|
| Ashlesha A. Nesarikar | Anika A. Nesarikar | Abhijit R. Nesarikar |
| 8025 Ambiance Way | 8025 Ambiance Way | 8025 Ambiance Way |
| Plano, Texas 75024 | Plano, Texas 75024 | Plano, Texas 75024 |
| 469-371-4983 | 469-371-4983 | 469-371-4983 |
| asedt0425@icloud.com | anedt0425@icloud.com | edt0425@nesarikar.com |

Date: June 26, 2026                    Plaintiffs, Inventors, and Appellants

# Addendum

**Table of Contents for Addendum**

| Name | Date | Page # |
|---|---|---|
| CAFC p*er curiam* opinion of the Panel, Circuit Judges Taranto, Hughes, and Cunningham (FC 36) | 05/12/26 | A01 |
| The United States Constitution: Article I, Section 8, Clause 8 | 1789 | A14 |
| 35 U.S.C. § 123 | 01/03/24 | A15 |
| Public Law 118-151 [Amendment to 35 U.S.C. § 123(f)] | 12/17/24 | A17 |
| Title 44, United States Code, 'Public Printing and Documents'. 44 U.S.C. § 3501 (pg. 136), 44 U.S.C. § 3502 (pg. 153, 154) | 2024 | A18 |
| 44 U.S.C. § 3512 | 01/03/24 | A21 |
| 5 U.S.C. § 552a | 01/06/25 | A23 |
| Rule 301. Presumptions in Civil Cases Generally in Federal Rules of Evidence | 12/01/19 | A38 |
| Rule 12(b). How to Present Defenses in Federal Rules of Civil Procedure | 12/01/25 | A40 |
| H. Rept. 104-99 - PAPERWORK REDUCTION ACT OF 1995, H. Rept.104-99, 104th Cong. (1995). (pg. 1, 36) | 04/03/95 | A42 |

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ASHLESHA A. NESARIKAR, ANIKA A. NESARIKAR, ABHIJIT R. NESARIKAR,**
*Plaintiffs-Appellants*

**v.**

**THE UNITED STATES PATENT AND TRADEMARK OFFICE, JOHN A. SQUIRES, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Defendants-Appellees*

---

2026-1167

---

Appeal from the United States District Court for the Eastern District of Texas in No. 4:25-cv-00423-JCB-JDL, Judge Campbell J. Barker.

---

Decided: May 12, 2026

---

ASHLESHA NESARIKAR, Plano, TX, pro se.

ANIKA NESARIKAR, Plano, TX, pro se.

ABHIJIT R. NESARIKAR, Plano, TX, pro se.

**A01**

PHILIP CHARLES STERNHELL, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendants-appellees. Also represented by SCOTT DAVID BOLDEN, BRETT SHUMATE.

————————————

Before TARANTO, HUGHES, and CUNNINGHAM, *Circuit Judges.*

PER CURIAM.

Ashlesha, Anika, and Abhijit Nesarikar are named inventors on U.S. Patent Application No. 18/069,288 and at least five other applications filed earlier. When the Nesarikars filed the '288 application in late 2022, they certified that they qualified as a "micro entity" under 35 U.S.C. § 123 and paid only the discounted application fees that come with such status. Micro-entity status is available only to an applicant who has not been named as an inventor on more than four earlier applications, but not counted against that limit are applications that the applicant is obligated to assign based on prior employment. *See* 35 U.S.C. § 123(a)–(b).

The Patent and Trademark Office informed the Nesarikars that their micro-entity certification appeared to be erroneous because they were named on more than four previous applications. The Nesarikars responded that the certification was correct because they were obligated to assign the earlier applications, and also the '288 application itself, as a result of prior employment. But they did not provide a copy, or even quote the language, of the alleged obligation, and the Office refused to accept their representations as sufficient for micro-entity status for the '288 application. The Office ceased examining the '288 application until the correct fees were paid. The Nesarikars did not pay the requested fees, and the application became abandoned.

The Nesarikars then brought suit in the U.S. District Court for the Eastern District of Texas against the Office, challenging the denial of micro-entity status for the '288 application, invoking the Administrative Procedure Act as one cause of action, and seeking injunctive relief. They attached to the complaint their statements to the Office that they were obligated to assign the '288 application as a result of previous employment. The Office moved to dismiss for lack of subject-matter jurisdiction, arguing that the Nesarikars' assignment-obligation representations meant they had not shown the injury necessary to establish their Article III standing to maintain the suit. The court agreed with the Office and dismissed the complaint without prejudice. *Nesarikar v. United States Patent and Trademark Office*, No. 4:25-cv-00423, 2025 WL 2795060 (E.D. Tex. Oct. 1, 2025) (*Dismissal*). The Nesarikars appeal, and we now affirm.

## I

### A

We recite the dispositive facts from the allegations in the Nesarikars' complaint and attached exhibits. The Nesarikars are the named inventors on four patent applications filed between March 2018 and September 2022. *See* Appx.[1] 30–31; *see also* Appx. 170–71. On December 21, 2022, they first filed U.S. Patent Application No. 18/069,263 and then filed the '288 application, making the '263 application at least the fifth application filed prior to the '288 application naming the Nesarikars as inventors. *See* Appx. 29–31. In connection with the '288 application, the Nesarikars certified to the Office that they were entitled to micro-entity status under 35 U.S.C. § 123 and paid

---

[1] "Appx." refers to the appendix submitted with the Nesarikars' opening brief.

the corresponding reduced application fees.  Appx. 9–10, 22.

Section 123 provides in relevant part:

(a) . . . "[M]icro entity" means an applicant who makes a certification that the applicant—

. . .

> (2) has not been named as an inventor on more than 4 previously filed patent applications . . . .

. . .

(b) An applicant is not considered to be named on a previously filed application . . . if the applicant has assigned, or is under an obligation by contract or law to assign, all ownership rights in the application as a result of the applicant's previous employment.

35 U.S.C. § 123.  The Leahy-Smith America Invents Act mandated a 75% reduction in certain application fees for micro-entity applicants, Pub. L. No. 112-29, § 10(b), 125 Stat. 284, 316–17 (2011), a discount later changed to 80%, *see* Unleashing American Innovators Act of 2022, Pub. L. No. 117-328, Div. W, § 107(a)(2), 136 Stat. 5518, 5521; *see also* Appx. 35 (fees schedule).

In April 2024, the Office sent the Nesarikars a notice of payment deficiency in connection with the '288 application, stating that their micro-entity certification appeared to be in error because they were named as inventors on at least the five earlier applications just discussed, and requesting that they either pay additional fees or provide "any necessary evidence" of their entitlement to micro-entity status. Appx. 9–11, 25–27. The notice set a two-month deadline for responding.  Appx. 27.  In May 2024, the Nesarikars filed a response, in which they invoked the 35 U.S.C. § 123(b) assignment-obligation exception, stating that "each of the inventors of . . . provisional patent

application No. 63265932 . . . was obligated to assign the rights in th[at application] and its child applications as a result of each of the inventors' previous employment . . . [including] 18069288 [*i.e.*, the '288 application]." Appx. 48, 63–64; *see* Appx. 49–62. The Nesarikars provided no other information about their alleged assignment obligation.

In August 2024, the Office sent the Nesarikars a letter stating that the May 2024 response was "insufficient" because it did not "provide an explanation *and the necessary evidence* to demonstrate [ ] entitlement to th[e § 123(b)] exception." Appx. 28–32 (emphasis added). The letter adds that any additional response would be considered late if not accompanied by a fee for an extension of time to reply to the April 2024 deficiency notice and, even with an extension, was due within seven months of the April 2024 notice. *See* Appx. 31–32; Appx. 27. The Nesarikars submitted a follow-up response in September 2024. Appx. 69–71. They insisted that "no extension of time [wa]s required," and, though they requested additional "noti[ce]" if any fees for an extension of time were necessary to prevent abandonment, they did not pay such fees. Appx. 71. While they now provided the names of the former employers to whom they were allegedly obligated to assign their rights in the '288 application and several other applications, they did not provide the assignments themselves or any other evidence supporting their alleged assignment obligation. Appx. 70.

In October 2024, the Office sent another letter to the Nesarikars, stating that their September filing was late and that, in any event, it still failed to provide "**evidence** of employment-related contractual or legal obligations to assign." Appx. 34–38 (emphasis in original). The Office further stated that a search of its own records revealed only one recorded assignment of any of the applications in question, and the assignee was neither of the identified former employers of the Nesarikars. Appx. 37. It again solicited a sufficient and timely response, warning that even with

payment for an extension of time, no further response would be accepted after November 22, 2024, and that failure to pay the application-fee deficiency or prove entitlement to micro-entity status by that time would result in treatment of the '288 application as abandoned. Appx. 37–38. On November 19, 2024, the Nesarikars submitted a third response, again not accompanied by either a payment for an extension of time or evidence of the assignment obligation. Appx. 39–43. In February 2025, the Office sent a notice of abandonment of the '288 application. Appx. 81–82.

B

In April 2025, the Nesarikars, proceeding pro se, filed suit in the Eastern District of Texas against the Office and its (then-Acting) Director. Appx. 8. Their complaint alleges that the Office, in denying micro-entity status to the Nesarikars for the '288 application, arbitrarily and capriciously failed to comply with its own micro-entity certification procedures and improperly altered those procedures. Appx. 9–10; *e.g.*, Appx. 20–21. It further alleges violations of the Paperwork Reduction Act, 44 U.S.C. § 3512. Appx. 13. Finally, the complaint contends that the Nesarikars exhausted the administrative remedies available to them and seeks an injunction that, *e.g.*, compels the Office to recognize their micro-entity status. Appx. 13, 22–23. Attached to the complaint are the communications between the Nesarikars and the Office just described, including their repeated representations about their obligation to assign the '288 application. Appx. 24–96. Neither in the complaint nor in any of the attached exhibits do the Nesarikars allege that they currently own the '288 application. The same month, the Nesarikars moved for a preliminary injunction, attaching documents from Office proceedings but no additional evidence of assignment obligations. Appx. 97–137.

**A06**

In June 2025, the Office moved to dismiss the complaint under Federal Rule of Civil Procedure (Rule) 12(b)(1). Appx. 199–219. The Office argued that the district court lacked subject-matter jurisdiction because the Nesarikars' own complaint, including their statements that they were obligated to assign their rights in the '288 application, indicated (in the absence of other information) that they lacked Article III standing to sue, and the Office also argued that the Nesarikars had not sufficiently pleaded exhaustion of administrative remedies. Appx. 212–17. The Nesarikars opposed dismissal, contending that (1) title to a patent application is presumed to be in the inventors, (2) the Office had not identified an "alternate owner," and (3) "all applications which [the Nesarikars] identified as obligated to assign rights in are currently owned by [the Nesarikars]." Appx. 329–31. They did not produce the assignments themselves. *See id.*

The district court referred the dismissal and preliminary-injunction motions to a magistrate judge. *See* Appx. 416–23. The magistrate judge, in August 2025, recommended that the court grant the Rule 12(b)(1) motion on standing grounds, writing that "[i]t is unclear from the [ ] complaint and the parties' briefing whether [the Nesarikars] have any remaining ownership interest in the '288 [application]." Appx. 421. The magistrate judge declined to reach the exhaustion ground and further recommended that the preliminary injunction motion be denied. Appx. 422–23, 422 n.4. The Nesarikars objected. Appx. 424–33.

In October 2025, the district court, on its own review of the record, also concluded that the complaint must be dismissed for lack of subject-matter jurisdiction. *Dismissal*, at \*1–3. The court ruled that the Nesarikars had "failed to carry their burden that they maintained any . . . rights to the '288 application." *Id.* at \*2. According to the district court, the Nesarikars' assertions in opposing dismissal that they owned the '288 application were not enough to show an injury in fact, and they did "not provide, plead, or

include anywhere in their various filings" the contract language governing the undisputed obligation to assign it. *Id.* The district court thus accepted the magistrate judge's findings and recommendations and dismissed the complaint without prejudice, and at the same time the court denied the motion for a preliminary injunction. *Id.* at *2–3.

The Nesarikars timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II

The Nesarikars principally argue that the district court legally erred by refusing to take as true their allegation that, notwithstanding their alleged obligation to assign the '288 application, they currently own it. They also contend that the district court improperly required evidence at the pleading stage, ignored the presumption that a patent application's named inventors own the application, and disregarded ownership of other patent applications or other interests (such as reputational interests) that support their standing. We reject all of these challenges.

"Article III standing determinations are reviewed de novo." *Intellectual Tech LLC v. Zebra Technologies Corp.*, 101 F.4th 807, 813 (Fed. Cir. 2024) (reviewing decision of a district court in Texas). To the extent that patent-law issues are involved in the standing determination, as in other contexts, we apply our own law, not that of the regional circuit. *See University of South Florida Research Foundation, Inc. v. Fujifilm Medical Systems U.S.A., Inc.*, 19 F.4th 1315, 1323–24 (Fed. Cir. 2021).

"When standing is challenged on the basis of the pleadings, we must accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Association of American Physicians & Surgeons, Inc. v. Texas Medical Board*, 627 F.3d 547, 550 (5th Cir. 2010) (cleaned up). The party asserting

jurisdiction has the burden of proof on a Rule 12(b)(1) motion to dismiss, and to overcome such a motion must "clearly allege facts demonstrating," as most relevant here, a cognizable injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975) (cleaned up)); *see Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011). "To establish injury in fact," a plaintiff's allegations "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The Nesarikars, who argue that they sufficiently alleged ownership of the '288 application, have not met their burden at the dismissal stage. The exhibits to the Nesarikars' complaint are considered part of the complaint. *See* Fed. R. Civ. P. 10(c); *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007); *United States ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370, 375 (5th Cir. 2004). The Nesarikars' complaint and exhibits, Appx. 8–23 (complaint); Appx. 24–96 (exhibits), contain repeated assertions by the Nesarikars that they were obligated to assign their rights in the '288 application, *see* Appx. 48, 70, 42–43. Those representations are insufficient to "clearly" support the Nesarikars' ownership of the '288 application so as to prevent a dismissal without prejudice. *Spokeo*, 578 U.S. at 338. And the Nesarikars in this court do not meaningfully make an argument about a concrete financial interest apart from ownership, which in any event would meet a pleading objection very similar to the one regarding ownership.

The Nesarikars have not shown that the arguments they made in opposing the government's motion are a substitute for the required pleading of facts in a complaint and its attachments. Even if such motion argument could ever be such a substitute, even for purposes of a without-

prejudice dismissal (which allows refiling), it is not so here. The Nesarikars have made only conclusory statements about the nature of the supposed assignment obligation— unsupported by any evidence and not even purporting to identify the assignment's terms, the assignee, or when the agreement takes effect or was executed. *See* Appx. 329–31 (asserting merely "current ownership" of '288 application); Appx. 403 (similar). Such statements are the kind of conclusory assertions that are properly viewed as insufficient. *See In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) ("We do not accept as true 'conclusory allegations . . . or legal conclusions.'"); *compare Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1151–55 (Fed. Cir. 2021) (affirming denial of Rule 12(b)(1) motion based on asserted lack of standing where party rebutted charge that it did not own patent with reference to specific assignment language).

The district court did not impose an inappropriately high burden of proof. Necessary at the pleading stage are plausible allegations that support the exercise of jurisdiction. *See Spokeo*, 578 U.S. at 338–39; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see Lujan*, 504 U.S. at 560; *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (applying *Twombly* plausibility pleading standard in Rule 12(b)(1) context). The actions of and communications with the Office that are the subject of this lawsuit indicate that the Nesarikars have set themselves the challenge of asserting that, for standing purposes, they have a sufficient interest in the '288 application despite an obligation to assign, while not defeating their claims about assignments of earlier applications on which their 35 U.S.C. § 123(b) position depends. In these circumstances, the district court rightly insisted on more specifics to support standing to invoke Article III jurisdiction.

The Nesarikars argue that they were entitled to rely on a legal presumption that patent applications are owned by the named inventors, but such a presumption does not

**A10**

require a different result here. The Supreme Court has "recognized that *unless there is an agreement to the contrary*, an employer does not have rights in an invention" of an employee. *Board of Trustees v. Roche Molecular Systems Inc.*, 563 U.S. 776, 785–86 (2011) (emphasis added). The "general rule" that named inventors, rather than their employers, own their inventions does not operate in this case, where the Nesarikars represented, consistent with their effort to secure reduced application fees in the Office, that an agreement "contrary" to that general rule existed. *See id.* at 786; Appx. 48, 70, 42–43.

The Nesarikars contend that ownership interests in other applications, or interests other than ownership, such as reputational interests, support a determination that they have standing. These arguments are unpersuasive as grounds for overturning the dismissal without prejudice. The complaint refers clearly only to the '288 application, so it was not error for the district court to refuse to consider whether the Nesarikars have standing to bring claims not raised related to applications not mentioned until after the Office moved to dismiss. *See* Appx. 9–10, 329, 430. The Nesarikars' asserted reputational interests and other non-ownership interests also do not support standing. Such a theory of standing was not clearly articulated until after the magistrate judge's report and recommendation, despite the fact that the Nesarikars filed a sur-reply during the Rule 12(b)(1) briefing, *see* Appx. 329–31, 402–04, so we treat it as forfeited. We observe, in addition, that although we have recognized that a concrete, particularized reputational interest (with employment or other economic consequences) can support standing of an inventor non-owner seeking correction of inventorship, *see Shukh v. Seagate Technologies, LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015), the Nesarikars have not alleged such concrete, particularized reputational interests or identified authority covering the different circumstances here.

Aside from their arguments about their Administrative Procedure Act claims, the Nesarikars appear to contend that their complaint sufficiently alleges Article III standing for claims under the Privacy Act, 5 U.S.C. § 552a, and the Paperwork Reduction Act, 44 U.S.C. § 3512. We agree with the district court that no Privacy Act claim is to be found in the complaint, even if it is construed liberally, so the question of Article III standing to assert the claim does not arise here. The Paperwork Reduction Act claim invokes 44 U.S.C. § 3512, which provides that "no person shall be subject to any penalty for failing to comply with a [covered] collection of information." There are good reasons to doubt that a private right of action exists under that provision, *see Dismissal*, at \*3; *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 844 (9th Cir. 1999), and that the Act applies at all to the Notice of Payment Deficiency in this matter, *see* Appx. 216–17 (citing *Hyatt v. Office of Management and Budget*, 998 F.3d 423, 426 (9th Cir. 2021)). But we need not resolve those issues. Even this claim depends, for a concrete Article III interest, on the Nesarikars having such an interest in the '288 application (as they were subject to no independent "penalty"), but for the reasons we have set out, we agree with the district court that Nesarikars have no such interest in the '288 application.

Finally, the Nesarikars make sundry allegations that the district court or the magistrate judge ignored certain parts of the record and inadequately addressed the Nesarikars' arguments. We do not agree, but, regardless, these allegations are of no moment because on our independent and *de novo* review, we reach the same result as the district court: The Nesarikars' complaint inadequately alleges their Article III standing to sue, so dismissal was warranted.

**A12**

## III

We have considered the Nesarikars' remaining arguments and find them unpersuasive.  For the foregoing reasons, we affirm the judgment of the district court.

The parties shall bear their own costs.

**AFFIRMED**

**The United States Constitution:**

**Article I, Section 8, Clause 8**

The Congress shall have Power…

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

## Editorial Notes

### AMENDMENTS

2012—Subsec. (b)(2)(B)(iii). Pub. L. 112–211 struck out '', unless it is shown to the satisfaction of the Director that the delay in submitting the notice was unintentional'' after ''regarded as abandoned''.

2011—Subsec. (b)(2)(A)(ii). Pub. L. 112–29, § 20(j), struck out ''of this title'' after ''181''.

Subsec. (b)(2)(A)(iii). Pub. L. 112–29, § 20(j), struck out ''of this title'' after ''111(b)''.

Subsec. (b)(2)(A)(iv). Pub. L. 112–29, § 20(j), struck out ''of this title'' after ''16''.

Subsec. (d). Pub. L. 112–29, § 20(j), struck out ''of this title'' after ''17''.

Subsec. (e). Pub. L. 112–29, § 8(a), added subsec. (e).

1999—Pub. L. 106–113 amended section catchline and text generally. Prior to amendment, text read as follows: ''Applications for patents shall be kept in confidence by the Patent and Trademark Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commissioner.''

1975—Pub. L. 93–596 substituted ''Patent and Trademark Office'' for ''Patent Office''.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–211 effective on the date that is 1 year after Dec. 18, 2012, applicable to patents issued before, on, or after that effective date and patent applications pending on or filed after that effective date, and not effective with respect to patents in litigation commenced before that effective date, see section 203 of Pub. L. 112–211, set out as an Effective Date note under section 27 of this title.

### EFFECTIVE DATE OF 2011 AMENDMENT

Pub. L. 112–29, § 8(b), Sept. 16, 2011, 125 Stat. 316, provided that: ''The amendments made by this section [amending this section] shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act [Sept. 16, 2011] and shall apply to any patent application filed before, on, or after that effective date.''

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by of Pub. L. 106–113 effective Nov. 29, 2000, and applicable only to applications (including international applications designating the United States) filed on or after that date, and applications published pursuant to subsec. (b) of this section resulting from an international application filed before Nov. 29, 2000 not to be effective as prior art as of the filing date of the international application, but to be effective as prior art in accordance with section 102(e) of this title in effect on Nov. 28, 2000, see section 1000(a)(9) [title IV, § 4508] of Pub. L. 106–113, as amended, set out as a note under section 10 of this title.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–596 effective Jan. 2, 1975, see section 4 of Pub. L. 93–596, set out as a note under section 1111 of Title 15, Commerce and Trade.

### STUDY OF APPLICANTS FILING ONLY IN UNITED STATES

Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4502(b)], Nov. 29, 1999, 113 Stat. 1536, 1501A–562, provided that:

''(1) IN GENERAL.—The Comptroller General shall conduct a 3-year study of the applicants who file only in the United States on or after the effective date of this subtitle [see section 1000(a)(9) [title IV, § 4508] of Pub. L. 106–113, set out as an Effective Date of 1999 Amendment note under section 10 of this title] and shall provide the results of such study to the Judiciary Committees of the House of Representatives and the Senate.

''(2) CONTENTS.—The study conducted under paragraph (1) shall—

''(A) consider the number of such applicants in relation to the number of applicants who file in the United States and outside of the United States;

''(B) examine how many domestic-only filers request at the time of filing not to be published;

''(C) examine how many such filers rescind that request or later choose to file abroad;

''(D) examine the status of the entity seeking an application and any correlation that may exist between such status and the publication of patent applications; and

''(E) examine the abandonment/issuance ratios and length of application pendency before patent issuance or abandonment for published versus unpublished applications.''

## § 123. Micro entity defined

(a) IN GENERAL.—For purposes of this title, the term ''micro entity'' means an applicant who makes a certification that the applicant—

(1) qualifies as a small entity, as defined in regulations issued by the Director;

(2) has not been named as an inventor on more than 4 previously filed patent applications, other than applications filed in another country, provisional applications under section 111(b), or international applications filed under the treaty defined in section 351(a) for which the basic national fee under section 41(a) was not paid;

(3) did not, in the calendar year preceding the calendar year in which the applicable fee is being paid, have a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census; and

(4) has not assigned, granted, or conveyed, and is not under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

(b) APPLICATIONS RESULTING FROM PRIOR EMPLOYMENT.—An applicant is not considered to be named on a previously filed application for purposes of subsection (a)(2) if the applicant has assigned, or is under an obligation by contract or law to assign, all ownership rights in the application as the result of the applicant's previous employment.

(c) FOREIGN CURRENCY EXCHANGE RATE.—If an applicant's or entity's gross income in the preceding calendar year is not in United States dollars, the average currency exchange rate, as reported by the Internal Revenue Service, during that calendar year shall be used to determine whether the applicant's or entity's gross income

exceeds the threshold specified in paragraphs[1] (3) or (4) of subsection (a).

(d) INSTITUTIONS OF HIGHER EDUCATION.—For purposes of this section, a micro entity shall include an applicant who certifies that—

(1) the applicant's employer, from which the applicant obtains the majority of the applicant's income, is an institution of higher education as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)); or

(2) the applicant has assigned, granted, conveyed, or is under an obligation by contract or law, to assign, grant, or convey, a license or other ownership interest in the particular applications to such an institution of higher education.

(e) DIRECTOR'S AUTHORITY.—In addition to the limits imposed by this section, the Director may, in the Director's discretion, impose income limits, annual filing limits, or other limits on who may qualify as a micro entity pursuant to this section if the Director determines that such additional limits are reasonably necessary to avoid an undue impact on other patent applicants or owners or are otherwise reasonably necessary and appropriate. At least 3 months before any limits proposed to be imposed pursuant to this subsection take effect, the Director shall inform the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate of any such proposed limits.

(f) PENALTY FOR FALSE CERTIFICATIONS.—In addition to any other penalty available under law, an entity that is found to have falsely made a certification under this section shall be subject to a fine, to be determined by the Director, the amount of which shall be not less than 3 times the amount that the entity failed to pay as a result of the false certification, whether the Director discovers the false certification before or after the date on which a patent has been issued.

(Added and amended Pub. L. 112–29, §§ 10(g)(1), 20(j), Sept. 16, 2011, 125 Stat. 318, 335; Pub. L. 112–274, § 1(m), Jan. 14, 2013, 126 Stat. 2459; Pub. L. 117–328, div. W, § 107(b)(2), Dec. 29, 2022, 136 Stat. 5522.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 61(a) of the Internal Revenue Code of 1986, referred to in subsec. (a)(3), (4), is classified to section 61(a) of Title 26, Internal Revenue Code.

#### AMENDMENTS

2022—Subsec. (f). Pub. L. 117–328 added subsec. (f).

2013—Subsec. (a). Pub. L. 112–274 inserted "of this title" after "For purposes" in introductory provisions.

2011—Subsec. (a). Pub. L. 112–29, § 20(j), struck out "of this title" after "For purposes" in introductory provisions.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2013 AMENDMENT

Amendment by Pub. L. 112–274 effective Jan. 14, 2013, and applicable to proceedings commenced on or after such date, see section 1(n) of Pub. L. 112–274, set out as a note under section 5 of this title.

---

[1] So in original. Probably should be "paragraph".

#### EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

#### EFFECTIVE DATE

Section effective on Sept. 16, 2011, see section 10(i)(1) of Pub. L. 112–29, set out as a Fee Setting Authority note under section 41 of this title.

## CHAPTER 12—EXAMINATION OF APPLICATION

Sec.
131.      Examination of application.
132.      Notice of rejection; reexamination.
133.      Time for prosecuting application.
134.      Appeal to the Patent Trial and Appeal Board.
135.      Derivation proceedings.

### Editorial Notes

#### AMENDMENTS

2011—Pub. L. 112–29, § 3(j)(5), Sept. 16, 2011, 125 Stat. 291, amended items 134 and 135 generally, substituting "Appeal to the Patent Trial and Appeal Board" for "Appeal to the Board of Patent Appeals and Interferences" in item 134 and "Derivation proceedings" for "Interferences" in item 135.

1984—Pub. L. 98–622, title II, § 204(b)(2), Nov. 8, 1984, 98 Stat. 3388, substituted "Patent Appeals and Interferences" for "Appeals" in item 134.

### Statutory Notes and Related Subsidiaries

TRANSFER OF ACCELERATION CERTIFICATE ISSUED PURSUANT TO THE PATENTS FOR HUMANITY PROGRAM

Pub. L. 116–316, Jan. 5, 2021, 134 Stat. 5065, provided that:

"SECTION 1. SHORT TITLE.

"This Act may be cited as the 'Patents for Humanity Program Improvement Act'.

"SEC. 2. TRANSFERABILITY OF ACCELERATION CERTIFICATES.

"(a) IN GENERAL.—A holder of an acceleration certificate issued pursuant to the Patents for Humanity Program (established in the notice entitled 'Humanitarian Awards Pilot Program', published at 77 Fed. Reg. 6544 (February 8, 2012)), or any successor thereto, of the United States Patent and Trademark Office, may transfer (including by sale) the entitlement to such acceleration certificate to another person.

"(b) REQUIREMENT.—An acceleration certificate transferred under subsection (a) shall be subject to any other applicable limitations under the notice entitled 'Humanitarian Awards Pilot Program', published at 77 Fed. Reg. 6544 (February 8, 2012), or any successor thereto."

## § 131. Examination of application

The Director shall cause an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefor.

(July 19, 1952, ch. 950, 66 Stat. 801; Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, § 13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906.)

#### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 36 (R.S. 4893).

Public Law 118–151
118th Congress

## An Act

To amend title 35, United States Code, to provide a good faith exception to the imposition of fines for false assertions and certifications, and for other purposes.

Dec. 17, 2024
[S. 3960]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. GOOD FAITH EXCEPTION TO THE IMPOSITION OF CERTAIN FINES.**

Patents and trademarks.

Title 35, United States Code, is amended—

(1) in section 41(j), by inserting ", unless the entity shows that the assertion was made in good faith," before "be subject"; and

(2) in section 123(f), by inserting ", unless the entity shows that the certification was made in good faith," before "be subject".

Approved December 17, 2024.

LEGISLATIVE HISTORY—S. 3960:

CONGRESSIONAL RECORD, Vol. 170 (2024):
   June 20, considered and passed Senate.
   Dec. 3, considered and passed House.

○



classified to sections 139 to 139f of former Title 5, transferred to chapter 12 (§ 421 et seq.) of former Title 44, and repealed by Pub. L. 90–620 upon the enactment of this title. Subsequent to its original enactment by Pub. L. 90–620, this chapter was amended generally by Pub. L. 96–511 and again by Pub. L. 104–13. As a result, this chapter is shown herein as having been added beginning with Pub. L. 104–13 without reference to earlier amendatory laws. See Prior Provisions notes throughout this chapter.

### AMENDMENTS

2019—Pub. L. 115–435, title II, § 202(d)(2)(A), (e)(2), (f)(2), title III, §§ 302(b), 303(b), Jan. 14, 2019, 132 Stat. 5541–5543, 5552, 5556, substituted ''Data inventory and Federal data catalogue'' for ''Establishment and operation of Government Information Locator Service'' in item 3511 and ''Chief Data Officers'' for ''Establishment of task force on information collection and dissemination'' in item 3520, added item 3520A, and added heading for subchapter III, headings for parts A to D of subchapter III, and items 3561 to 3564, 3571, 3572, 3575, 3576, and 3581 to 3583.

2018—Pub. L. 115–114, § 2(b), Jan. 10, 2018, 131 Stat. 2278, added item 3559.

2014—Pub. L. 113–283, § 2(e)(1), Dec. 18, 2014, 128 Stat. 3086, added heading for subchapter II and items 3551 to 3558 and struck out heading for former subchapter II and items 3531 to 3538 and heading for subchapter III and items 3541 to 3549. Prior to amendment, headings for both subchapters II and III read ''INFORMATION SECURITY'' and items under each subchapter were substantially similar to items 3551 to 3558.

2002—Pub. L. 107–347, title III, § 301(b)(2), Dec. 17, 2002, 116 Stat. 2955, added heading for subchapter III and items 3541 to 3549.

Pub. L. 107–296, title X, § 1001(b)(2), Nov. 25, 2002, 116 Stat. 2267, reenacted items 3531 to 3535 without change, substituted ''National security systems'' for ''Expiration'' in item 3536, and added items 3537 and 3538.

Pub. L. 107–198, § 3(b), June 28, 2002, 116 Stat. 732, added item 3520 and renumbered former item 3520 as 3521.

2000—Pub. L. 106–398, § 1 [[div. A], title X, § 1064(a)(1)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275, inserted subchapters I and II headings and added items 3531 to 3536.

1995—Pub. L. 104–13, § 2, May 22, 1995, 109 Stat. 163, amended chapter heading and analysis generally.

1980—Pub. L. 96–511, § 2(a), Dec. 11, 1980, 94 Stat. 2812, substituted in chapter heading ''INFORMATION POLICY'' for ''REPORTING SERVICES'', and amended analysis generally.

## SUBCHAPTER I—FEDERAL INFORMATION POLICY

### Editorial Notes

#### AMENDMENTS

2000—Pub. L. 106–398, § 1 [[div. A], title X, § 1064(a)(2)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275, inserted subchapter heading.

### § 3501. Purposes

The purposes of this subchapter are to—

(1) minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government;

(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government;

(3) coordinate, integrate, and to the extent practicable and appropriate, make uniform Federal information resources management policies and practices as a means to improve the productivity, efficiency, and effectiveness of Government programs, including the reduction of information collection burdens on the public and the improvement of service delivery to the public;

(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society;

(5) minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information;

(6) strengthen the partnership between the Federal Government and State, local, and tribal governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government;

(7) provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology;

(8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to—

(A) privacy and confidentiality, including section 552a of title 5;

(B) security of information, including section 11332 of title 40 [1]; and

(C) access to information, including section 552 of title 5;

(9) ensure the integrity, quality, and utility of the Federal statistical system;

(10) ensure that information technology is acquired, used, and managed to improve performance of agency missions, including the reduction of information collection burdens on the public; and

(11) improve the responsibility and accountability of the Office of Management and Budget and all other Federal agencies to Congress and to the public for implementing the information collection review process, information resources management, and related policies and guidelines established under this subchapter.

(Added Pub. L. 104–13, § 2, May 22, 1995, 109 Stat. 163; amended Pub. L. 106–398, § 1 [[div. A], title X, § 1064(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275; Pub. L. 107–217, § 3(l)(3), Aug. 21, 2002, 116 Stat. 1301.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 11332 of title 40, referred to in par. (8)(B), was repealed by Pub. L. 107–296, title X, § 1005(a)(1), Nov. 25, 2002, 116 Stat. 2272, and Pub. L. 107–347, title III, § 305(a), Dec. 17, 2002, 116 Stat. 2960.

#### PRIOR PROVISIONS

A prior section 3501, added Pub. L. 96–511, § 2(a), Dec. 11, 1980, 94 Stat. 2812; amended Pub. L. 99–500, § 101(m)

---

[1] See References in Text note below.

dural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(7) The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 3502. Definitions

As used in this subchapter—

(1) the term "agency" means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency, but does not include—

　(A) the Government Accountability Office;

　(B) Federal Election Commission;

　(C) the governments of the District of Columbia and of the territories and possessions of the United States, and their various subdivisions; or

　(D) Government-owned contractor-operated facilities, including laboratories engaged in national defense research and production activities;

(2) the term "burden" means time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency, including the resources expended for—

　(A) reviewing instructions;

　(B) acquiring, installing, and utilizing technology and systems;

　(C) adjusting the existing ways to comply with any previously applicable instructions and requirements;

　(D) searching data sources;

　(E) completing and reviewing the collection of information; and

　(F) transmitting, or otherwise disclosing the information;

(3) the term "collection of information"—

　(A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—

　　(i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or

　　(ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes; and

　(B) shall not include a collection of information described under section 3518(c)(1);

(4) the term "Director" means the Director of the Office of Management and Budget;

(5) the term "independent regulatory agency" means the Board of Governors of the Federal Reserve System, the Commodity Futures Trading Commission, the Consumer Product Safety Commission, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Energy Regulatory Commission, the Federal Housing Finance Agency, the Federal Maritime Commission, the Federal Trade Commission, the Interstate Commerce Commission, the Mine Enforcement Safety and Health Review Commission, the National Labor Relations Board, the Nuclear Regulatory Commission, the Occupational Safety and Health Review Commission, the Postal Regulatory Commission, the Securities and Exchange Commission, the Bureau of Consumer Financial Protection, the Office of Financial Research, Office of the Comptroller of the Currency, and any other similar agency designated by statute as a Federal independent regulatory agency or commission;

(6) the term "information resources" means information and related resources, such as personnel, equipment, funds, and information technology;

(7) the term "information resources management" means the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public;

(8) the term "information system" means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information;

(9) the term "information technology" has the meaning given that term in section 11101 of title 40 but does not include national security systems as defined in section 11103 of title 40;

(10) the term "person" means an individual, partnership, association, corporation, business trust, or legal representative, an organized group of individuals, a State, territorial, tribal, or local government or branch thereof, or a political subdivision of a State, territory, tribal, or local government or a branch of a political subdivision;

(11) the term "practical utility" means the ability of an agency to use information, particularly the capability to process such information in a timely and useful fashion;

(12) the term "public information" means any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public;

(13) the term "recordkeeping requirement" means a requirement imposed by or for an agency on persons to maintain specified records, including a requirement to—

　(A) retain such records;

　(B) notify third parties, the Federal Government, or the public of the existence of such records;

　(C) disclose such records to third parties, the Federal Government, or the public; or

　(D) report to third parties, the Federal Government, or the public regarding such records;

(14) the term "penalty" includes the imposition by an agency or court of a fine or other punishment; a judgment for monetary damages or equitable relief; or the revocation, suspension, reduction, or denial of a license, privilege, right, grant, or benefit;

(15) the term "comprehensive data inventory" means the inventory created under section 3511(a), but does not include any underlying data asset listed on the inventory;

(16) the term "data" means recorded information, regardless of form or the media on which the data is recorded;

(17) the term "data asset" means a collection of data elements or data sets that may be grouped together;

(18) the term "machine-readable", when used with respect to data, means data in a format that can be easily processed by a computer without human intervention while ensuring no semantic meaning is lost;

(19) the term "metadata" means structural or descriptive information about data such as content, format, source, rights, accuracy, provenance, frequency, periodicity, granularity, publisher or responsible party, contact information, method of collection, and other descriptions;

(20) the term "open Government data asset" means a public data asset that is—

(A) machine-readable;

(B) available (or could be made available) in an open format;

(C) not encumbered by restrictions, other than intellectual property rights, including under titles 17 and 35, that would impede the use or reuse of such asset; and

(D) based on an underlying open standard that is maintained by a standards organization;

(21) the term "open license" means a legal guarantee that a data asset is made available—

(A) at no cost to the public; and

(B) with no restrictions on copying, publishing, distributing, transmitting, citing, or adapting such asset;

(22) the term "public data asset" means a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under section 552 of title 5; and

(23) the term "statistical laws" means subchapter III of this chapter and other laws pertaining to the protection of information collected for statistical purposes as designated by the Director.

(Added Pub. L. 104–13, §2, May 22, 1995, 109 Stat. 164; amended Pub. L. 104–106, div. E, title LVI, §5605(a), Feb. 10, 1996, 110 Stat. 700; Pub. L. 105–85, div. A, title X, §1073(h)(5)(A), Nov. 18, 1997, 111 Stat. 1907; Pub. L. 106–398, §1 [[div. A], title X, §1064(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275; Pub. L. 107–217, §3(l)(4), Aug. 21, 2002, 116 Stat. 1301; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 109–435, title VI, §604(e), Dec. 20, 2006, 120 Stat. 3242; Pub. L. 110–289, div. A, title II, §1216(e), July 30, 2008, 122 Stat. 2792; Pub. L. 111–203, title III, §315, title X, §1100D(a), July 21, 2010, 124 Stat. 1524, 2111; Pub. L. 115–435, title II, §202(a), Jan. 14, 2019, 132 Stat. 5534.)

### Editorial Notes

#### PRIOR PROVISIONS

A prior section 3502, added Pub. L. 96–511, §2(a), Dec. 11, 1980, 94 Stat. 2813; amended Pub. L. 98–443, §9(h), Oct.

4, 1984, 98 Stat. 1708; Pub. L. 99–500, §101(m) [title VIII, §812], Oct. 18, 1986, 100 Stat. 1783–308, 1783–335, and Pub. L. 99–591, §101(m) [title VIII, §812], Oct. 30, 1986, 100 Stat. 3341–308, 3341–335; Pub. L. 101–73, title VII, §744(e), Aug. 9, 1989, 103 Stat. 438, defined terms used in this chapter prior to the general amendment of this chapter by Pub. L. 104–13.

Another prior section 3502, Pub. L. 90–620, Oct. 22, 1968, 82 Stat. 1302; Pub. L. 93–153, title IV, §409(a), Nov. 16, 1973, 87 Stat. 593, defined "Federal agency", "person", and "information", prior to the general amendment of this chapter by Pub. L. 96–511.

#### AMENDMENTS

2019—Pars. (15) to (23). Pub. L. 115–435 added pars. (15) to (23).

2010—Par. (5). Pub. L. 111–203, §1100D(a), which directed amendment of section 2(5) of the Paperwork Reduction Act (44 U.S.C. 3502(5)) by inserting "the Bureau of Consumer Financial Protection, the Office of Financial Research," after "the Securities and Exchange Commission,", was executed to this section to reflect the probable intent of Congress.

Pub. L. 111–203, §315, inserted "Office of the Comptroller of the Currency," after "the Securities and Exchange Commission,".

2008—Par. (5). Pub. L. 110–289 substituted "Federal Housing Finance Agency" for "Federal Housing Finance Board".

2006—Par. (5). Pub. L. 109–435 substituted "Postal Regulatory Commission" for "Postal Rate Commission".

2004—Par. (1)(A). Pub. L. 108–271 substituted "Government Accountability Office" for "General Accounting Office".

2002—Par. (9). Pub. L. 107–217 substituted "section 11101 of title 40" for "section 5002 of the Clinger-Cohen Act of 1996 (40 U.S.C. 1401)" and "section 11103 of title 40" for "section 5142 of that Act (40 U.S.C. 1452)".

2000—Pub. L. 106–398 substituted "subchapter" for "chapter" in introductory provisions.

1997—Par. (9). Pub. L. 105–85 substituted "the Clinger-Cohen Act of 1996 (40 U.S.C. 1401)" for "the Information Technology Management Reform Act of 1996" and inserted "(40 U.S.C. 1452)" after "that Act".

1996—Par. (9). Pub. L. 104–106 added par. (9) and struck out former par. (9) which read as follows: "the term 'information technology' has the same meaning as the term 'automatic data processing equipment' as defined by section 111(a)(2) and (3)(C)(i) through (v) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2) and (3)(C)(i) through (v));".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2019 AMENDMENT

Amendment by Pub. L. 115–435 effective 180 days after Jan. 14, 2019, see section 403 of Pub. L. 115–435, set out as a note under section 306 of Title 5, Government Organization and Employees.

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 315 of Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

Amendment by section 1100D(a) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

#### EFFECTIVE DATE OF 2000 AMENDMENT

Amendment by Pub. L. 106–398 effective 30 days after Oct. 30, 2000, see section 1 [[div. A], title X, §1065] of Pub. L. 106–398, Oct. 30, 2000, 114 Stat. 1654, formerly set out as an Effective Date note under former section 3531 of this title.

**A20**



(iii) the cost and benefits to the public of converting the data into a format that could be understood and used by the public;

(iv) whether the public dissemination of the data asset could result in legal liability;

(v) whether the data asset—

(I) is subject to intellectual property rights, including rights under titles 17 and 35;

(II) contains confidential business information, that could be withheld under section 552(b)(4) of title 5; or

(III) is restricted by contract or other binding, written agreement;

(vi) whether the holder of a right to such data asset has been consulted;

(vii) the expectation that all data assets that would otherwise be made available under section 552 of title 5 be disclosed; and

(viii) any other considerations that the Director determines to be relevant.

(F) Criteria for the head of an agency to use in assessing the indication of a determination under subparagraph (A)(iii) and how to prioritize any such subsequent determinations in the strategic information management plan under section 3506, in consideration of the existing resources available to the agency.

(3) REGULAR UPDATES REQUIRED.—With respect to each data asset created or identified by an agency, the head of the agency shall update the comprehensive data inventory of the agency not later than 90 days after the date of such creation or identification.

(b) PUBLIC DATA ASSETS.—The head of each agency shall submit public data assets, or links to public data assets available online, as open Government data assets for inclusion in the Federal data catalogue maintained under subsection (c), in accordance with the guidance established under subsection (a)(2).

(c) FEDERAL DATA CATALOGUE.—

(1) IN GENERAL.—The Administrator of General Services shall maintain a single public interface online as a point of entry dedicated to sharing agency data assets with the public, which shall be known as the ''Federal data catalogue''. The Administrator and the Director shall ensure that agencies can submit public data assets, or links to public data assets, for publication and public availability on the interface.

(2) REPOSITORY.—The Director shall collaborate with the Office of Government Information Services and the Administrator of General Services to develop and maintain an online repository of tools, best practices, and schema standards to facilitate the adoption of open data practices across the Federal Government, which shall—

(A) include any definitions, regulations, policies, checklists, and case studies related to open data policy;

(B) facilitate collaboration and the adoption of best practices across the Federal

Government relating to the adoption of open data practices; and

(C) be made available on the Federal data catalogue maintained under paragraph (1).

(3) ACCESS TO OTHER DATA ASSETS.—The Director shall ensure the Federal data catalogue maintained under paragraph (1) provides information on how the public can access a data asset included in a comprehensive data inventory under subsection (a) that is not yet available on the Federal data catalogue, including information regarding the application process established under section 3583 of title 44.

(d) DELEGATION.—The Director shall delegate to the Administrator of the Office of Information and Regulatory Affairs and the Administrator of the Office of Electronic Government the authority to jointly issue guidance required under this section.

(Added Pub. L. 104–13, §2, May 22, 1995, 109 Stat. 180; amended Pub. L. 113–235, div. H, title I, §1301(c)(1), Dec. 16, 2014, 128 Stat. 2537; Pub. L. 115–435, title II, §202(d)(1), Jan. 14, 2019, 132 Stat. 5538.)

EDITORIAL NOTES

PRIOR PROVISIONS

A prior section 3511, added Pub. L. 96–511, §2(a), Dec. 11, 1980, 94 Stat. 2822; amended Pub. L. 99–500, §101(m) [title VIII, §818], Oct. 18, 1986, 100 Stat. 1783–308, 1783–339, and Pub. L. 99–591, §101(m) [title VIII, §818], Oct. 30, 1986, 100 Stat. 3341–308, 3341–339, related to establishment and operation of a Federal Information Locator System prior to the general amendment of this chapter by Pub. L. 104–13.

Another prior section 3511, Pub. L. 90–620, Oct. 22, 1968, 82 Stat. 1305, provided for penalty for failure to furnish information, prior to the general amendment of this chapter by Pub. L. 96–511.

AMENDMENTS

2019—Pub. L. 115–435 amended section generally. Prior to amendment, section related to establishment and operation of Government Information Locator Service.

2014—Subsec. (a)(3). Pub. L. 113–235 substituted ''Director of the Government Publishing Office'' for ''Public Printer''.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 2019 AMENDMENT

Amendment by Pub. L. 115–435 effective 180 days after Jan. 14, 2019, see section 403 of Pub. L. 115–435, set out as a note under section 306 of Title 5, Government Organization and Employees.

EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

## § 3512. Public protection

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—

(1) the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter; or

(2) the agency fails to inform the person who is to respond to the collection of information

that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

(Added Pub. L. 104–13, §2, May 22, 1995, 109 Stat. 181; amended Pub. L. 106–398, §1 [[div. A], title X, §1064(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A–275.)

### Editorial Notes

#### PRIOR PROVISIONS

A prior section 3512, added Pub. L. 96–511, §2(a), Dec. 11, 1980, 94 Stat. 2822, related to protection of persons failing to maintain or provide information if information collection request did not display current control number prior to the general amendment of this chapter by Pub. L. 104–13.

Another prior section 3512, added Pub. L. 93–153, title IV, §409(b), Nov. 16, 1973, 87 Stat. 593, related to information for independent regulatory agencies, prior to the general amendment of this chapter by Pub. L. 96–511.

#### AMENDMENTS

2000—Subsec. (a). Pub. L. 106–398 substituted ''subchapter'' for ''chapter'' in introductory provisions and par. (1).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2000 AMENDMENT

Amendment by Pub. L. 106–398 effective 30 days after Oct. 30, 2000, see section 1 [[div. A], title X, §1065] of Pub. L. 106–398, Oct. 30, 2000, 114 Stat. 1654, formerly set out as an Effective Date note under former section 3531 of this title.

#### EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

### § 3513. Director review of agency activities; reporting; agency response

(a) In consultation with the Administrator of General Services, the Archivist of the United States, the Director of the National Institute of Standards and Technology, and the Director of the Office of Personnel Management, the Director shall periodically review selected agency information resources management activities to ascertain the efficiency and effectiveness of such activities to improve agency performance and the accomplishment of agency missions.

(b) Each agency having an activity reviewed under subsection (a) shall, within 60 days after receipt of a report on the review, provide a written plan to the Director describing steps (including milestones) to—

(1) be taken to address information resources management problems identified in the report; and

(2) improve agency performance and the accomplishment of agency missions.

(c) COMPARABLE TREATMENT.—Notwithstanding any other provision of law, the Director shall treat or review a rule or order prescribed or proposed by the Director of the Bureau of Consumer Financial Protection on the same terms and conditions as apply to any rule or order prescribed or proposed by the Board of Governors of the Federal Reserve System.

(Added Pub. L. 104–13, §2, May 22, 1995, 109 Stat. 181; amended Pub. L. 111–203, title X, §1100D(b), July 21, 2010, 124 Stat. 2111.)

### Editorial Notes

#### PRIOR PROVISIONS

A prior section 3513, added Pub. L. 96–511, §2(a), Dec. 11, 1980, 94 Stat. 2822; amended Pub. L. 98–497, title I, §107(b)(27), Oct. 19, 1984, 98 Stat. 2291, related to periodic review of agency activities by Director and report of review and agency response to it prior to the general amendment of this chapter by Pub. L. 104–13.

#### AMENDMENTS

2010—Subsec. (c). Pub. L. 111–203 added subsec. (c).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

#### EFFECTIVE DATE

Section effective Oct. 1, 1995, except as otherwise provided, see section 4(a) of Pub. L. 104–13, set out as a note under section 3501 of this title.

### § 3514. Responsiveness to Congress

(a)(1) The Director shall—

(A) keep the Congress and congressional committees fully and currently informed of the major activities under this subchapter; and

(B) submit a report on such activities to the President of the Senate and the Speaker of the House of Representatives annually and at such other times as the Director determines necessary.

(2) The Director shall include in any such report a description of the extent to which agencies have—

(A) reduced information collection burdens on the public, including—

(i) a summary of accomplishments and planned initiatives to reduce collection of information burdens;

(ii) a list of all violations of this subchapter and of any rules, guidelines, policies, and procedures issued pursuant to this subchapter;

(iii) a list of any increase in the collection of information burden, including the authority for each such collection; and

(iv) a list of agencies that in the preceding year did not reduce information collection burdens in accordance with section 3505(a)(1), a list of the programs and statutory responsibilities of those agencies that precluded that reduction, and recommendations to assist those agencies to reduce information collection burdens in accordance with that section;

(B) improved the quality and utility of statistical information;



(b) Within 90 days of the issuance of the Open Data Policy, the Administrator for Federal Procurement Policy, Controller of the Office of Federal Financial Management, CIO, and Administrator of OIRA shall work with the Chief Acquisition Officers Council, Chief Financial Officers Council, Chief Information Officers Council, and Federal Records Council to identify and initiate implementation of measures to support the integration of the Open Data Policy requirements into Federal acquisition and grant-making processes. Such efforts may include developing sample requirements language, grant and contract language, and workforce tools for agency acquisition, grant, and information management and technology professionals.

(c) Within 90 days of the date of this order, the Chief Performance Officer (CPO) shall work with the President's Management Council to establish a Cross-Agency Priority (CAP) Goal to track implementation of the Open Data Policy. The CPO shall work with agencies to set incremental performance goals, ensuring they have metrics and milestones in place to monitor advancement toward the CAP Goal. Progress on these goals shall be analyzed and reviewed by agency leadership, pursuant to the GPRA Modernization Act of 2010 (Public Law 111–352).

(d) Within 180 days of the date of this order, agencies shall report progress on the implementation of the CAP Goal to the CPO. Thereafter, agencies shall report progress quarterly, and as appropriate.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Nothing in this order shall compel or authorize the disclosure of privileged information, law enforcement information, national security information, personal information, or information the disclosure of which is prohibited by law.

(e) Independent agencies are requested to adhere to this order.

BARACK OBAMA.

FREEDOM OF INFORMATION ACT

Memorandum of President of the United States, Jan. 21, 2009, 74 F.R. 4683, provided:

Memorandum for the Heads of Executive Departments and Agencies

A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, ''sunlight is said to be the best of disinfectants.'' In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.

The presumption of disclosure also means that agencies should take affirmative steps to make information public. They should not wait for specific requests from the public. All agencies should use modern technology to inform citizens about what is known and done by their Government. Disclosure should be timely.

I direct the Attorney General to issue new guidelines governing the FOIA to the heads of executive departments and agencies, reaffirming the commitment to accountability and transparency, and to publish such guidelines in the Federal Register. In doing so, the Attorney General should review FOIA reports produced by the agencies under Executive Order 13392 of December 14, 2005. I also direct the Director of the Office of Management and Budget to update guidance to the agencies to increase and improve information dissemination to the public, including through the use of new technologies, and to publish such guidance in the Federal Register.

This memorandum does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 552a. Records maintained on individuals

(a) DEFINITIONS.—For purposes of this section—

(1) the term ''agency'' means agency as defined in section 552(e)[1] of this title;

(2) the term ''individual'' means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term ''maintain'' includes maintain, collect, use, or disseminate;

(4) the term ''record'' means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term ''system of records'' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

(6) the term ''statistical record'' means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;

(7) the term ''routine use'' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

(8) the term ''matching program''—

_____
[1] See References in Text note below.

(A) means any computerized comparison of—

(i) two or more automated systems of records or a system of records with non-Federal records for the purpose of—

(I) establishing or verifying the eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs, or

(II) recouping payments or delinquent debts under such Federal benefit programs, or

(ii) two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records,

(B) but does not include—

(i) matches performed to produce aggregate statistical data without any personal identifiers;

(ii) matches performed to support any research or statistical project, the specific data of which may not be used to make decisions concerning the rights, benefits, or privileges of specific individuals;

(iii) matches performed, by an agency (or component thereof) which performs as its principal function any activity pertaining to the enforcement of criminal laws, subsequent to the initiation of a specific criminal or civil law enforcement investigation of a named person or persons for the purpose of gathering evidence against such person or persons;

(iv) matches of tax information (I) pursuant to section 6103(d) of the Internal Revenue Code of 1986, (II) for purposes of tax administration as defined in section 6103(b)(4) of such Code, (III) for the purpose of intercepting a tax refund due an individual under authority granted by section 404(e), 464, or 1137 of the Social Security Act; or (IV) for the purpose of intercepting a tax refund due an individual under any other tax refund intercept program authorized by statute which has been determined by the Director of the Office of Management and Budget to contain verification, notice, and hearing requirements that are substantially similar to the procedures in section 1137 of the Social Security Act;

(v) matches—

(I) using records predominantly relating to Federal personnel, that are performed for routine administrative purposes (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)); or

(II) conducted by an agency using only records from systems of records maintained by that agency;

if the purpose of the match is not to take any adverse financial, personnel, disciplinary, or other adverse action against Federal personnel;

(vi) matches performed for foreign counterintelligence purposes or to produce background checks for security clearances of Federal personnel or Federal contractor personnel;

(vii) matches performed incident to a levy described in section 6103(k)(8) of the Internal Revenue Code of 1986;

(viii) matches performed pursuant to section 202(x)(3) or 1611(e)(1) of the Social Security Act (42 U.S.C. 402(x)(3), 1382(e)(1));

(ix) matches performed by the Secretary of Health and Human Services or the Inspector General of the Department of Health and Human Services with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records; or

(x) matches performed pursuant to section 3(d)(4) of the Achieving a Better Life Experience Act of 2014; [1]

(9) the term "recipient agency" means any agency, or contractor thereof, receiving records contained in a system of records from a source agency for use in a matching program;

(10) the term "non-Federal agency" means any State or local government, or agency thereof, which receives records contained in a system of records from a source agency for use in a matching program;

(11) the term "source agency" means any agency which discloses records contained in a system of records to be used in a matching program, or any State or local government, or agency thereof, which discloses records to be used in a matching program;

(12) the term "Federal benefit program" means any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals; and

(13) the term "Federal personnel" means officers and employees of the Government of the United States, members of the uniformed services (including members of the Reserve Components), individuals entitled to receive immediate or deferred retirement benefits under any retirement program of the Government of the United States (including survivor benefits).

(b) CONDITIONS OF DISCLOSURE.—No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

(4) to the Bureau of the Census for purposes of planning or carrying out a census or survey

or related activity pursuant to the provisions of title 13;

(5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

(11) to the Director of the Congressional Budget Office, or any authorized representative of the Director, in the course of performance of the duties of the Congressional Budget Office;

(12) pursuant to the order of a court of competent jurisdiction; or

(13) to a consumer reporting agency in accordance with section 3711(e) of title 31.

(c) ACCOUNTING OF CERTAIN DISCLOSURES.—Each agency, with respect to each system of records under its control, shall—

(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

(B) the name and address of the person or agency to whom the disclosure is made;

(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

(3) except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request; and

(4) inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made.

(d) ACCESS TO RECORDS.—Each agency that maintains a system of records shall—

(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;

(2) permit the individual to request amendment of a record pertaining to him and—

(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and

(B) promptly, either—

(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section;

(4) in any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed; and

**A25**

(5) nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding.

(e) AGENCY REQUIREMENTS.—Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

(f) AGENCY RULES.—In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including spe-

cial procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.

(g)(1) CIVIL REMEDIES.—Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the ex-

emptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

(h) RIGHTS OF LEGAL GUARDIANS.—For the purposes of this section, the parent of any minor, or the legal guardian of any individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, may act on behalf of the individual.

(i)(1) CRIMINAL PENALTIES.—Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

(2) Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

(3) Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

**A27**

(j) GENERAL EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is—

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(k) SPECIFIC EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4)(G), (H), and (I) and (f) of this section if the system of records is—

(1) subject to the provisions of section 552(b)(1) of this title;

(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section: *Provided, however*, That if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual, except to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(3) maintained in connection with providing protective services to the President of the United States or other individuals pursuant to section 3056 of title 18;

(4) required by statute to be maintained and used solely as statistical records;

(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(6) testing or examination material used solely to determine individual qualifications for appointment or promotion in the Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process; or

(7) evaluation material used to determine potential for promotion in the armed services, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(*l*)(1) ARCHIVAL RECORDS.—Each agency record which is accepted by the Archivist of the United States for storage, processing, and servicing in accordance with section 3103 of title 44 shall, for the purposes of this section, be considered to be maintained by the agency which deposited the record and shall be subject to the provisions of this section. The Archivist of the United States shall not disclose the record except to the agency which maintains the record, or under rules established by that agency which are not inconsistent with the provisions of this section.

(2) Each agency record pertaining to an identifiable individual which was transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, prior to the effective date of this section, shall, for the purposes of this section, be considered to be maintained by the National Archives and shall not be subject to the provisions of this section, except that a statement generally describing such records (modeled after the requirements relating to records subject to subsections (e)(4)(A) through (G) of this section) shall be published in the Federal Register.

(3) Each agency record pertaining to an identifiable individual which is transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, on or after the effective date of this section, shall, for the purposes

of this section, be considered to be maintained by the National Archives and shall be exempt from the requirements of this section except subsections (e)(4)(A) through (G) and (e)(9) of this section.

(m)(1) GOVERNMENT CONTRACTORS.—When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system. For purposes of subsection (i) of this section any such contractor and any employee of such contractor, if such contract is agreed to on or after the effective date of this section, shall be considered to be an employee of an agency.

(2) A consumer reporting agency to which a record is disclosed under section 3711(e) of title 31 shall not be considered a contractor for the purposes of this section.

(n) MAILING LISTS.—An individual's name and address may not be sold or rented by an agency unless such action is specifically authorized by law. This provision shall not be construed to require the withholding of names and addresses otherwise permitted to be made public.

(o) MATCHING AGREEMENTS.—(1) No record which is contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency specifying—

(A) the purpose and legal authority for conducting the program;

(B) the justification for the program and the anticipated results, including a specific estimate of any savings;

(C) a description of the records that will be matched, including each data element that will be used, the approximate number of records that will be matched, and the projected starting and completion dates of the matching program;

(D) procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)), to—

(i) applicants for and recipients of financial assistance or payments under Federal benefit programs, and

(ii) applicants for and holders of positions as Federal personnel,

that any information provided by such applicants, recipients, holders, and individuals may be subject to verification through matching programs;

(E) procedures for verifying information produced in such matching program as required by subsection (p);

(F) procedures for the retention and timely destruction of identifiable records created by a recipient agency or non-Federal agency in such matching program;

(G) procedures for ensuring the administrative, technical, and physical security of the records matched and the results of such programs;

(H) prohibitions on duplication and redisclosure of records provided by the source agency within or outside the recipient agency or the non-Federal agency, except where required by law or essential to the conduct of the matching program;

(I) procedures governing the use by a recipient agency or non-Federal agency of records provided in a matching program by a source agency, including procedures governing return of the records to the source agency or destruction of records used in such program;

(J) information on assessments that have been made on the accuracy of the records that will be used in such matching program; and

(K) that the Comptroller General may have access to all records of a recipient agency or a non-Federal agency that the Comptroller General deems necessary in order to monitor or verify compliance with the agreement.

(2)(A) A copy of each agreement entered into pursuant to paragraph (1) shall—

(i) be transmitted to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives; and

(ii) be available upon request to the public.

(B) No such agreement shall be effective until 30 days after the date on which such a copy is transmitted pursuant to subparagraph (A)(i).

(C) Such an agreement shall remain in effect only for such period, not to exceed 18 months, as the Data Integrity Board of the agency determines is appropriate in light of the purposes, and length of time necessary for the conduct, of the matching program.

(D) Within 3 months prior to the expiration of such an agreement pursuant to subparagraph (C), the Data Integrity Board of the agency may, without additional review, renew the matching agreement for a current, ongoing matching program for not more than one additional year if—

(i) such program will be conducted without any change; and

(ii) each party to the agreement certifies to the Board in writing that the program has been conducted in compliance with the agreement.

(p) VERIFICATION AND OPPORTUNITY TO CONTEST FINDINGS.—(1) In order to protect any individual whose records are used in a matching program, no recipient agency, non-Federal agency, or source agency may suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program to such individual, or take other adverse action against such individual, as a result of information produced by such matching program, until—

(A)(i) the agency has independently verified the information; or

(ii) the Data Integrity Board of the agency, or in the case of a non-Federal agency the Data Integrity Board of the source agency, determines in accordance with guidance issued by the Director of the Office of Management and Budget that—

(I) the information is limited to identification and amount of benefits paid by the source agency under a Federal benefit program; and

**A29**

(II) there is a high degree of confidence that the information provided to the recipient agency is accurate;

(B) the individual receives a notice from the agency containing a statement of its findings and informing the individual of the opportunity to contest such findings; and

(C)(i) the expiration of any time period established for the program by statute or regulation for the individual to respond to that notice; or

(ii) in the case of a program for which no such period is established, the end of the 30-day period beginning on the date on which notice under subparagraph (B) is mailed or otherwise provided to the individual.

(2) Independent verification referred to in paragraph (1) requires investigation and confirmation of specific information relating to an individual that is used as a basis for an adverse action against the individual, including where applicable investigation and confirmation of—

(A) the amount of any asset or income involved;

(B) whether such individual actually has or had access to such asset or income for such individual's own use; and

(C) the period or periods when the individual actually had such asset or income.

(3) Notwithstanding paragraph (1), an agency may take any appropriate action otherwise prohibited by such paragraph if the agency determines that the public health or public safety may be adversely affected or significantly threatened during any notice period required by such paragraph.

(q) SANCTIONS.—(1) Notwithstanding any other provision of law, no source agency may disclose any record which is contained in a system of records to a recipient agency or non-Federal agency for a matching program if such source agency has reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency.

(2) No source agency may renew a matching agreement unless—

(A) the recipient agency or non-Federal agency has certified that it has complied with the provisions of that agreement; and

(B) the source agency has no reason to believe that the certification is inaccurate.

(r) REPORT ON NEW SYSTEMS AND MATCHING PROGRAMS.—Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.

(s) BIENNIAL REPORT.—The President shall biennially submit to the Speaker of the House of Representatives and the President pro tempore of the Senate a report—

(1) describing the actions of the Director of the Office of Management and Budget pursuant to section 6 of the Privacy Act of 1974 during the preceding 2 years;

(2) describing the exercise of individual rights of access and amendment under this section during such years;

(3) identifying changes in or additions to systems of records;

(4) containing such other information concerning administration of this section as may be necessary or useful to the Congress in reviewing the effectiveness of this section in carrying out the purposes of the Privacy Act of 1974.

(t)(1) EFFECT OF OTHER LAWS.—No agency shall rely on any exemption contained in section 552 of this title to withhold from an individual any record which is otherwise accessible to such individual under the provisions of this section.

(2) No agency shall rely on any exemption in this section to withhold from an individual any record which is otherwise accessible to such individual under the provisions of section 552 of this title.

(u) DATA INTEGRITY BOARDS.—(1) Every agency conducting or participating in a matching program shall establish a Data Integrity Board to oversee and coordinate among the various components of such agency the agency's implementation of this section.

(2) Each Data Integrity Board shall consist of senior officials designated by the head of the agency, and shall include any senior official designated by the head of the agency as responsible for implementation of this section, and the inspector general of the agency, if any. The inspector general shall not serve as chairman of the Data Integrity Board.

(3) Each Data Integrity Board—

(A) shall review, approve, and maintain all written agreements for receipt or disclosure of agency records for matching programs to ensure compliance with subsection (o), and all relevant statutes, regulations, and guidelines;

(B) shall review all matching programs in which the agency has participated during the year, either as a source agency or recipient agency, determine compliance with applicable laws, regulations, guidelines, and agency agreements, and assess the costs and benefits of such programs;

(C) shall review all recurring matching programs in which the agency has participated during the year, either as a source agency or recipient agency, for continued justification for such disclosures;

(D) shall compile an annual report, which shall be submitted to the head of the agency and the Office of Management and Budget and made available to the public on request, describing the matching activities of the agency, including—

(i) matching programs in which the agency has participated as a source agency or recipient agency;

(ii) matching agreements proposed under subsection (o) that were disapproved by the Board;

(iii) any changes in membership or structure of the Board in the preceding year;

(iv) the reasons for any waiver of the requirement in paragraph (4) of this section for completion and submission of a cost-benefit analysis prior to the approval of a matching program;

(v) any violations of matching agreements that have been alleged or identified and any corrective action taken; and

(vi) any other information required by the Director of the Office of Management and Budget to be included in such report;

(E) shall serve as a clearinghouse for receiving and providing information on the accuracy, completeness, and reliability of records used in matching programs;

(F) shall provide interpretation and guidance to agency components and personnel on the requirements of this section for matching programs;

(G) shall review agency recordkeeping and disposal policies and practices for matching programs to assure compliance with this section; and

(H) may review and report on any agency matching activities that are not matching programs.

(4)(A) Except as provided in subparagraphs (B) and (C), a Data Integrity Board shall not approve any written agreement for a matching program unless the agency has completed and submitted to such Board a cost-benefit analysis of the proposed program and such analysis demonstrates that the program is likely to be cost effective.[2]

(B) The Board may waive the requirements of subparagraph (A) of this paragraph if it determines in writing, in accordance with guidelines prescribed by the Director of the Office of Management and Budget, that a cost-benefit analysis is not required.

(C) A cost-benefit analysis shall not be required under subparagraph (A) prior to the initial approval of a written agreement for a matching program that is specifically required by statute. Any subsequent written agreement for such a program shall not be approved by the Data Integrity Board unless the agency has submitted a cost-benefit analysis of the program as conducted under the preceding approval of such agreement.

(5)(A) If a matching agreement is disapproved by a Data Integrity Board, any party to such agreement may appeal the disapproval to the Director of the Office of Management and Budget. Timely notice of the filing of such an appeal shall be provided by the Director of the Office of Management and Budget to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives.

(B) The Director of the Office of Management and Budget may approve a matching agreement notwithstanding the disapproval of a Data Integrity Board if the Director determines that—

(i) the matching program will be consistent with all applicable legal, regulatory, and policy requirements;

(ii) there is adequate evidence that the matching agreement will be cost-effective; and

(iii) the matching program is in the public interest.

(C) The decision of the Director to approve a matching agreement shall not take effect until 30 days after it is reported to committees described in subparagraph (A).

(D) If the Data Integrity Board and the Director of the Office of Management and Budget disapprove a matching program proposed by the inspector general of an agency, the inspector general may report the disapproval to the head of the agency and to the Congress.

(6) In the reports required by paragraph (3)(D), agency matching activities that are not matching programs may be reported on an aggregate basis, if and to the extent necessary to protect ongoing law enforcement or counterintelligence investigations.

(v) OFFICE OF MANAGEMENT AND BUDGET RESPONSIBILITIES.—The Director of the Office of Management and Budget shall—

(1) develop and, after notice and opportunity for public comment, prescribe guidelines and regulations for the use of agencies in implementing the provisions of this section; and

(2) provide continuing assistance to and oversight of the implementation of this section by agencies.

(w) APPLICABILITY TO BUREAU OF CONSUMER FINANCIAL PROTECTION.—Except as provided in the Consumer Financial Protection Act of 2010, this section shall apply with respect to the Bureau of Consumer Financial Protection.

(Added Pub. L. 93–579, §3, Dec. 31, 1974, 88 Stat. 1897; amended Pub. L. 94–183, §2(2), Dec. 31, 1975, 89 Stat. 1057; Pub. L. 97–365, §2, Oct. 25, 1982, 96 Stat. 1749; Pub. L. 97–375, title II, §201(a), (b), Dec. 21, 1982, 96 Stat. 1821; Pub. L. 97–452, §2(a)(1), Jan. 12, 1983, 96 Stat. 2478; Pub. L. 98–477, §2(c), Oct. 15, 1984, 98 Stat. 2211; Pub. L. 98–497, title I, §107(g), Oct. 19, 1984, 98 Stat. 2292; Pub. L. 100–503, §§2–6(a), 7, 8, Oct. 18, 1988, 102 Stat. 2507–2514; Pub. L. 101–508, title VII, §7201(b)(1), Nov. 5, 1990, 104 Stat. 1388–334; Pub. L. 103–66, title XIII, §13581(c), Aug. 10, 1993, 107 Stat. 611; Pub. L. 104–193, title I, §110(w), Aug. 22, 1996, 110 Stat. 2175; Pub. L. 104–226, §1(b)(3), Oct. 2, 1996, 110 Stat. 3033; Pub. L. 104–316, title I, §115(g)(2)(B), Oct. 19, 1996, 110 Stat. 3835; Pub. L. 105–34, title X, §1026(b)(2), Aug. 5, 1997, 111 Stat. 925; Pub. L. 105–362, title XIII, §1301(d), Nov. 10, 1998, 112 Stat. 3293; Pub. L. 106–170, title IV, §402(a)(2), Dec. 17, 1999, 113 Stat. 1908; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 111–148, title VI, §6402(b)(2), Mar. 23, 2010, 124 Stat. 756; Pub. L. 111–203, title X, §1082, July 21, 2010, 124 Stat. 2080; Pub. L. 113–295, div. B, title I, §102(d), Dec. 19, 2014, 128 Stat. 4062; Pub. L. 118–104, §2, Oct. 2, 2024, 138 Stat. 1586.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 552(e) of this title, referred to in subsec. (a)(1), was redesignated section 552(f) of this title by section 1802(b) of Pub. L. 99–570.

Section 6103 of the Internal Revenue Code of 1986, referred to in subsec. (a)(8)(B)(iv), (vii), is classified to section 6103 of Title 26, Internal Revenue Code.

Sections 404, 464, and 1137 of the Social Security Act, referred to in subsec. (a)(8)(B)(iv), are classified to sec-

---

[2]So in original. Probably should be "cost-effective."

tions 604, 664, and 1320b–7, respectively, of Title 42, The Public Health and Welfare.

The Achieving a Better Life Experience Act of 2014, referred to in subsec. (a)(8)(B)(x), probably means Pub. L. 113–295, div. B, Dec. 19, 2014, 128 Stat. 4056, known as the Stephen Beck, Jr., Achieving a Better Life Experience Act of 2014 or the Stephen Beck, Jr., ABLE Act of 2014. The Act does not contain a section 3.

For effective date of this section, referred to in subsecs. (k)(2), (5), (7), (l)(2), (3), and (m), see Effective Date note below.

Section 6 of the Privacy Act of 1974, referred to in subsec. (s)(1), is section 6 of Pub. L. 93–579, which was set out below and was repealed by section 6(c) of Pub. L. 100–503.

For classification of the Privacy Act of 1974, referred to in subsec. (s)(4), see Short Title note below.

The Consumer Financial Protection Act of 2010, referred to in subsec. (w), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, which enacted subchapter V (§ 5481 et seq.) of chapter 53 of Title 12, Banks and Banking, and enacted and amended numerous other sections and notes in the Code. For complete classification of this Act to the Code, see Short Title note set out under section 5301 of Title 12 and Tables.

#### CODIFICATION

Section 552a of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2244 of Title 7, Agriculture.

#### AMENDMENTS

2024—Subsec. (b)(11) to (13). Pub. L. 118–104 added par. (11) and redesignated former pars. (11) and (12) as (12) and (13), respectively.

2014—Subsec. (a)(8)(B)(x). Pub. L. 113–295 added cl. (x).

2010—Subsec. (a)(8)(B)(ix). Pub. L. 111–148 added cl. (ix).

Subsec. (w). Pub. L. 111–203 added subsec. (w).

2004—Subsec. (b)(10). Pub. L. 108–271 substituted ''Government Accountability Office'' for ''General Accounting Office''.

1999—Subsec. (a)(8)(B)(viii). Pub. L. 106–170 added cl. (viii).

1998—Subsec. (u)(6), (7). Pub. L. 105–362 redesignated par. (7) as (6), substituted ''paragraph (3)(D)'' for ''paragraphs (3)(D) and (6)'', and struck out former par. (6) which read as follows: ''The Director of the Office of Management and Budget shall, annually during the first 3 years after the date of enactment of this subsection and biennially thereafter, consolidate in a report to the Congress the information contained in the reports from the various Data Integrity Boards under paragraph (3)(D). Such report shall include detailed information about costs and benefits of matching programs that are conducted during the period covered by such consolidated report, and shall identify each waiver granted by a Data Integrity Board of the requirement for completion and submission of a cost-benefit analysis and the reasons for granting the waiver.''

1997—Subsec. (a)(8)(B)(vii). Pub. L. 105–34 added cl. (vii).

1996—Subsec. (a)(8)(B)(iv)(III). Pub. L. 104–193 substituted ''section 404(e), 464,'' for ''section 464''.

Subsec. (a)(8)(B)(v) to (vii). Pub. L. 104–226 inserted ''or'' at end of cl. (v), struck out ''or'' at end of cl. (vi), and struck out cl. (vii) which read as follows: ''matches performed pursuant to section 6103(l)(12) of the Internal Revenue Code of 1986 and section 1144 of the Social Security Act;''.

Subsecs. (b)(12), (m)(2). Pub. L. 104–316 substituted ''3711(e)'' for ''3711(f)''.

1993—Subsec. (a)(8)(B)(vii). Pub. L. 103–66 added cl. (vii).

1990—Subsec. (p). Pub. L. 101–508 amended subsec. (p) generally, restating former pars. (1) and (3) as par. (1), adding provisions relating to Data Integrity Boards, and restating former pars. (2) and (4) as (2) and (3), respectively.

1988—Subsec. (a)(8) to (13). Pub. L. 100–503, § 5, added pars. (8) to (13).

Subsec. (e)(12). Pub. L. 100–503, § 3(a), added par. (12).

Subsec. (f). Pub. L. 100–503, § 7, substituted ''biennially'' for ''annually'' in last sentence.

Subsecs. (o) to (q). Pub. L. 100–503, § 2(2), added subsecs. (o) to (q). Former subsecs. (o) to (q) redesignated (r) to (t), respectively.

Subsec. (r). Pub. L. 100–503, § 3(b), inserted ''and matching programs'' in heading and amended text generally. Prior to amendment, text read as follows: ''Each agency shall provide adequate advance notice to Congress and the Office of Management and Budget of any proposal to establish or alter any system of records in order to permit an evaluation of the probable or potential effect of such proposal on the privacy and other personal or property rights of individuals or the disclosure of information relating to such individuals, and its effect on the preservation of the constitutional principles of federalism and separation of powers.''

Pub. L. 100–503, § 2(1), redesignated former subsec. (o) as (r).

Subsec. (s). Pub. L. 100–503, § 8, substituted ''Biennial'' for ''Annual'' in heading, ''biennially submit'' for ''annually submit'' in introductory provisions, ''preceding 2 years'' for ''preceding year'' in par. (1), and ''such years'' for ''such year'' in par. (2).

Pub. L. 100–503, § 2(1), redesignated former subsec. (p) as (s).

Subsec. (t). Pub. L. 100–503, § 2(1), redesignated former subsec. (q) as (t).

Subsec. (u). Pub. L. 100–503, § 4, added subsec. (u).

Subsec. (v). Pub. L. 100–503, § 6(a), added subsec. (v).

1984—Subsec. (b)(6). Pub. L. 98–497, § 107(g)(1), substituted ''National Archives and Records Administration'' for ''National Archives of the United States'', and ''Archivist of the United States or the designee of the Archivist'' for ''Administrator of General Services or his designee''.

Subsec. (l)(1). Pub. L. 98–497, § 107(g)(2), substituted ''Archivist of the United States'' for ''Administrator of General Services'' in two places.

Subsec. (q). Pub. L. 98–477 designated existing provisions as par. (1) and added par. (2).

1983—Subsec. (b)(12). Pub. L. 97–452 substituted ''section 3711(f) of title 31'' for ''section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))''.

Subsec. (m)(2). Pub. L. 97–452 substituted ''section 3711(f) of title 31'' for ''section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))''.

1982—Subsec. (b)(12). Pub. L. 97–365, § 2(a), added par. (12).

Subsec. (e)(4). Pub. L. 97–375, § 201(a), substituted ''upon establishment or revision'' for ''at least annually'' after ''Federal Register''.

Subsec. (m). Pub. L. 97–365, § 2(b), designated existing provisions as par. (1) and added par. (2).

Subsec. (p). Pub. L. 97–375, § 201(b), substituted provisions requiring annual submission of a report by the President to the Speaker of the House and President pro tempore of the Senate relating to the Director of the Office of Management and Budget, individual rights of access, changes or additions to systems of records, and other necessary or useful information, for provisions which had directed the President to submit to the Speaker of the House and the President of the Senate, by June 30 of each calendar year, a consolidated report, separately listing for each Federal agency the number of records contained in any system of records which were exempted from the application of this section under the provisions of subsections (j) and (k) of this section during the preceding calendar year, and the reasons for the exemptions, and such other information as indicate efforts to administer fully this section.

1975—Subsec. (g)(5). Pub. L. 94–183 substituted ''to September 27, 1975'' for ''to the effective date of this section''.

**A32**

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Committee on Governmental Affairs of Senate changed to Committee on Homeland Security and Governmental Affairs of Senate, effective Jan. 4, 2005, by Senate Resolution No. 445, One Hundred Eighth Congress, Oct. 9, 2004.

Committee on Government Operations of House of Representatives treated as referring to Committee on Government Reform and Oversight of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Government Reform and Oversight of House of Representatives changed to Committee on Government Reform of House of Representatives by House Resolution No. 5, One Hundred Sixth Congress, Jan. 6, 1999. Committee on Government Reform of House of Representatives changed to Committee on Oversight and Government Reform of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007. Committee on Oversight and Government Reform of House of Representatives changed to Committee on Oversight and Reform of House of Representatives by House Resolution No. 6, One Hundred Sixteenth Congress, Jan. 9, 2019. Committee on Oversight and Reform of House of Representatives changed to Committee on Oversight and Accountability of House of Representatives by House Resolution No. 5, One Hundred Eighteenth Congress, Jan. 9, 2023.

#### EFFECTIVE DATE OF 2014 AMENDMENT

Pub. L. 113–295, div. B, title I, § 102(f)(1), Dec. 19, 2014, 128 Stat. 4062, provided that: ''The amendments made by this section [enacting section 529A of Title 26, Internal Revenue Code, and amending this section, section 5517 of Title 12, Banks and Banking, and sections 26, 877A, 4965, 4973, and 6693 of Title 26] shall apply to taxable years beginning after December 31, 2014.''

#### EFFECTIVE DATE OF 2010 AMENDMENT

Pub. L. 111–203, title X, § 1082, July 21, 2010, 124 Stat. 2080, provided that the amendment made by section 1082 is effective on July 21, 2010.

Pub. L. 111–203, title X, § 1100H, July 21, 2010, 124 Stat. 2113, provided that: ''Except as otherwise provided in this subtitle [subtitle H (§§ 1081–1100H) of title X of Pub. L. 111–203, see Tables for classification] and the amendments made by this subtitle, this subtitle and the amendments made by this subtitle, other than sections 1081 [amending section 8G of Pub. L. 95–452, formerly set out in the Appendix to this title, and enacting provisions set out as a note under section 8G of Pub. L. 95–452] and 1082 [amending this section and enacting provisions set out as a note under this section], shall become effective on the designated transfer date.''

[The term ''designated transfer date'' is defined in section 5481(9) of Title 12, Banks and Banking, as the date established under section 5582 of Title 12, which is July 21, 2011.]

#### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–170 applicable to individuals whose period of confinement in an institution commences on or after the first day of the fourth month beginning after December 1999, see section 402(a)(4) of Pub. L. 106–170, set out as a note under section 402 of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–34 applicable to levies issued after Aug. 5, 1997, see section 1026(c) of Pub. L. 105–34, set out as a note under section 6103 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–66 effective Jan. 1, 1994, see section 13581(d) of Pub. L. 103–66, set out as a note under section 1395y of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–503, § 10, Oct. 18, 1988, 102 Stat. 2514, as amended by Pub. L. 101–56, § 2, July 19, 1989, 103 Stat. 149, provided that:

''(a) IN GENERAL.—Except as provided in subsections (b) and (c), the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall take effect 9 months after the date of enactment of this Act [Oct. 18, 1988].

''(b) EXCEPTIONS.—The amendment made by sections 3(b), 6, 7, and 8 of this Act [amending this section and repealing provisions set out as a note below] shall take effect upon enactment.

''(c) EFFECTIVE DATE DELAYED FOR EXISTING PROGRAMS.—In the case of any matching program (as defined in section 552a(a)(8) of title 5, United States Code, as added by section 5 of this Act) in operation before June 1, 1989, the amendments made by this Act (other than the amendments described in subsection (b)) shall take effect January 1, 1990, if—

''(1) such matching program is identified by an agency as being in operation before June 1, 1989; and

''(2) such identification is—

''(A) submitted by the agency to the Committee on Governmental Affairs of the Senate, the Committee on Government Operations of the House of Representatives, and the Office of Management and Budget before August 1, 1989, in a report which contains a schedule showing the dates on which the agency expects to have such matching program in compliance with the amendments made by this Act, and

''(B) published by the Office of Management and Budget in the Federal Register, before September 15, 1989.''

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–497 effective Apr. 1, 1985, see section 301 of Pub. L. 98–497, set out as a note under section 2102 of Title 44, Public Printing and Documents.

#### EFFECTIVE DATE

Pub. L. 93–579, § 8, Dec. 31, 1974, 88 Stat. 1910, provided that: ''The provisions of this Act [enacting this section and provisions set out as notes under this section] shall be effective on and after the date of enactment [Dec. 31, 1974], except that the amendments made by sections 3 and 4 [enacting this section and amending analysis preceding section 500 of this title] shall become effective 270 days following the day on which this Act is enacted.''

#### SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–508, title VII, § 7201(a), Nov. 5, 1990, 104 Stat. 1388–334, provided that: ''This section [amending this section and enacting provisions set out as notes below] may be cited as the 'Computer Matching and Privacy Protection Amendments of 1990'.''

#### SHORT TITLE OF 1989 AMENDMENT

Pub. L. 101–56, § 1, July 19, 1989, 103 Stat. 149, provided that: ''This Act [amending section 10 of Pub. L. 100–503,

set out as a note above] may be cited as the 'Computer Matching and Privacy Protection Act Amendments of 1989'.''

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–503, § 1, Oct. 18, 1988, 102 Stat. 2507, provided that: ''This Act [amending this section, enacting provisions set out as notes above and below, and repealing provisions set out as a note below] may be cited as the 'Computer Matching and Privacy Protection Act of 1988'.''

SHORT TITLE OF 1974 AMENDMENT

Pub. L. 93–579, § 1, Dec. 31, 1974, 88 Stat. 1896, provided: ''That this Act [enacting this section and provisions set out as notes under this section] may be cited as the 'Privacy Act of 1974'.''

SHORT TITLE

This section is popularly known as the ''Privacy Act'' and the ''Privacy Act of 1974''.

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of reporting provisions in subsec. (s) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 31 of House Document No. 103–7.

DELEGATION OF FUNCTIONS

Functions of Director of Office of Management and Budget under this section delegated to Administrator for Office of Information and Regulatory Affairs by section 3 of Pub. L. 96–511, Dec. 11, 1980, 94 Stat. 2825, set out as a note under section 3503 of Title 44, Public Printing and Documents.

OMB GUIDANCE ON ELECTRONIC CONSENT AND ACCESS FORMS

Pub. L. 116–50, § 3, Aug. 22, 2019, 133 Stat. 1073, provided that:

''(a) GUIDANCE.—Not later than 1 year after the date of the enactment of this Act [Aug. 22, 2019], the Director shall issue guidance that does the following:

''(1) Requires each agency to accept electronic identity proofing and authentication processes for the purposes of allowing an individual to provide prior written consent for the disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(2) Creates a template for electronic consent and access forms and requires each agency to post the template on the agency website and to accept the forms from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(3) Requires each agency to accept the electronic consent and access forms described in paragraph (2) from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records to another entity, including a congressional office, in accordance with section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) [of such title].

''(b) AGENCY COMPLIANCE.—Each agency shall comply with the guidance issued pursuant to subsection (a) not later than 1 year after the date on which such guidance is issued.

''(c) DEFINITIONS.—In this section:

''(1) AGENCY; INDIVIDUAL; RECORD.—The terms 'agency', 'individual', and 'record' have the meanings given those terms in section 552a(a) of title 5, United States Code.

''(2) DIRECTOR.—The term 'Director' means the Director of the Office of Management and Budget.''

EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES

Pub. L. 114–126, Feb. 24, 2016, 130 Stat. 282, provided that:

''SECTION 1. SHORT TITLE.

''This Act may be cited as the 'Judicial Redress Act of 2015'.

''SEC. 2. EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES.

''(a) CIVIL ACTION; CIVIL REMEDIES.—With respect to covered records, a covered person may bring a civil action against an agency and obtain civil remedies, in the same manner, to the same extent, and subject to the same limitations, including exemptions and exceptions, as an individual may bring and obtain with respect to records under—

''(1) section 552a(g)(1)(D) of title 5, United States Code, but only with respect to disclosures intentionally or willfully made in violation of section 552a(b) of such title; and

''(2) subparagraphs (A) and (B) of section 552a(g)(1) of title 5, United States Code, but such an action may only be brought against a designated Federal agency or component.

''(b) EXCLUSIVE REMEDIES.—The remedies set forth in subsection (a) are the exclusive remedies available to a covered person under this section.

''(c) APPLICATION OF THE PRIVACY ACT WITH RESPECT TO A COVERED PERSON.—For purposes of a civil action described in subsection (a), a covered person shall have the same rights, and be subject to the same limitations, including exemptions and exceptions, as an individual has and is subject to under section 552a of title 5, United States Code, when pursuing the civil remedies described in paragraphs (1) and (2) of subsection (a).

''(d) DESIGNATION OF COVERED COUNTRY.—

''(1) IN GENERAL.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Secretary of Homeland Security, designate a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' for purposes of this section if—

''(A)(i) the country or regional economic integration organization, or member country of such organization, has entered into an agreement with the United States that provides for appropriate privacy protections for information shared for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses; or

''(ii) the Attorney General has determined that the country or regional economic integration organization, or member country of such organization, has effectively shared information with the United States for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses and has appropriate privacy protections for such shared information;

''(B) the country or regional economic integration organization, or member country of such organization, permits the transfer of personal data for commercial purposes between the territory of that country or regional economic organization and the territory of the United States, through an agreement with the United States or otherwise; and

''(C) the Attorney General has certified that the policies regarding the transfer of personal data for commercial purposes and related actions of the country or regional economic integration organization, or member country of such organization, do not materially impede the national security interests of the United States.

''(2) REMOVAL OF DESIGNATION.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Sec-

retary of Homeland Security, revoke the designation of a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' if the Attorney General determines that such designated 'covered country'—

"(A) is not complying with the agreement described under paragraph (1)(A)(i);

"(B) no longer meets the requirements for designation under paragraph (1)(A)(ii);

"(C) fails to meet the requirements under paragraph (1)(B);

"(D) no longer meets the requirements for certification under paragraph (1)(C); or

"(E) impedes the transfer of information (for purposes of reporting or preventing unlawful activity) to the United States by a private entity or person.

"(e) DESIGNATION OF DESIGNATED FEDERAL AGENCY OR COMPONENT.—

"(1) IN GENERAL.—The Attorney General shall determine whether an agency or component thereof is a 'designated Federal agency or component' for purposes of this section. The Attorney General shall not designate any agency or component thereof other than the Department of Justice or a component of the Department of Justice without the concurrence of the head of the relevant agency, or of the agency to which the component belongs.

"(2) REQUIREMENTS FOR DESIGNATION.—The Attorney General may determine that an agency or component of an agency is a 'designated Federal agency or component' for purposes of this section, if—

"(A) the Attorney General determines that information exchanged by such agency with a covered country is within the scope of an agreement referred to in subsection (d)(1)(A); or

"(B) with respect to a country or regional economic integration organization, or member country of such organization, that has been designated as a 'covered country' under subsection (d)(1)(B), the Attorney General determines that designating such agency or component thereof is in the law enforcement interests of the United States.

"(f) FEDERAL REGISTER REQUIREMENT; NONREVIEWABLE DETERMINATION.—The Attorney General shall publish each determination made under subsections (d) and (e). Such determination shall not be subject to judicial or administrative review.

"(g) JURISDICTION.—The United States District Court for the District of Columbia shall have exclusive jurisdiction over any claim arising under this section.

"(h) DEFINITIONS.—In this Act:

"(1) AGENCY.—The term 'agency' has the meaning given that term in section 552(f) of title 5, United States Code.

"(2) COVERED COUNTRY.—The term 'covered country' means a country or regional economic integration organization, or member country of such organization, designated in accordance with subsection (d).

"(3) COVERED PERSON.—The term 'covered person' means a natural person (other than an individual) who is a citizen of a covered country.

"(4) COVERED RECORD.—The term 'covered record' has the same meaning for a covered person as a record has for an individual under section 552a of title 5, United States Code, once the covered record is transferred—

"(A) by a public authority of, or private entity within, a country or regional economic organization, or member country of such organization, which at the time the record is transferred is a covered country; and

"(B) to a designated Federal agency or component for purposes of preventing, investigating, detecting, or prosecuting criminal offenses.

"(5) DESIGNATED FEDERAL AGENCY OR COMPONENT.—The term 'designated Federal agency or component' means a Federal agency or component of an agency designated in accordance with subsection (e).

"(6) INDIVIDUAL.—The term 'individual' has the meaning given that term in section 552a(a)(2) of title 5, United States Code.

"(i) PRESERVATION OF PRIVILEGES.—Nothing in this section shall be construed to waive any applicable privilege or require the disclosure of classified information. Upon an agency's request, the district court shall review in camera and ex parte any submission by the agency in connection with this subsection.

"(j) EFFECTIVE DATE.—This Act shall take effect 90 days after the date of the enactment of this Act [Feb. 24, 2016]."

PUBLICATION OF GUIDANCE UNDER SUBSECTION (p)(1)(A)(ii)

Pub. L. 101–508, title VII, §7201(b)(2), Nov. 5, 1990, 104 Stat. 1388–334, provided that: "Not later than 90 days after the date of the enactment of this Act [Nov. 5, 1990], the Director of the Office of Management and Budget shall publish guidance under subsection (p)(1)(A)(ii) of section 552a of title 5, United States Code, as amended by this Act."

LIMITATION ON APPLICATION OF VERIFICATION REQUIREMENT

Pub. L. 101–508, title VII, §7201(c), Nov. 5, 1990, 104 Stat. 1388–335, provided that: "Section 552a(p)(1)(A)(ii)(II) of title 5, United States Code, as amended by section 2 [probably means section 7201(b)(1) of Pub. L. 101–508], shall not apply to a program referred to in paragraph (1), (2), or (4) of section 1137(b) of the Social Security Act (42 U.S.C. 1320b–7), until the earlier of—

"(1) the date on which the Data Integrity Board of the Federal agency which administers that program determines that there is not a high degree of confidence that information provided by that agency under Federal matching programs is accurate; or

"(2) 30 days after the date of publication of guidance under section 2(b) [probably means section 7201(b)(2) of Pub. L. 101–508, set out as a note above]."

EFFECTIVE DATE DELAYED FOR CERTAIN EDUCATION BENEFITS COMPUTER MATCHING PROGRAMS

Pub. L. 101–366, title II, §206(d), Aug. 15, 1990, 104 Stat. 442, provided that:

"(1) In the case of computer matching programs between the Department of Veterans Affairs and the Department of Defense in the administration of education benefits programs under chapters 30 and 32 of title 38 and chapter 106 of title 10, United States Code, the amendments made to section 552a of title 5, United States Code, by the Computer Matching and Privacy Protection Act of 1988 [Pub. L. 100–503] (other than the amendments made by section 10(b) of that Act) [see Effective Date of 1988 Amendment note above] shall take effect on October 1, 1990.

"(2) For purposes of this subsection, the term 'matching program' has the same meaning provided in section 552a(a)(8) of title 5, United States Code."

IMPLEMENTATION GUIDANCE FOR 1988 AMENDMENTS

Pub. L. 100–503, §6(b), Oct. 18, 1988, 102 Stat. 2513, required the Director, pursuant to section 552a(v) of this title, to develop guidelines and regulations for the use of agencies in implementing amendments made by Pub. L. 100–503 not later than 8 months after Oct. 18, 1988.

CONSTRUCTION OF 1988 AMENDMENTS

Pub. L. 100–503, §9, Oct. 18, 1988, 102 Stat. 2514, provided that: "Nothing in the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall be construed to authorize—

"(1) the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies;

"(2) the direct linking of computerized systems of records maintained by Federal agencies;

"(3) the computer matching of records not otherwise authorized by law; or

"(4) the disclosure of records for computer matching except to a Federal, State, or local agency."

CONGRESSIONAL FINDINGS AND STATEMENT OF PURPOSE

Pub. L. 93–579, §2, Dec. 31, 1974, 88 Stat. 1896, provided that:

''(a) The Congress finds that—

''(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies;

''(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;

''(3) the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;

''(4) the right to privacy is a personal and fundamental right protected by the Constitution of the United States; and

''(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.

''(b) The purpose of this Act [enacting this section and provisions set out as notes under this section] is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

''(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies;

''(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent;

''(3) permit an individual to gain access to information pertaining to him in Federal agency records, to have a copy made of all or any portion thereof, and to correct or amend such records;

''(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information;

''(5) permit exemptions from the requirements with respect to records provided in this Act only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority; and

''(6) be subject to civil suit for any damages which occur as a result of willful or intentional action which violates any individual's rights under this Act.''

PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §5, Dec. 31, 1974, 88 Stat. 1905, as amended by Pub. L. 95–38, June 1, 1977, 91 Stat. 179, which established the Privacy Protection Study Commission and provided that the Commission study data banks, automated data processing programs and information systems of governmental, regional and private organizations to determine standards and procedures in force for protection of personal information, that the Commission report to the President and Congress the extent to which requirements and principles of section 552a of title 5 should be applied to the information practices of those organizations, and that it make other legislative recommendations to protect the privacy of individuals while meeting the legitimate informational needs of government and society, ceased to exist on September 30, 1977, pursuant to section 5(g) of Pub. L. 93–579.

GUIDELINES AND REGULATIONS FOR MAINTENANCE OF PRIVACY AND PROTECTION OF RECORDS OF INDIVIDUALS

Pub. L. 93–579, §6, Dec. 31, 1974, 88 Stat. 1909, which provided that the Office of Management and Budget shall develop guidelines and regulations for use of agencies in implementing provisions of this section and provide continuing assistance to and oversight of the implementation of the provisions of such section by agencies, was repealed by Pub. L. 100–503, §6(c), Oct. 18, 1988, 102 Stat. 2513.

DISCLOSURE OF SOCIAL SECURITY NUMBER

Pub. L. 93–579, §7, Dec. 31, 1974, 88 Stat. 1909, provided that:

''(a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

''(2) the [The] provisions of paragraph (1) of this subsection shall not apply with respect to—

''(A) any disclosure which is required by Federal statute, or

''(B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

''(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.''

AUTHORIZATION OF APPROPRIATIONS TO PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §9, Dec. 31, 1974, 88 Stat. 1910, as amended by Pub. L. 94–394, Sept. 3, 1976, 90 Stat. 1198, authorized appropriations for the period beginning July 1, 1975, and ending on September 30, 1977.

**Executive Documents**

EX. ORD. NO. 9397. NUMBERING SYSTEM FOR FEDERAL ACCOUNTS RELATING TO INDIVIDUAL PERSONS

Ex. Ord. No. 9397, Nov. 22, 1943, 8 F.R. 16095, as amended by Ex. Ord. No. 13478, §2, Nov. 18, 2008, 73 F.R. 70239, provided:

WHEREAS certain Federal agencies from time to time require in the administration of their activities a system of numerical identification of accounts of individual persons; and

WHEREAS some seventy million persons have heretofore been assigned account numbers pursuant to the Social Security Act; and

WHEREAS a large percentage of Federal employees have already been assigned account numbers pursuant to the Social Security Act; and

WHEREAS it is desirable in the interest of economy and orderly administration that the Federal Government move towards the use of a single, unduplicated numerical identification system of accounts and avoid the unnecessary establishment of additional systems:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States, it is hereby ordered as follows:

1. Hereafter any Federal department, establishment, or agency may, whenever the head thereof finds it advisable to establish a new system of permanent account numbers pertaining to individual persons, utilize the Social Security Act account numbers assigned pursuant to title 20, section 422.103 of the Code of Federal Regulations and pursuant to paragraph 2 of this order.

2. The Social Security Administration shall provide for the assignment of an account number to each person who is required by any Federal agency to have such a number but who has not previously been assigned such number by the Administration. The Administration may accomplish this purpose by (a) assigning such numbers to individual persons, (b) assigning blocks of numbers to Federal agencies for reassignment to indi-

vidual persons, or (c) making such other arrangements for the assignment of numbers as it may deem appropriate.

3. The Social Security Administration shall furnish, upon request of any Federal agency utilizing the numerical identification system of accounts provided for in this order, the account number pertaining to any person with whom such agency has an account or the name and other identifying data pertaining to any account number of any such person.

4. The Social Security Administration and each Federal agency shall maintain the confidential character of information relating to individual persons obtained pursuant to the provisions of this order.

5. There shall be transferred to the Social Security Administration, from time to time, such amounts as the Director of the Office of Management and Budget shall determine to be required for reimbursement by any Federal agency for the services rendered by the Administration pursuant to the provisions of this order.

6. This order shall be implemented in accordance with applicable law and subject to the availability of appropriations.

7. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers, employees, or agents, or any other person.

8. This order shall be published in the Federal Register.

CLASSIFIED NATIONAL SECURITY INFORMATION

For provisions relating to a response to a request for information under this section when the fact of its existence or nonexistence is itself classified or when it was originally classified by another agency, see Ex. Ord. No. 13526, § 3.6, Dec. 29, 2009, 75 F.R. 718, set out as a note under section 3161 of Title 50, War and National Defense.

## § 552b. Open meetings

(a) For purposes of this section—

(1) the term ''agency'' means any agency, as defined in section 552(e)[1] of this title, headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency;

(2) the term ''meeting'' means the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business, but does not include deliberations required or permitted by subsection (d) or (e); and

(3) the term ''member'' means an individual who belongs to a collegial body heading an agency.

(b) Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency shall be open to public observation.

(c) Except in a case where the agency finds that the public interest requires otherwise, the second sentence of subsection (b) shall not apply to any portion of an agency meeting, and the requirements of subsections (d) and (e) shall not

[1] See References in Text note below.

apply to any information pertaining to such meeting otherwise required by this section to be disclosed to the public, where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to—

(1) disclose matters that are (A) specifically authorized under criteria established by an Executive order to be kept secret in the interests of national defense or foreign policy and (B) in fact properly classified pursuant to such Executive order;

(2) relate solely to the internal personnel rules and practices of an agency;

(3) disclose matters specifically exempted from disclosure by statute (other than section 552 of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(4) disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) involve accusing any person of a crime, or formally censuring any person;

(6) disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy;

(7) disclose investigatory records compiled for law enforcement purposes, or information which if written would be contained in such records, but only to the extent that the production of such records or information would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

(8) disclose information contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions;

(9) disclose information the premature disclosure of which would—

(A) in the case of an agency which regulates currencies, securities, commodities, or financial institutions, be likely to (i) lead to significant financial speculation in currencies, securities, or commodities, or (ii) significantly endanger the stability of any financial institution; or

(B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action,

except that subparagraph (B) shall not apply in any instance where the agency has already disclosed to the public the content or nature of its proposed action, or where the agency is required by law to make such disclosure on its



# FEDERAL RULES

## OF

## EVIDENCE

––––––––

DECEMBER 1, 2019



Printed for the use
of

## THE COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

**A38**

(As amended Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE II. JUDICIAL NOTICE

### Rule 201. Judicial Notice of Adjudicative Facts

(a) SCOPE. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

(b) KINDS OF FACTS THAT MAY BE JUDICIALLY NOTICED. The court may judicially notice a fact that is not subject to reasonable dispute because it:

 (1) is generally known within the trial court's territorial jurisdiction; or

 (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) TAKING NOTICE. The court:

 (1) may take judicial notice on its own; or

 (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(d) TIMING. The court may take judicial notice at any stage of the proceeding.

(e) OPPORTUNITY TO BE HEARD. On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

(f) INSTRUCTING THE JURY. In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE III. PRESUMPTIONS IN CIVIL CASES

### Rule 301. Presumptions in Civil Cases Generally

In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

### Rule 302. Applying State Law to Presumptions in Civil Cases

In a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision.

(As amended Apr. 26, 2011, eff. Dec. 1, 2011.)

## ARTICLE IV. RELEVANCE AND ITS LIMITS

### Rule 401. Test for Relevant Evidence

Evidence is relevant if:

 (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and



# FEDERAL RULES

## OF

# CIVIL PROCEDURE

————

DECEMBER 1, 2025



Printed for the use
of

## THE COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

**A40**

official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

(3) *United States Officers or Employees Sued in an Individual Capacity.* A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

(4) *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

> (A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or
>
> (B) if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

(b) HOW TO PRESENT DEFENSES. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

> (1) lack of subject-matter jurisdiction;
> (2) lack of personal jurisdiction;
> (3) improper venue;
> (4) insufficient process;
> (5) insufficient service of process;
> (6) failure to state a claim upon which relief can be granted; and
> (7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

(c) MOTION FOR JUDGMENT ON THE PLEADINGS. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

(d) RESULT OF PRESENTING MATTERS OUTSIDE THE PLEADINGS. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

(e) MOTION FOR A MORE DEFINITE STATEMENT. A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

**A41**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

| 104TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
| 1st Session | | 104–99 |

# PAPERWORK REDUCTION ACT OF 1995

APRIL 3, 1995.—Ordered to be printed

Mr. CLINGER, from the committee of conference,
submitted the following

# CONFERENCE REPORT

[To accompany S. 244]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 244), to further the goals of the Paperwork Reduction Act to have Federal agencies become more responsible and publicly accountable for reducing the burden of Federal paperwork on the public, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

### SECTION 1. SHORT TITLE.

*This Act may be cited as the "Paperwork Reduction Act of 1995".*

### SEC. 2. COORDINATION OF FEDERAL INFORMATION POLICY.

*Chapter 35 of title 44, United States Code, is amended to read as follows:*

## "CHAPTER 35—COORDINATION OF FEDERAL INFORMATION POLICY

"Sec.
"3501. Purposes.
"3502. Definitions.
"3503. Office of Information and Regulatory Affairs.
"3504. Authority and functions of Director.
"3505. Assignment of tasks and deadlines.
"3506. Federal agency responsibilities.

99–006

**A42**

27. Public Information collection activities; submission to Director; approval and delegation—Improved "Fast Track" Procedures.

The Senate bill amends section 3507(j) of existing law to provide additional flexibility in the so-called "Fast Track" review process, under a proposed collection of information can be reviewed on a very expedited schedule without any opportunity for public notice or comment prior to approval by the OMB Director.

The House amendment reflects existing law.

The House recedes.

The conferees note that no instance has been identified in the 15 years of experience under the Act in which its "Fast Track" review procedures have not been made available to an agency under the current version of section 3507(j), or the proposed collection of information has not been cleared on a schedule that completely accommodated the agency's exigent circumstances.

28. Determination of necessity for information; hearing.

The Senate bill modifies section 3508 of the Act, which establishes the fundamental standard used by the Director in determining whether to approve a collection of information being proposed by an agency.

The House amendment reflects existing law.

The Senate recedes.

29. Establishment and operation of Government Information Locator Service—Specific exclusion for CIA "operational files".

The Senate bill includes a provision which provides for the establishment and operation of the Government Information Locator Service (GILS). The Senate provisions includes an explicit exclusion from GILS for "operational files" as defined in the Central Intelligence Agency Information Act.

The House amendment contains an identical provision regarding GILS, but does not include the specific exclusion for the CIA's "operational files".

The House recedes.

30. Public Protection.

The Senate bill contains a provision which changes the Act's current "public protection" provision by requiring a collection of information subject to the Act display a notice that a person is not required to respond to the collection of information unless it displays a control number which is valid.

The House amendment contains a provision which clarifies and strengthens the Act's current "public protection" provision by enabling a person to assert this protection at any time during an agency administrative process or any subsequent judicial review of an agency action involving a penalty.

The Senate recedes with an amendment. The conference agreement clarifies and strengthens the Act's "public protection" provision by explicitly providing that the protection provided by the section may be asserted or raised by a person in the form of a complete defense, bar or other manner, at any time during a agency administrative process or any subsequent judicial review. The protection provided by the section applies if the agency fails to display a valid control number, or inform the person that they are not re-